FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

99 JUL 23  AM 8: 58

U.S. DISTRICT COURT
N.D. OF ALABAMA

MADE IN THE USA FOUNDATION )
UNITED STEEL WORKERS OF )
AMERICA, LOCAL 12L UNITED STEEL )
WORKERS, FRANK VICKERS, JAMES )
L. BOWEN, and DAVID WILSON, )
)
    Plaintiffs, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
    Defendant. )
)

**ENTERED**

'JUL 2 3 1999

Case No. CV-98-PT-1794 M

### MEMORANDUM OPINION

This cause comes to be heard on a motion to dismiss filed by the defendant on December 21,

1998 and on the respective motions for summary judgment filed by the plaintiffs on March 19, 1999

and by the defendant on April 19, 1999. The parties have acknowledged that there are no genuine

issues of fact and that the only issues are issues of law. This court heard recorded oral arguments on

May 17, 1999. The parties acknowledged at that hearing that there is no need for any further hearing

before this court, evidentiary or otherwise.[1]

---

[1]THE COURT: "[M]y understanding is that where we stand procedurally is this . . . all
parties agree and recognize that there are no genuine issues of fact; that the only issues are legal
issues . . . all the decisions which are due to be made, either issues of standing, issues of merit,
whatever issues will be deemed to be submitted to the court without further evidentiary hearing or
otherwise. Does everybody agree with that?"
    PLAINTIFFS' COUNSEL: "That's the plaintiffs' understanding."
    GOVERNMENT'S COUNSEL: "That's correct, your honor."
    THE COURT: "In other words, this is the last train out of this station, agreed?"
    PLAINTIFFS' COUNSEL: "Agreed."
    GOVERNMENT'S COUNSEL: "Agreed."



## I. Introduction and Summary of the Parties' Positions

In 1990 the United States, Mexico and Canada initiated negotiations with the intention of creating a "free trade zone" through the elimination or reduction of tariffs and other barriers to trade. After two years of negotiations, the leaders of the three countries signed the North American Free Trade Agreement ("NAFTA" or the "Agreement") on December 17, 1992. Congress approved and implemented NAFTA on December 8, 1993 with the passage of NAFTA Implementation Act ("Implementation Act"),[2] which was passed by a vote of 234 to 200 in the House[3] and 61 to 38 in the Senate.[4] The Implementation Act served two purposes, to "approve" NAFTA and to provide a series of laws to "locally" enforce NAFTA's provisions.[5] The enactment of the Implementation Act brought to a close a lengthy period of rancorous debate over NAFTA. The instant suit seeks to reopen that debate by pulling back NAFTA's coat and demonstrating that the Agreement and Implementation Act stand on sand rather than on firm Constitutional ground. Brought to bear in this case is an almost century-long bout of Constitutional theorizing about whether the Treaty Clause, contained in Article II, Section 2 of the United States Constitution (the "Treaty Clause"), creates the exclusive means of making certain types of international agreements.

Neither NAFTA nor the Implementation Act were subjected to the procedures outlined in the Treaty Clause. The President purportedly negotiated and concluded NAFTA pursuant to his constitutional responsibility for conducting the foreign affairs of the United States and in accordance with the Omnibus Trade and Competitiveness Act of 1988, 19 U.S.C. § 2901, et seq. ("Trade Act of 1988"), and the Trade Act of 1974, 19 U.S.C. § 2101, et seq., ("Trade Act of 1974"), under the

---

[2] Pub. L. No. 103-182, 107 Stat. 2057 (1993), codified at 19 U.S.C. §§ 3301-3473. Some of this court's references to "NAFTA" will be joint references to NAFTA and to the Implementation Act.

[3] 139 Cong. Rec. H10,048 (daily ed. Nov. 17, 1993).

[4] 139 Cong. Rec. S16,712-13 (daily ed. Nov. 20, 1993).

[5] See 107 Stat. 2057, 2061-62, codified at 19 U.S.C. § 3311.

so-called "fast track" procedure. Congress then approved and implemented NAFTA by enacting the Implementation Act, allegedly pursuant to its power to legislate in the areas of tariffs and domestic and foreign commerce.

The plaintiffs contend that this failure to go through the Article II, Section 2, prerequisites renders the Agreement and, apparently, the Implementation Act, unconstitutional. The Government denies this, arguing, first, that this court has no Article III jurisdiction over the instant question because the plaintiffs lack standing to bring this action and also because the plaintiffs' claims present a non-justiciable political question and, second, that NAFTA and the Implementation Act are not in violation of the Constitution.

The issues have been exceedingly well-briefed and well-argued by both sides. As the Romans might have said, this court is now charged with finding *veritas* from *toto caelo* positions. This court has been supplied with a variety of ingredients from the parties, academic pundits, voices from the past, caselaw extrapolations and other sources from which a judicial chef can create any desired Constitutional pottage. The issues are relatively easy to state, but are more difficult to resolve.

The issues are the following:

(1)     Do the individual plaintiffs have standing to bring this action?

(2)     Do plaintiffs Made in the U.S.A. Foundation, United Steel Workers of America and Local 12L United Steel Workers have standing to bring this action?

(3)     Does the political question doctrine preclude jurisdiction of this court as to all plaintiffs and all claims?

(4)     Do NAFTA and the Implementation Act constitute a "treaty" as contemplated by Article II, Section 2 of the Constitution?

(5)     Even if NAFTA and the Implementation Act constitute a "treaty" as contemplated by Article II, Section 2 of the Constitution, was the making and implementation of NAFTA authorized under other provisions of the Constitution?

The only certitude established by the parties through their briefs and oral arguments is that there is

no certitude with regard to any of the issues.

Remarkably, in the over two hundred years of this nation, the Supreme Court of the United States has not specifically and definitively decided the principles applicable to issues (4) and (5). I will discuss the issues in the order stated, except that it will not be possible to totally separate the discussion of the principles applicable to the various issues, because the issues are intertwined. There may be some duplication of discussion. I will, however, reach separate conclusions as to these intertwined issues. In my discussion I will summarize and emphasize the arguments of the parties. I am well aware that this court lacks both infallibility and finality and that any decisions I reach will likely be ephemeral. For this reason I wish to give full vent to the parties' positions as well as reach my own conclusions. Actual quotes from cases, documents, treatises, articles, etc. as stated by the parties are adopted by the court unless otherwise stated.

## II. Standing

For the purposes of the standing analysis the plaintiffs can be divided into two distinct groups: (1) the "voter plaintiffs," consisting of those plaintiffs who have brought claims in their individual capacities and (2) the "institutional plaintiffs," which include the Made in the USA Foundation, the United Steelworkers of America, and Local 12L United Steel Workers. The Government asserts that both the institutional and voter plaintiffs lack standing to bring their claims. Although the standing arguments differ somewhat with respect to each of the two sets of plaintiffs, the basic principles of the standing analysis, as outlined by the Supreme Court, apply to both.

"While the Constitution of the United States divides all power conferred upon the Federal Government into 'legislative Powers,' '[t]he executive Power,' and '[t]he judicial Power,' it does not attempt to define those terms."[6] The Constitution clearly "limits the jurisdiction of federal courts to 'Cases' and 'Controversies' . . ."[7] The Supreme Court has stated that, "No principle is more

---

[6] Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992).

[7] Id.

fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[8] As stated in Allen v. Wright, 468 U.S. 737, 750 (1984), "the case or controversy requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."

"One of the landmarks, setting apart the 'Cases' and 'Controversies' that are 'serv[ing] to identify those disputes which are appropriately resolved through the judicial process,' – is the doctrine of standing."[9] "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[10] The Supreme Court's decision in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), represents, perhaps, the most comprehensive exposition of the standing requirements the Court has provided. In Lujan, the Court noted that the standing analysis requires the examination of three criteria, stating:

. . . [T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural' or 'hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

504 U.S. 560-61 (citations omitted).

As to the third prong of the standing analysis, the Ninth Circuit has stated that "[T]o have standing, a federal plaintiff must show only that a favorable decision is likely to redress his injury, not

---

[8] Raines v. Byrd, 117 S.Ct. 2312, 2317 (1997), quoting Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976).

[9] Lujan, 504 U.S. at 560, quoting Whitmore v. Arkansas, 495 U.S. 149 (1990).

[10] Allen, 468 U.S. at 750-51, quoting Warth v. Seldin, 422 U.S. 490, 498 (1975).

that a favorable decision will inevitably redress his injury."[11] The Supreme Court's decision in Public Citizen v. Dept. of Justice, 491 U.S. 440 (1989), where the Court found that a declaratory judgment might fulfill the redressability requirement even if it does not provide full redress for the plaintiffs' injuries, appears to support the Ninth Circuit's position.[12] Nonetheless, the Supreme Court "ha[s] always insisted on strict compliance" with Article III standing requirements, and the standing inquiry is "especially rigorous" in determining the constitutionality of legislation.[13]

Significant in the analysis of any legal doctrine is the placement of the burden of proof and the degree of proof required. In Lujan, the Court discussed the burden of proof applicable to a standing analysis, stating:

> The party invoking federal jurisdiction bears the burden of establishing these elements. See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990); Warth, 422 U.S., at 508, 95 S.Ct., at 2210. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889, 110 S.Ct. 3177, 3185-3189, 111 L.Ed.2d 695 (1990); Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 114-115, and n. 31, 99 S.Ct. 1601, 1614-1615, and n. 31, 60 L.Ed.2d 66 (1979); Simon, 426 U.S., at 45, n. 25, 96 S.Ct., at 1927, and n. 25; Warth, 422 U.S., at 527, and n. 6, 95 S.Ct., at 2219, and n. 6 (Brennan, J., dissenting). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." National Wildlife Federation, 497 U.S., at 889, 110 S.Ct., at 3189.

Lujan, 504 U.S. at 561 (emphasis added). Thus, for the purposes of this motion, this court will presume that the general allegations made in the plaintiffs' amended complaint with respect to their alleged injuries are true and that they "embrace those specific facts that are necessary to support the

---

[11] Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir. 1994).

[12] Public Citizen v. Dept. of Justice, 491 U.S. 440, 450-51 (1989).

[13] Raines, 117 S.Ct. at 2317-18.

claim."[14] Nonetheless, this court will remain mindful of the plaintiffs' responsibility of showing that their claims are properly before this court, as the Supreme Court has warned that it is "the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers,"[15] and that "a federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."[16]

As noted above, the parties divide their standing arguments into two primary categories: (1) those involving the voter plaintiffs; and (2) those involving the institutional plaintiffs. The court will address each in turn.

**A. Voter Standing**

_____

[14] In addressing the standing burden of proof with respect to motions for summary judgment, the Lujan Court stated:

In response to a summary judgment motion . . . the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." Gladstone, 441 U.S., at 115, n. 31, 99 S.Ct., at 1616, n. 31.

504 U.S. at 561. The court notes that neither party has addressed the standing issue according to the summary judgment standard and that both parties have agreed that the hearing held in connection with this case on May 17, 1999 was sufficient to address all issues before this court in this case.

The Government has addressed the jurisdiction issues solely with respect to its Motion to Dismiss. Thus, plaintiffs argue that their Amended Complaint alleges that their injuries have been caused by NAFTA and remind the court that it must deny the Government's motion "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle them to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 688-89 (1973) (refusing to dismiss for lack of standing based on argument that causation allegations were untrue, stating, "[i]f . . .these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue"); Smith v. Meese, 821 F.2d 1484, 1496 (11th Cir. 1987) (applying Conley standard to standing issue).

[15] Warth, 422 U.S. at 518.

[16] Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990).

The individual plaintiffs contend that they have established standing by alleging that their voting rights were diluted because their Senators' votes on the approval of NAFTA and its Implementing Act were not given their proper weight. According to Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464 (1982), Article III of the Constitution "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"[17] A plaintiff must also show that he "stand[s] to profit in some personal interest" by a judgment in his or her favor.[18] Further, the plaintiff must show that he has been injured in some particularized way, meaning that the plaintiff's "injury must affect the plaintiff in a personal and individual way."[19] It is "the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."[20] The basis for standing is established "so long as each person can be said to have suffered a distinct and concrete harm."[21] However, "[t]he fact that other citizens or groups of citizens might make the same complaint . . . does not lessen appellants' asserted injury . . .,"[22] and "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."[23]

While the Supreme Court has held that standing exists when a plaintiff's vote has been diluted

---

[17] 454 U.S. at 472 (quoting Gladstone Realtors v. Village of Belwood, 441 U.S. 91, 99 (1979)).

[18] Allen v. Wright, 468 U.S. 737, 766 (1984).

[19] Lujan, 504 U.S. at 560 n.1.

[20] Warth v. Seldin, 422 U.S. 490, 518 (1975).

[21] Michel v. Anderson, 14 F.3d 623, 626 (D.C.Cir. 1994).

[22] Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 449-50 (1989).

[23] Whitmore v. Arkansas, 495 U.S. at 160.

relative to the votes of other citizens,[24] or when voting districts are distorted in the interest of providing specific groups of voters more or less leverage,[25] the Court has never recognized/addressed the standing of a plaintiff claiming an injury based on the dilution of the vote of his elected representative. However, the voter plaintiffs in this case are asking this court to decide just such an issue. They maintain that their voting rights were harmed because their Senators' votes against the approval of NAFTA were effectively nullified by the failure of the Senate and the President to comply with the Treaty Clause.

### 1. Michel v. Anderson

The strongest support for voter plaintiffs' standing argument comes in the form of the D.C. Circuit's decision in Michel v. Anderson, 14 F.3d 623 (D.C.Cir. 1994). In Michel, the D.C. Circuit held that voters had standing to challenge the constitutionality of a House rule allowing territorial delegates to vote in the Committee of the Whole, which diluted their representatives' votes. Citing previous cases in which the Supreme Court held that voters had standing to challenge practices allegedly diluting their vote, the court stated:

[I]n this case the alleged [vote] dilution occurs after the voters' representative is elected . . . [b]ut we do not understand why that should be of any significance. It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor.

That all voters in the states suffer this injury, along with the appellants, does not make it an "abstract" one.

14 F.3d at 626. The voter plaintiffs argue that this court should follow the reasoning of the Michel court and determine that they have standing to bring their claims against the Government.

### 2. Raines v. Byrd; Determining the Applicability and Viability of Michel

According to the Government, the individual plaintiffs' attempt to assert standing through a two-step "bootstrapping" argument fails due to the lack of a particularized or identifiable injury to

---

[24] See, e.g., Baker v. Carr, 369 U.S. 186 (1962).

[25] See e.g., Davis v. Bandemer, 478 U.S. 109 (1986).

the plaintiffs themselves. Further, the Government contends that NAFTA did not affect the rights of the voter plaintiffs' Senators to participate and vote on legislation, and that the passage of NAFTA did not hinder the Senators' ability to participate and vote in the future.

The Government argues both that Michel is factually dissimilar from this case and that the Supreme Court's decision in Raines v. Byrd casts serious doubt as to Michel's continued viability. In Raines, individual members of Congress brought an action challenging the constitutionality of the Line Item Veto Act. The Court held that the individuals did not have a sufficient "personal stake" in the dispute and did not sufficiently allege a concrete injury so as to establish standing under Article III. The Court, distinguishing its decision in Powell v. McCormack, 395 U.S. 486 (1969),[26] found that the Act did not single out any of the plaintiffs, but that the diminution of power damaged all Members of Congress equally. The Court also found that the plaintiffs were seeking redress from a loss of political power rather than something to which they were personally entitled, as was the case in Powell.[27]

The Raines court further concluded that the plaintiffs' situation did not fall within its holding in Coleman v. Miller, 307 U.S. 433 (1939). In Coleman, the Court recognized the standing of state legislators who had been locked in a tie vote that would have defeated the state's ratification of a proposed federal constitutional amendment, and who claimed that their votes were nullified when the Lieutenant Governor broke the tie by casting his vote in favor of ratification. The Court found that the plaintiffs had "a plain, direct and adequate interest in maintaining the effectiveness of their votes."[28] The plaintiffs in Raines, however, had not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. The Court thus determined that application of Coleman to the facts of Raines would require too great an

---

[26] See, supra, at (II)(C)(2)(d) for discussion.

[27] Powell, 117 S.Ct. at 2319-19.

[28] Coleman, 307 U.S. at 438.

extension of the Coleman decision. The abstract notion of dilution propounded by the Raines plaintiffs was simply not enough to create standing.

The Government argues that this case is factually similar to Raines in that the plaintiffs in this case are seeking redress for a dilution in voting power that each member of the Senate has experienced. The failure to utilize the Treaty Clause mechanism for the passage of international agreements does not, according to the Government, single out any particular Senators, rather, it influences the relative weight of each of their votes. Further, the Government contends that this case is similar to Raines in that the plaintiffs are complaining of a loss of political power rather than of an individual right. Thus, argues the Government, the Supreme Court's Raines decision arguably repudiates the D.C. Circuit's holding in Michel.[29]

The plaintiffs, in contrast, concentrate on the Raines decision's discussion of Coleman. They argue that here, as in Coleman, the complaint focuses on the legislators' loss of voting power in relation to a specific vote. The plaintiffs contend that although the individual plaintiffs' Senators had sufficient votes to defeat the passage of NAFTA, the Senate, the Congress and the President failed to acknowledge the fact that the Agreement had not been properly ratified. They argue that their votes were not given the proper weight and that they therefore lost a vote which they should have won.

The Government also argues that the voter plaintiffs have failed to allege any specific injury apart from the "generalized interest of all citizens in constitutional government."[30] The Government points to the Supreme Court's language in Lujan, where the Court stated that:

[R]aising only a generally available grievance about government – claiming only harm to his and every citizen's interest in the proper application of the Constitution and laws, and seeking

---

[29] The Government also notes that the Raines court took into consideration the fact that the plaintiffs had not been authorized to act as representatives of their respective Houses of Congress in the action, and argues that this court, too, should attach "some importance" to the fact that the plaintiffs here have not been so authorized.

[30] Raines, 117 S.Ct. at 2324 (Souter, J., concurring in judgment).

relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy.

504 U.S. at 573-74. The Government, in characterizing the plaintiffs' complaint as a generalized grievance, also cites Fairchild v. Hughes, 258 U.S. 126 (1922), where the Court dismissed a suit challenging the propriety of the process by which the Nineteenth Amendment was ratified. This case, according to the Government, involves nothing more than a generalized claim that the individual plaintiffs' Senators, like all other Senators, have, in an indirect and abstract manner, lost some of their voting power. Thus, based on the Supreme Court's language in Raines, Lujan, and Fairchild, the Government contends that the voter plaintiffs' claims should be dismissed for lack of standing.[31]

The Government also suggests that the plaintiffs' claims do not entitle them to any type of declaratory judgment or injunctive relief. The Government argues that when a plaintiff seeks declaratory and injunctive relief, he or she must "establish a real and immediate threat of future injury."[32] "Past exposure to illegal conduct does not suffice to confer standing to seek declaratory and injunctive relief, absent a real threat of imminent and continued exposure to the conduct."[33] Thus, the Government claims, citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983), that unless the plaintiffs can show that the Government will again violate the provisions of the

---

[31] The plaintiffs counter the Government's argument that their injury is undifferentiated from that of the general public simply by pointing out that they are not complaining of a general dilution of their Senators' voting power. Rather, the plaintiffs argue that they voted for Senators who, like the plaintiffs, opposed the approval and implementation of NAFTA's provisions and that those Senators, in turn, voted against NAFTA on November 20, 1993.

[32] Alabama Freethought Ass'n v. Moore, 893 F.Supp. 1522, 1544 (N.D.Ala. 1995) (citing Cone Corporation v. Florida Dept. of Transp., 921 F.2d 1109, 1203-05 (11th Cir.), cert. denied, 500 U.S. 942 (1991).

[33] Steel Company v. Citizens for a Better Environment, 523 U.S. 83 (1998); Alabama Freethought, 893 F.Supp. at 1544.

Constitution, they have no right to declaratory and/or injunctive relief.[34]

## B. First Conclusion of the Court

I conclude that the individual plaintiffs have not satisfactorily alleged "voter standing." In Allen v. Wright, the Supreme Court noted that part of the standing inquiry involves the following inquiry: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable."[35] Such is the case for the individual plaintiffs. I cannot conclude that these plaintiffs have alleged that they have been injured in a "personal and individual way" or that their injury is "concrete and particularized."[36] As in Raines, the plaintiffs in this case have not been individually "singled out for specially unfavorable treatment."[37]

Although the plaintiffs argue that their Senators' votes were not given their proper weight in the NAFTA vote, the plaintiffs do not contend that the NAFTA vote was specifically engineered to injure them or that the process used to conclude NAFTA was created solely for the purpose of diluting their Senators' votes. The fast track procedure has been used to conclude a number of international agreements since its inception in 1974, it was not created for the purpose of diminishing the votes of the plaintiffs' Senators. Whatever injury, if any, these plaintiffs may have suffered may

---

[34] The plaintiffs, citing In re Thornbrough, 869 F.2d 1503, 1511 (D.C.Cir. 1989), contend that the Government's arguments regarding impropriety of injunctive relief are premature in that a redressability analysis should begin from the premise that "a decision on the merits would be favorable and that the requested relief would be granted;" it is not "an inquiry into the scope of the court's power to grant relief." Thus, according to the plaintiffs, the Governments argument regarding the negative effects of injunctive relief on foreign relations is not relevant as to whether this court has the authority to grant such relief and whether such relief would redress plaintiffs' injuries. Whether this court *should*, in its discretion, grant such relief is not pertinent to the question of whether it *may* do so and, thereby remedy the plaintiffs' injuries.

[35] Allen, 468 U.S. at 752.

[36] Raines, 117 S.Ct. at 2317 (quoting Lujan, 504 U.S. at 560).

[37] Raines, at 2318. It should also be noted that, as in Raines, the plaintiffs' claim of standing was based on a loss of political power rather than loss of a private right. If the plaintiffs alleged the loss of a private right, their injury would appear more concrete. See id.

be shared by any citizen of the United States who objects to NAFTA regardless of whether their Senator(s) voted for or against NAFTA. A voter whose Senator(s) voted for NAFTA but who himself objects to NAFTA would arguably have an equal right to complain as would a voter whose Senator(s) voted against NAFTA. These plaintiffs' votes have been no more diluted.[38] The injury claimed by the voter plaintiffs is simply too abstract to suffice for standing in this case. As noted by the Whitmore Court, "an asserted right to have the Government act in accordance with the law is not sufficient, standing alone, to confer jurisdiction . . ."[39] The voter plaintiffs have asserted little else. These plaintiffs' claims will be dismissed for lack of standing.

## C. Institutional Plaintiffs

The Government argues that the institutional plaintiffs' claims fail to establish standing when examined under the second and third prongs of the Lujan analysis, claiming that the institutional plaintiffs have failed to show that their alleged injuries are fairly traceable to actions taken by the defendant and that they have failed to establish that their injuries are redressable by this court.[40]

---

[38] The Supreme Court has held that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." Raines, 117 S.Ct. 2319 (citing Coleman, 307 U.S. 433). Clearly, the plaintiffs' contention that NAFTA would not have been passed had the two-thirds rule been applied to the vote that was taken is correct. A first blush reading might lead one to conclude that the plaintiffs have made a fairly strong case for voter standing based on the Raines Court's discussion of Coleman. However, the Raines Court carefully articulates the fact that the holding in Coleman applies to situations where votes on a specific piece of legislation are completely nullified. The plaintiffs' claims do not truly focus on a one-time nullification of their Senators' votes, but on an allegedly unconstitutional process that has been employed in a number of instances. The injury is clearly not specifically focused on the plaintiffs or their Senators. Thus, although this case is closer to creating the specificity called for by the Coleman decision than did the Raines scenario, it does not fall under the aegis of the Coleman Court's conclusion.

[39] 495 U.S. at 160.

[40] The Government has not contested the plaintiffs' claim that they have suffered an injury in fact:

THE COURT: So you're not making an argument of no injury?
MS. RUBIO: [For defendant] No. . . . .

### 1. Causal Connection

According to the Government, the vague and non-specific allegations of the institutional plaintiffs fail to form sufficient foundation for establishing that their injuries are "fairly traceable" to the actions of the defendant. Further, although the Government argues that the general "causal connection" language of cases such as Lujan sufficiently illustrates why the institutional plaintiffs lack standing in this case, it makes an additional "causal connection" argument based on a claimed distinction between NAFTA itself and NAFTA's implementing legislation. [41]

> ### a. The Government's Claimed Distinction Between the NAFTA Agreement and the Implementing Legislation

The Government contends that NAFTA, as concluded between the United States, Canada and Mexico, is separate and distinct from the implementing legislation and related regulations. The Government further submits that the parties to NAFTA did not intend NAFTA to be self-executing, but agreed that each nation would adopt the "necessary legal procedures" to give the agreement effect as domestic law under their respective systems of government.[42]  The "necessary legal procedures" employed by the United States came in the form of the Implementation Act. In passing the Implementation Act, Congress approved NAFTA and made "all amendments to existing Federal statutes or provision of new authorities, including authority for Federal agencies to issue regulations, known to be necessary or appropriate to enable full implementation of, and compliance with, U.S.

---

THE COURT: So your emphasis is on redressability?

MS. RUBIO: That's right.

THE COURT: Not injury or the lack thereof itself?

MS. RUBIO: Right, right. . . .

Transcript of Oral Argument of May 17, 1999, 19-20.

[41] This alleged distinction also plays an important role in the Government's arguments concerning the redressability of plaintiffs' injuries and on the merits of this case.

[42] H.R. Doc. No. 103-159, vol. I, at 1292 (1993) (NAFTA art. 2203); 19 U.S.C. § 3311(b).

obligations under NAFTA."[43] The crux of the Government's contention with respect to this matter is that even though the Implementation Act refers to NAFTA in establishing a number of the laws necessary for the agreement's implementation, such reference simply incorporates certain written terms of NAFTA into duly-approved domestic legislation. The mere fact that the Implementation Act refers to NAFTA does not, according to the Government, make the Agreement and the Act one and the same.

In refuting the plaintiffs' contentions, outlined below, regarding whether or not portions of NAFTA are self-executing, the Government points to 19 U.S.C. § 3312(a) which states that no provision of NAFTA shall have effect if it is inconsistent with federal law. This, argues the Government, is a clear statement by Congress indicating that NAFTA itself was to have no effect on United States domestic law.

The Government's "causal connection" argument springs from its contention that the plaintiffs' complaint focuses on injuries that could only be caused by the Implementation Act as opposed to NAFTA itself. The Government cites a number of passages from the plaintiffs' complaint seeking relief from the "implementation" of NAFTA rather than from NAFTA itself, and notes that the plaintiffs have failed to identify any specific provisions of NAFTA itself that have contributed to their alleged injuries. Thus, the Government concludes that the plaintiffs' claims, while allegedly attacking the constitutionality of NAFTA itself, actually focus upon the provisions of the Implementation Act. This is significant in that, according to the Government, the plaintiffs cannot legitimately argue that the Implementation Act is unconstitutional. Therefore, according to the Government's analysis, the plaintiffs' claims are not challenging, and cannot challenge, the constitutionality of the true source of their injuries – the Implementation Act. Rather, plaintiffs' claims call for the elimination of NAFTA, an international agreement, while claiming injury from duly passed domestic legislation. Thus, the Government argues that the plaintiffs have failed to allege facts

---

[43] H.R. Rep. No. 103-361(I), at 17 (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2567.

Case 4:98-cv-01794-RBP   Document 42   Filed 07/23/99   Page 17 of 156

Page -17-

showing that their alleged injuries are "fairly traceable" to NAFTA itself.

### b. The Plaintiffs' Response

The institutional plaintiffs note that their complaint alleges that they have suffered the following injuries as a result of the approval and implementation of NAFTA: (1) members of plaintiff Made in the USA Foundation have been impeded in their efforts to buy American-made goods; (2) members of plaintiffs USWA, Local 12L, and Made in the USA Foundation have lost their jobs; (3) plaintiff USWA has lost members as a result of those job losses; (4) plaintiff USWA and its members have been impeded in their efforts to negotiate collective bargaining agreements; and (5) plaintiff USWA has been forced to utilize scarce resources to counteract and seek redress for the various injuries that NAFTA has caused its membership. They therefore argue that the Government's basic lack of causal connection argument is without merit.

The institutional plaintiffs make several arguments with respect to the Government's arguments based on the distinction between NAFTA and the Implementation Act. They first contend that, despite the Government's attempt to characterize them otherwise, the claims contained in the amended complaint are directed at injuries caused by NAFTA itself. They note that even their original complaint seeks relief from injuries caused both by the making and implementation of NAFTA and that the amended complaint refers specifically to injuries caused by NAFTA itself. Further, they maintain that the attempt to separate NAFTA from the Implementation Act is an invention of the Government for the purposes of this case and that the alleged distinction represents an attempt to separate that which is inexorably bound together.

The plaintiffs point out that President Clinton's 1997 "Study on the Operation and Effect of the North American Free Trade Agreement" refers in general to "NAFTA's . . . benefits," not to the benefits created by the Implementation Act. The Statement of Administrative Action submitted to Congress by the President (hereinafter "SAA" or "Statement of Administrative Action"),[44] explaining

---

[44] H.R. Doc. 103-159, Vol. I.

the expected impact of NAFTA and describing the necessary implementing legislation acknowledged that, "as a result of NAFTA," some workers would lose their jobs. The Statement of Administrative Action also stated that the purpose of the implementing legislation was "to bring U.S. law fully into compliance with U.S. obligations under the Agreement."[45] The plaintiffs also argue that the Implementation Act itself makes it clear that it cannot exist without NAFTA, pointing out that most of its provisions take effect only as of the date of entry into force of NAFTA, and that even its threshold provision, in 19 U.S.C. § 3311, acknowledges this dependence.[46] These references to NAFTA represent more than an incorporation of NAFTA's provisions, argue the plaintiffs. Rather, they represent the complete dependence of the Implementing Act upon the making of the Agreement itself.

The plaintiffs further maintain that the dependence of the Implementation Act on NAFTA does not stop with the threshold provision of the Implementation Act. Rather, they contend that a number of the specific provisions of the Implementation Act are dependent upon NAFTA for their effectiveness. The plaintiffs' primary examples are the tariff provisions. While the Government characterizes the tariff provisions as completely independent of NAFTA itself, the plaintiffs point out that, in providing the President with authority to reduce tariffs in order to comply with NAFTA, Congress provided that the President could modify or reduce tariffs as "necessary or appropriate to carry out or apply articles 302, 305, 307, 308, and 703 and Annexes 302.2, 307.1, 308.1, 300-B, 703.2, and 703.3 of the [NAFTA]."[47]

The plaintiffs also argue that many of NAFTA's provisions are completely independent from the Implementation Act, such that, even if one were to attempt to view the Agreement and the Act as severable, NAFTA would still be playing a major role in the harm suffered by the plaintiffs.

---

[45] SAA at 457.

[46] 19 U.S.C. §§ 3314, 3331, 3332, 3334, 3335.

[47] 19 U.S.C. § 3331.

Examples of self-executing provisions within NAFTA, according to the plaintiffs, include: (1) commitments made under Articles 302, 307, 309 and 310, whereby the United States agreed not to increase any duty except as provided for in the Agreement and not to adopt certain other prohibitions or restrictions on imports, and (2) provisions under Chapter Eleven requiring Mexico to change its policies regarding foreign investment. Plaintiffs claim that although the law changed in the second example is Mexican law, the law clearly would not have been changed without the Agreement, and that the change has injured plaintiffs by causing American businesses and jobs to move to Mexico. According to the plaintiffs, the Government's distinction between NAFTA and its implementing legislation is both new and inaccurate. Thus, they contend not only that their claims clearly focus on both the Agreement and the Act, but that, to the extent that they do not, such failure makes no difference in light of the fact that they are part of an indivisible whole.

## 2. Redressability

The Government's primary standing-based argument with respect to the institutional plaintiffs focuses on whether the plaintiffs' injuries would likely be redressed in the event of a favorable ruling. As noted above, where "none of the relief sought by [the plaintiffs'] would likely remedy [their] alleged injury in fact, [the court] must conclude that [plaintiffs] lack standing . . ."[48] The Lujan decision, among others, makes clear that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[49]

---

[48] Steel Company v. Citizens for a Better Environment, 118 S.Ct. 1003, 1020 (1998).

[49] 504 U.S. at 561 (quoting Simon, 426 U.S. 26, 41-42 (1976)). At some point in their brief in response to the Government's Motion to Dismiss, the plaintiffs argue that they must simply allege "a plausible ground to believe that the injuries they allege could be redressed by the Court." The Government points out that this contention is incorrect. Citing Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 45-46 (1976) and Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 74-75, and n. 20 (1978), the Government argues that the Supreme Court has, on numerous occasions, articulated the fact that a plaintiff must show that a particular result is not just "plausible", but "substantially likely." The Government notes that the plaintiffs' complaint does not allege that it is "substantially likely" that their desired relief will truly remedy their injuries. The Government argues that no such claim is made because the

The institutional plaintiffs seek two orders from this court: (1) a declaration that NAFTA was not approved in a constitutional manner and therefore is "null, void and of no effect"; and (2) an order directing the President to notify the governments of Mexico and Canada that, within thirty days, the United States is terminating its participation in NAFTA. The Government contends that a recognition of the distinction between NAFTA and the Implementation Act, as detailed above, reveals the fact that even if the plaintiffs did obtain a ruling declaring NAFTA itself unconstitutional, which is all the Government believes that plaintiffs can expect to get in the event of their success on the merits,[50] such a ruling would have no effect on the validity of the Implementation Act. With respect to this court's ability to strike down NAFTA itself, the Government contends: (1) that this court lacks the requisite authority to order the President of the United States to notify Mexico and Canada of this nation's withdrawal from NAFTA; (2) that an order directed at subordinate executive branch officials would be insufficient to cease the implementation of NAFTA; and, finally, (3) whatever declaratory judgment the plaintiffs could obtain, be it in the form of an order directing the President to take an action, an order directed at subordinate officials, or a general order declaring NAFTA

---

plaintiffs recognize that they cannot make such a showing.

[50] The Government makes this contention based on its belief that while the plaintiffs' complaint focuses on the effect of the Implementation Act, the complaint does not truly challenge the constitutionality of the Implementation Act or regulations, but NAFTA itself. The Government notes that the plaintiffs have not alleged a cause of action against the constitutionality of the Implementation Act and have not, in relation to the Motion to Dismiss, provided any basis for challenging the validity of the Implementation Act as passed pursuant to Congress's enumerated Article I powers. Thus, according to the Government, any relief the plaintiffs could receive as a result of this court's finding that NAFTA was approved in an unconstitutional manner would fail to redress any of the plaintiffs' injuries, which arise out of the implementing legislation.

The Government also asserts that to the extent the plaintiffs do raise claims against the Implementation Act, such claims must surely fail, as the Implementation Act amounts to nothing more than duly-passed congressional legislation enacted pursuant to the Congress's Article I powers to raise revenue, lay and collect taxes, duties, imposts and excises, and to regulate foreign commerce. If this is the case, then, under the Government's analysis, the plaintiffs either do not or cannot seek relief from the true cause of their injuries – the Implementation Act – and cannot, therefore have standing to bring this suit.

unconstitutional, is not likely to remedy the plaintiffs' alleged injuries, because such a judgment would not necessarily cause the governments of Mexico and Canada to change their practices and policies with respect to United States industry and products or cause businesses to alter their behavior or investments in a manner benefitting the plaintiffs. According to this view, any change in the policies of Mexico and Canada or in the practices of American businesses that the plaintiffs might foresee is purely speculative. As the plaintiffs must show that relief is "likely" to redress their injuries, the Government claims that they have failed to satisfy the third prong of the standing criteria as outlined in Lujan.

The plaintiffs suggest that this court has the power and authority to grant a declaratory judgment that the procedures used to approve NAFTA are unconstitutional. They cite In re Aircrash in Bali, 684 F.2d 1301, 1308-10 (9th Cir. 1982), cert. denied, 493 U.S. 917 (1989); United States v. Guy Capps, Inc., 204 F.2d 655, 659-60 (4th Cir. 1953), aff'd on other grounds 348 U.S. 296 (1955); and Swearingen v. United States, 565 F.Supp. 1019 (D.Colo. 1983), as examples of cases in which federal courts have addressed the constitutionality of treaty provisions or asserted their authority to do so, and point out that, according to the Restatement (Third) of the Law of Foreign Relations of the United States, § 302-303 (1987) (hereinafter "Restatement"), § 326(2), "Courts in the United States have final authority to interpret an international agreement for purposes of applying it as law in the United States." Thus, the plaintiffs argue that, given this court's authority to rule on the constitutionality of the provisions of an international agreement, the argument that an order of this court declaring the procedures used to approve NAFTA unconstitutional would have no practical effect is clearly misguided.

### a. NAFTA/Implementation Act Distinction With Respect to Redressability

The Government contends that a ruling declaring NAFTA itself unconstitutional would have no effect on the validity or enforceability of the Implementation Act and that, as the plaintiffs have asked for and can receive no more than such a declaration, they have no standing in this case. The

plaintiffs contest this contention on the same bases they contest the Government's claims with respect to the "causal connection" issue – they claim that they have, in fact, asked this court to declare both the Agreement and the Implementation Act unconstitutional and that, in any case, the two are indivisible.

The plaintiffs also argue that, to the extent that this court concludes that the Agreement and Act are distinct and that it can only make a ruling with respect to NAFTA itself, such a ruling would sufficiently redress their injuries. In so arguing, the plaintiffs maintain that if this court declares NAFTA invalid as United States law, the Agreement's self-executing provisions, cited above,[51] will be invalidated. Furthermore, the plaintiffs assert that if NAFTA itself is held invalid, a number of the Implementation Act's provisions will, by their own language, be rendered inoperative. Of primary significance among such provisions, according to the plaintiffs, is the Implementation Act's threshold provision. The plaintiffs contend that the invalidation of this "key provision" would cause the remainder of the implementing legislation to become invalid under basic principles of severability. Under Scheinberg v. Smith, 659 F.2d 476, 481 (5th Cir. 1981), the "controlling inquiry" for purposes of a severability analysis, "is whether the legislature intended the offensive statutory provision to be an integral part of the statutory enactment viewed in its entirety." If so, the entire statute must be struck down.[52]

The principles of severability referenced by the plaintiffs would, according to the Government, not render the Implementation Act inoperative. The Government argues that even if this court did declare NAFTA itself (again, as opposed to the Implementation Act) unconstitutional under United States domestic law, the international obligation of the United States would remain, because this court, according to the Government, cannot direct the President to repudiate an international

_____

[51] See, supra, at (II)(C)(1)(b).

[52] Scheinberg, 659 F.2d at 4810. See also Sutherland on Statutes, § 44.07 ("Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void.").

agreement.[53] Thus, that the provisions of the Implementation Act that are dependent upon the completion of NAFTA would not, according to the Government, prevent the Implementation Act from taking effect.

Plaintiffs reply to the Government's contentions regarding the rule of severability as it applies to international obligations, arguing that the Government's position has no basis in case law. Further, plaintiffs contend that even if the Government were to be correct about the effect of a valid international obligation on the legislation, the Government's argument would still fail due to the fact that NAFTA, in the plaintiffs' view, was designed not to go into effect until the necessary legal procedures in each nation were completed. According to plaintiffs, because the United States never completed those procedures, NAFTA never went into effect and never became binding under international law.[54]

## b. The Court's Power to Order the President to Perform an Act

According to the Government, the President, in signing NAFTA, caused the agreement to become binding on the United States under international law.[55] As noted above, the Government

---

[53] This argument is recounted in detail infra, at (II)(C)(2)(b).

[54] The plaintiffs argue that even if this court finds that the Implementation Act does not fall as a direct result of a finding that NAFTA is unconstitutional, they have alleged that the Implementation Act would not have been passed in the absence of NAFTA. Thus, the plaintiffs seek a judgment declaring the Act null and void based on that more indirect connection.

[55] The Government asserts, citing § 339(c) of the Restatement, that only the President has the authority and discretion to bind the United States under international law. The Government also points to United States v. Pink, 513 U.S. 203, 229 (1942), in which the Court, quoting Justice Sutherland's dicta in United States v. Curtiss-Wright Corp., 299 U.S. 304, 320 (1936), states that the President is "the sole organ of the federal government in the field of international relations." Based on the Court's deference to the Chief Executive in areas of foreign relations, the Court has, in the past, refused to question the position taken by the President concerning the recognition of foreign nations, sovereignty over territory, or declaring or denying sovereign immunity. See, e.g., Pfizer, Inc. v. United States, 137 U.S. 308, 319-20 (1978); Jones v. United States, 137 U.S. 202, 212 (1890); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 307 (1829); Republic of Mexico v. Hoffman, 324 U.S. 30, 35-36 (1945).

In arguing that the President's action in this case created a binding international obligation,

argues that this court lacks the authority to compel the President to abrogate an international obligation of the United States.

While recognizing that in Reid v. Covert, 354 U.S. 1, 16-18 (1957), the Supreme Court asserted its right and responsibility to declare whether an international agreement is constitutional or

---

the Government points to the Restatement, § 302-303, and the Vienna Convention on the Law of Treaties, art. 26. The Government argues that even if this court were to declare NAFTA unconstitutional for purposes of domestic law, the United States' obligations under international law would persist. The Government notes that in Pigeon River Improvement, Slide and Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 160 (1934), the Supreme Court acknowledged that although a later Act of Congress that conflicted with a provision in a treaty "would control in our courts as the later expression of our [domestic] law . . . the international obligation [would] remain [] unaffected." Further, the Vienna Convention, Article 46, states:

1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

2. A violation is manifest if it would be objectively evident to any State conducting itself in the manner in accordance with normal practice and in good faith.

The Vienna Convention defines the term "treaty" to include any international agreement, irrespective of the procedure used to bring it into force. Vienna Convention, Article 2, para. 1(a). In determining whether the use of an executive agreement in lieu of a treaty would amount to a "manifest violation," the Restatement concludes that such use would not generally be a manifest violation given the lack of specificity within the text of the Constitution and the fact that the President clearly has the authority to conclude at least some types of agreements as executive agreements. Restatement § 311(3) and comment c.

Plaintiffs argue that the Government's reliance on provisions of the Vienna Convention on treaties is misplaced in that the United States has refused to ratify the Vienna Convention specifically because Article 46(2) does not recognize that the President must comply with the Treaty Clause in order for the United States to make a treaty. Plaintiffs note that their contention is borne out by a study prepared for the Senate Committee on Foreign Relations by the Congressional Research Service entitled: Treaties and Other International Agreements: The Role of the United States Senate 21-22 (Comm. Print 1993). Plaintiffs also maintain that, under the Pigeon River case, if this court were to declare NAFTA unconstitutional as a matter of United States domestic law, any international obligation that might remain "would [not] control in our courts." 291 U.S. at 160. Thus, despite the fact that this court could not invalidate any of the United States obligations under international law, it could redress plaintiffs' injuries caused by changes in domestic law.

otherwise has effect as domestic law of the United States,[56] the Government, citing Franklin v.

---

[56] In Reid, the Court, in determining whether an international agreement – in this case an executive agreement – could subject American citizens living abroad with their military spouses to criminal prosecution via military courts without a trial by jury or other Bill of Rights protections, held that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." 354 U.S. at 16. The Court went on to state that:

Article VI, the Supremacy Clause of the Constitution, declares: 'This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . ."

There is nothing in this language which intimates that treaties and laws enacted pursuant to them do not have to comply with the provisions of the Constitution. Nor is there anything in the debates which accompanied the drafting and ratification of the Constitution which even suggests such a result. These debates as well as the history that surrounds the adoption of the treaty provision in Article VI make it clear that the reason treaties were not limited to those made in 'pursuance' of the Constitution was so that agreements made by the United States under the Articles of Confederation, including the important peace treaties which concluded the Revolutionary War, would remain in effect. It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights--let alone alien to our entire constitutional history and tradition--to construe Article VI as permitting the United States to exercise power under an international agreement without observing constitutional prohibitions. In effect, such construction would permit amendment of that document in a manner not sanctioned by Article V. The prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be nullified by the Executive or by the Executive and the Senate combined.

There is nothing new or unique about what we say here. This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty. For example, in Geofroy v. Riggs, 133 U.S. 258, 267, it declared:

The treaty power, as expressed in the constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the constitution forbids, or a change in the character of the government or in that of one of the States, or a session of any portion of the territory of the latter, without its consent.

This Court has also repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null. It would be completely anomalous to say that a treaty need not comply with the Constitution when such an agreement can be overridden by a

Massachusetts, 505 U.S 788, 802-03 (1992); Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501 (1866); and Swan v. Clinton, 100 F.3d 973, 976-77 (D.C. Cir. 1996), maintains that courts do not have jurisdiction to direct or enjoin the President in the performance of his official duties.[57] The Government contends that the Supreme Court's language in Clark v. Allen, 331 U.S. 503, 509 (1947)[58]; Van Der Weyde v. Ocean Transp. Co., 97 U.S. 114, 118 (1936)[59]; Charlton v. Kelly, 229

---

statute that must conform to that instrument.

There is nothing in Missouri v. Holland which is contrary to the position taken here. There the Court carefully noted that the treaty involved was not inconsistent with any specific provision of the Constitution. The Court was concerned with the Tenth Amendment which reserves to the States or the people all power not delegated to the National Government. To the extent that the United States can validly make treaties, the people and the States have delegated their power to the National Government and the Tenth Amendment is no barrier.

In summary, we conclude that the Constitution in its entirety applied to the trials of Mrs. Smith and Mrs. Covert. Since their court-martial did not meet the requirements of Art. III, § 2, or the Fifth and Sixth Amendments we are compelled to determine if there is anything within the Constitution which authorizes the military trial of dependents accompanying the armed forces overseas.

354 U.S. 16-18. The Court recognized that an executive agreement was involved, but held that "it cannot be contended that such an agreement rises to greater stature than a treaty." Id. at 17. Thus, the Court held that it could construe the provisions of the international agreement involved in essentially the same manner as any piece of legislation.

[57] The Government does recognize that the Supreme Court's decision in Franklin left open the question of whether the President might be enjoined from performing a purely ministerial act, but argues that a decision concerning the entry into or withdrawal from an international agreement clearly involves a large degree of discretion and cannot be considered purely ministerial.

[58] The Clark court, in determining the extent to which an outbreak of war suspends or abrogates a treaty between warring nations, stated:

The question is not what states may do after war has supervened, and this without breach of their duty as members of the society of nations. The question is what courts are to presume that they have done. . . [The] President and Senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts. The treaty of peace itself may set up new relations, and terminate earlier compacts, either tacitly or expressly. . . But until some one of these things is done, until some one of these events occurs, while war is still flagrant, and the will of the political departments of the government unrevealed, the courts, as I view their function,

U.S. 447, 474-76 (1913)[60]; and Terlinden v. Ames, 184 U.S. 270, 283 (1902)[61], supports its

---

play a humbler and more cautious part. It is not for them to denounce treaties generally, en bloc. Their part it is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence presumably intended to be limited to times of peace. The mere fact that other portions of the treaty are suspended, or even abrogated, is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act.

Clark, 331 U.S. at 509-10.

[59] The allegedly relevant portion of the Van Der Weyde decision states:
In this instance, the Congress requested and directed the President to give notice of the termination of the treaty provisions in conflict with the act. From every point of view, it was incumbent upon the President, charged with the conduct of negotiations with foreign governments, and also with the duty to take care that the laws of the United States are faithfully executed, to reach a conclusion as to the inconsistency between the provisions of the treaty and the provisions of the new law. It is not possible to say that his conclusion as to [the arguably conflicting treaty and domestic law provisions] was arbitrary or inadmissible. Having determined that their termination was necessary, the President, through the Secretary of State took appropriate steps to effect it.

Van Der Weyde, 291 U.S. at 117-18.

[60] In Charlton, the Court was faced with the question of whether or not to grant habeas corpus relief to a United States citizen who was to be extradited to Italy. The petitioner sought relief, claiming that the pertinent treaty had been abrogated because, although the United States was willing to honor the treaty, Italy insisted that it was not bound to reciprocate when its citizens were involved. In deferring to the State Department's decision to continue under the auspices of the treaty, the Court stated:
The Executive Department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender the appellant as one imposed by the treaty as the supreme law of the land, and as affording authority for the warrant of extradition.

Charlton, 229 U.S. at 476.

[61] In analyzing the effectiveness of an extradition treaty with Germany, the Terlinden Court commented that: "[W]ithout considering whether extinguished treaties can be renewed by tacit consent under our Constitution, we think that on the question, whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance." 184 U.S. at 285. It is difficult to tell how this passage or the page cited by the Government support the proposition that courts may not compel the President to abrogate an international agreement.

contention that courts cannot compel the President to terminate an agreement and abrogate obligations of the United States. Further, pointing to Flynn v. Shultz, 748 F.2d 1186 (7ᵗʰ Cir. 1984), cert. denied, 474 U.S. 830 (1985)[62], the Government also makes the assertion that this court cannot impinge upon the President's constitutional power by dictating how he will conduct this Nation's foreign affairs. According to this view of presidential power, even if this court were to conclude that the procedure used to approve NAFTA is unconstitutional, the President, by virtue of his foreign affairs powers, would be able to exercise his judgment in determining how to react to such a ruling. The Government argues that the President's right to exercise his discretion in choosing how to respond to a ruling of this court makes it far less likely that the plaintiffs' injuries would be redressed by their desired relief, even if this court did have the authority to grant such relief.[63]

_____

[62] In Flynn, the Seventh Circuit held that it could not order the United States to request the Mexican Government to provide reasons for detaining American citizens because such an order would put the court in the role of directing the Nation's foreign affairs. Flynn v. Shultz, 748 F.2d 1186, 1190 (7ᵗʰ Cir. 1984), cert. denied, 474 U.S. 830 (1985).

[63] Although it did not mention the issue at the extensive recorded oral argument, the Government, in its Memorandum in Support of its Supplemental Motion to Dismiss, pg. 26 n.12, has argued that there is no waiver of sovereign immunity under United States law that would allow the plaintiffs to proceed in their suit against the United States. Although plaintiffs have cited five statutes, 28 U.S.C. §§ 1331, 1337, 1343, 1346 and 1361, purportedly supporting this court's jurisdiction in this case, the Government contends that none of those statutory provisions suffice. Section 1331 is the general "federal question" jurisdictional statute which, in cases involving the federal government, does not constitute a waiver of the government's sovereign immunity. Section 1337, although providing that district courts have original jurisdiction of any civil action arising under acts of Congress relating to commerce or protecting trade, does not, under cases such as Hagemir v. Block, 806 F.2d 197, 202 (8ᵗʰ Cir. 1986), cert. denied, 481 U.S. 1054 (1987), provide a waiver of sovereign immunity. Similarly, in Beale v. Blount, 461 F.2d 1133, 1138 (5ᵗʰ Cir. 1972), the Fifth Circuit found that Section 1343 does not constitute a waiver of the federal government's sovereign immunity. Although Section 1346 does amount to a limited waiver, the Government argues that, under Shanbaum v. United States, 32 F.3d 180, 182 (5ᵗʰ Cir. 1994), waiver is limited to circumstances not present here. Finally, the Government contends that Bobula v. Dep't of Justice, 970 F.2d 854, 860 (Fed. Cir. 1992) supports the conclusion that Section 1361, the federal mandamus statute, does not constitute a general waiver of sovereign immunity, but confers subject matter jurisdiction only when a plaintiff has a clear right to relief, a defendant has a clear duty to act, and no other adequate relief is available. Finally, the Government notes that the statute most often cited as the source of the federal

### c. The Judiciary's Ability to Order Subordinate Executive Department
### Officials to Act or Refrain From Acting and the Effectiveness of Such an
### Order in this Case

In addressing the Government's assertion that this court may not order the President to communicate the United States' withdrawal from NAFTA to Canada and Mexico, the plaintiffs not only argue that the issue of this court's authority vis-a-vis the President is unsettled, but that such an order is not required to achieve the results they seek. The plaintiffs thus argue, based on the D.C. Circuit's holding in Swan v. Clinton that this court may order subordinate executive officials not to enforce NAFTA's provisions. In Swan, the plaintiff sought relief against the President and other executive branch officials, seeking to have his removal from the Board of the National Credit Union Administration declared unlawful.[64] The plaintiff sought an injunction ordering the President to reinstate him and/or "such additional relief as the court shall deem just."[65] The court found that it was unclear whether or not it could order the President to reinstate a Presidential appointee who had been wrongfully dismissed.[66] However, although the court acknowledged that the President alone had the

---

government's waiver of sovereign immunity in cases not involving money damages is the Administrative Procedure Act, 5 U.S.C. § 701-706. However, as the President is not an "agency" within the meaning of the statute, the Government asserts that his actions are not subject to review under the Act and that, because only the President may terminate the Agreement, plaintiffs' suit is barred by sovereign immunity.

After reviewing the Government's footnote and hearing oral arguments in this case, the court posed certain questions addressing this issue to the parties. Those questions and the parties' responses will be filed. The court is persuaded by the plaintiffs' answers and does not hold that this action is barred by sovereign immunity. The parties' differences of opinion fit a pattern in this case.

[64] 100 F.3d at 975, 976 n.1.

[65] Id. at 973.

[66] Id. at 976-78. In addressing whether or not the authority of the federal courts to direct the President to perform discretionary acts is well-settled, the Swan court stated:

A question exists . . . as to whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties. The

authority to reinstate the plaintiff, the court found that it could get around the question of whether it could direct the President to act while still granting the plaintiff relief by ordering subordinate executive officials to act as if plaintiff had been reinstated.[67] The court determined that this partial remedy would be sufficient for redressability "even recognizing that the President has the power, if

---

Supreme Court has confirmed that a "grant of injunctive relief against the President himself is extraordinary, and should . . . raise [ ] judicial eyebrows." Franklin, 505 U.S. at 802, 112 S.Ct. at 2776. Franklin involved a challenge to the methodology by which overseas federal employees were allocated to different states in the 1990 census, which in turn determined how seats in the House of Representatives would be reapportioned. Under the automatic reapportionment statute, the Secretary of Commerce is required to perform the census and report the data to the president, who within nine months is required to transmit a statement to Congress indicating the number of Representatives to which each state is entitled based on the census data. The plaintiffs in Franklin sued both the Secretary of Commerce and the President seeking injunctive and declaratory relief. The plurality opinion of the Court concluded that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,'" and a majority of the Justices in fact subscribed to this position. Id. at 802-03, 112 S.Ct. at 2776-77 (quoting Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501, 18 L.Ed. 437 (1866)); see also id. at 826, 112 S.Ct. at 2788-89 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act."). Franklin does not, however, directly decide the question of whether this court has the power to grant Swan the injunctive relief he seeks, because the plurality opinion there specifically noted that the Court had "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." Id. at 802, 112 S.Ct. at 2776 (quoting, Mississippi, 71 U.S. (4 Wall.) at 498-99).

100 F.3d at 976-77.

[67] Id. at 979-81. The court stated that "In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials. Noting that, "it might appear that this case represents one of those rare instances where . . . only injunctive relief against the President himself will redress Swan's injury, because only the President has the power to remove or reinstate NCUA Board members," the court found that, in the alternative, it could order NCUA staff members to treat the plaintiff as a "de facto" Board member despite the executive director's inability to reinstate the plaintiff. Id. at 977, 980.

he so chose, to undercut [the] relief."[68] In further examining the propriety of its redressability determination, the court stated:

> We do not believe that . . . we are performing an end run around the redressability requirement of standing doctrine. Rather, we are simply recognizing that such partial relief is sufficient for standing purposes when determining whether we can order more complete relief would require us to delve into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch.

Id. at 981. Thus, in the event that this court determines it is unable to directly order the President to terminate this Nation's participation in NAFTA, the plaintiffs request an order instructing subordinate executive officials to cease their compliance with NAFTA's provisions.

The Government contends that the plaintiffs reliance on Swan v. Clinton is misplaced, arguing that this case is distinguishable from Swan in that, in order to provide the plaintiffs with redress, the relief in this case would have to run, in some instances, directly or indirectly against the President. For instance, the Government argues that only the President is given authority under the Implementation Act to make modifications to tariff rates pursuant to the provisions of NAFTA. An order directing subordinate officials to refuse to comply with NAFTA could, according to the Government, diminish the President's authority under such provisions and could, therefore, not provide the plaintiffs substantial relief. Further, the Government asserts that any order directing government officials to cease the implementation and operation of the Implementation Act and, thus, NAFTA, amounts to an abrogation of the United States' obligations under the Agreement – a decision that only the President is authorized to make.[69]

The Government argues that, given the Eleventh Circuit's declaration that "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of

---

[68] Id. at 980-81.

[69] In addition to maintaining that Swan is distinguishable from this case, the Government asserts that the D.C. Circuit erred in making its jurisdiction determination, and notes that the decision is not binding on this court.

government as to be largely immune from judicial inquiry or interference,'"[70] the combination of, (1) the plaintiffs' failure to specify which officials should be enjoined and which provisions of the Implementing Act and/or regulations those officials should cease to enforce, and (2) the delicate issues of foreign relations implicated in this case, counsels strongly against this court's finding standing in this case.[71]

The Government concedes that there are subordinate executive officials involved in the continued implementation and operation of NAFTA's provisions. However, the Government notes that the plaintiffs' complaint has failed to identify those officials who could be enjoined and that plaintiffs have failed to identify any specific provisions of the Implementation Act or regulations that the unidentified officials should cease to implement in order to redress the plaintiffs' injuries.[72]

---

[70] Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997) (quoting Haig v. Agee, 453 U.S. 280, 292 (1981)).

[71] The Government notes that the D.C. Circuit recently refused to direct "the Secretary of State to adopt a certain position in negotiations with the Federal Republic of Germany." Miller v. Albright, No. 98-CV-01955, 1998 WL 846653 (D.C. Cir. Nov. 30, 1998). The court held that such action would represent "an unwarranted usurpation of the executive's conduct in foreign relations." Id.

[72] The lack of specificity in the plaintiffs' request for relief does not, according to the plaintiffs, prevent a finding of redressability. The plaintiffs note that in Swan the court found standing on the ground that the plaintiff might be able to obtain some form of injunctive relief that he had never requested prior to appeal. See 100 F.3d at 979-80.

In determining whether the plaintiff's complaint had adequately identified parties that would need to be enjoined in order to redress his injuries, the court in Swan noted that although Swan had named the executive director of the NCUA as a defendant, he had not named the other NCUA staff members, who, unlike the executive director, would have the authority to speak for the Board and effectuate the relief sought. In deciding whether this oversight precluded relief, the D.C. Circuit stated that:

Although Swan has not included the Chairman, other NCUA Board members or the Board Secretary as defendants in this action, it seems indisputable that he would have done so had he thought that suit against the President, Nash [an assistant to the President], and Hoyle [the Executive Director of NCUA] would not be sufficient to provide the relief he desires. At oral argument Swan's counsel asked that we read Swan's request "for such additional relief as the court shall deem just and proper" to encompass relief against subordinate branch officials not named as parties. Indeed, the Supreme Court has held

### d. The "Likely" Reaction of Foreign Governments, Foreign Business and United States Executive Department Officials to a Declaration that NAFTA is Unconstitutional

The plaintiffs argue that the Government's contentions regarding the potential reaction of the Canadian and Mexican governments is flawed for two reasons. First, plaintiffs maintain that even if a declaration invalidating NAFTA had absolutely no effect on the trade policies of Canada and Mexico, they (the plaintiffs) would still have standing as a result of the influence such declaration would have under domestic law, as noted above. Second, the plaintiffs argue that the suggestion that the United States' repudiation of NAFTA would have little or no influence on the policies of the other two parties involved in the agreement is far more unlikely and speculative than are plaintiffs' predictions. The plaintiffs note that the Statement of Administrative Action that accompanied the President's submission of NAFTA to Congress declared that NAFTA would "eliminate [] significant Mexican . . . investment restrictions that have distorted investment flows . . . for decades."[73] The Statement also proclaimed that "U.S. investors will be entitled to the same treatment in Mexico as

---

that a court has power under the All Writs Act to issue commands that apply to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977); see also 28 U.S.C. § 1651(a). Thus, we think that it would elevate form over substance in a case of this dimension not to treat Swan's complaint as if it also sought injunctive or declaratory relief against these individuals in their official capacity. Injunctive relief against Hoyle and these added defendants could on balance substantially redress Swan's injury and is sufficient to satisfy the redressability requirement of standing. While these officials cannot officially remove Wheat [the person appointed to replace the plaintiff] and reinstate Swan, they can accomplish these deeds de facto by treating Swan as a member of the NCUA Board and allowing him to exercise the privileges of that office--i.e., including Swan in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member, etc.--and by denying any such treatment to Wheat.
100 F.3d at 979-80.

[73] SAA, at 682.

Mexican investors and will be protected in the case of expropriation."[74] The Statement went on to claim that "Nothing about doing business in Mexico will be the same . . . which is one of the key benefits of NAFTA, because doing business in Mexico until now has been so difficult."[75] Finally, the Statement asserted that, "Without NAFTA, it will be business as usual with Mexico. U.S. firms will continue to face . . . investment requirements . . . and a complete lack of certainty about the conditions of doing business in Mexico."[76] The plaintiffs thus argue that an order declaring NAFTA unconstitutional as a matter of United States law would clearly have an effect on Mexican trade policies with respect to the United States, noting that in Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59 (1978), the Supreme Court held that "a party seeking to invoke federal jurisdiction [is not required to] negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief."[77]

This court's authority to issue a declaratory judgment in this case redressing their injuries is, according to the plaintiffs, enough to satisfy the Supreme Court's standing requirements.[78] Plaintiffs note that in Powell v. McCormack, the Court considered a claim by a Congressman who alleged that he had been unlawfully excluded from the House of Representatives, and who sought declaratory,

[74] Id. at 685.

[75] Id. at 695.

[76] Id.

[77] Id. at 78.

[78] Plaintiffs, citing Larson v. Valente, 456 U.S. 241 (1982), note that although they must demonstrate that their requested relief is "likely, as opposed to merely speculative, that their injuries will be redressed by a favorable decision," they do not need to demonstrate that such relief will redress all of their injuries. In Larson, the Court held that an organization had standing to seek a declaration that a provision exempting from a charitable solicitations statute only those religious organizations that received more than fifty percent of their contributions from members or affiliated organizations was invalid even though the plaintiff organization still might not qualify as a religious organization entitled to exemption. The Court found that "[a]t the very least . . ., a declaration that [the] fifty per cent rule is unconstitutional" would "surely [make it] more burdensome" for the state to establish that the organization was not exempt. 456 U.S. at 242-43.

mandatory and injunctive relief against certain House members, officials and employees. The Court determined that the plaintiff's request for a declaration that his exclusion was unconstitutional was sufficient, standing alone, to render the case justiciable.[79] Plaintiffs argue that in this case, as in Powell, the declaratory relief sought is sufficient to establish standing. The plaintiffs also argue that several other cases have found that a request for declaratory relief is sufficient to establish standing even when it is unclear as to whether or not the government actor will be bound by the declaration. For example, the plurality opinion in Franklin v. Massachusetts, 505 U.S. 788 (1992), determined that a request for declaratory relief against an agency satisfied the redressability requirement despite the fact that a declaration would not directly bind the President or the other relevant executive and congressional actors. The Court concluded that the declaration was substantially likely to redress the plaintiff's injury because the Court found that it was "substantially likely that the President and other[s] . . . would abide by an authoritative" declaratory judgment.[80]

Thus, despite being arguably unable to definitively predict what all of the repercussions of an order declaring NAFTA unconstitutional might be, the plaintiffs argue that they have clearly established that the nullification of NAFTA would eliminate provisions that injured them. The purpose of NAFTA was to bring about a sweeping change in the terms and conditions under which companies do business in Canada, Mexico and the United States. It was recognized by the President that the changes made in United States-Mexico trade policies would not have come about without NAFTA. The Statement of Administrative Action clearly acknowledges that some Americans would lose jobs as a result of the implementation of NAFTA. In 1997, the International Trade Commission recognized that some sectors and regions of the United States had suffered job "dislocations" and

---

[79] Powell, at 517-18.

[80] Franklin, 505 U.S. at 803.

earnings reductions as a result of NAFTA.[81]

The plaintiffs argue that the Court's standing determination in Bennett v. Spear, 520 U.S. 154 (1997), repudiates the Government's assertion that executive department officials might choose to ignore this court's order. In Bennett, the Supreme Court found that the plaintiffs had met their burden on the redressability element of the standing analysis despite questions as to whether the agency involved would conform to a court order, stating that the plaintiffs' burden was "relatively modest at this stage of the litigation."[82]

The Government maintains that the plaintiffs' request for declaratory relief is insufficient to confer standing in this case, as the plaintiffs are still unable to show that it is "substantially likely" that the declaration will redress their injuries. The Government notes that the Declaratory Judgment Act does not discharge the plaintiffs from their obligation to establish that their claim can be redressed by a favorable decision. The plaintiffs' assertion that standing has been found to exist in cases where it was far from clear that the government actor involved would be bound by a court order is, according to the Government, patently false. The cases cited by the plaintiffs, comments the Government, all involved a finding that it was substantially likely that the government officials involved would abide by a declaratory judgment. Thus, in Bennett v. Spear, the Court found that the threat of substantial civil and criminal penalties had a "powerful coercive effect" on the agency involved, and therefore provided a sufficient prospect of remedial action.[83] Similarly, the Court found in Franklin v. Massachusetts that it was "substantially likely that the President and other[s]" would abide by a declaratory judgment issued against the Secretary of Commerce.[84] The Lujan decision,

---

[81] ITC, Investigation No. 332-381: The Impact of the North American Free Trade Agreement on the U.S. Economy and Industries: A Three-Year Review, 4-1, 4-15, 4-18, 4-19 (July 1997).

[82] Bennett, 520 U.S. at 171.

[83] 520 U.S. at 166-71.

[84] 505 U.S. at 803.

argues the Government, engages in an analysis that would be appropriate in this case. In Lujan, the Court found that because only the Secretary of the Interior would be bound by a decree (as the Secretary was the only named party), the decree sought by the plaintiffs would not redress their alleged injuries.[85]

The Government argues that even if NAFTA were declared unconstitutional, such declaration would not guarantee action by the governments of Canada and Mexico that would serve to remedy the injuries to plaintiffs' lost jobs, wages, and benefits or the plaintiffs' ability to purchase American-made goods. Along those lines, the Government alleges that, with respect to Mexico, the implementation of NAFTA was not the sole, nor necessarily the primary, factor in motivating American companies to move their operations to that country or in causing steelworkers to lose their jobs to Mexican workers. The Government points out that American steel manufacturers had, for some time before the implementation of NAFTA, been subject to the competitive pressure of European steelmakers, and that it is possible that the opening of the Mexican labor market did not replace American, but European, jobs. Further, noting the statements made by various congressmen in the Congressional Record, the Government asserts that American companies had been moving to Mexico well before the implementation of NAFTA.[86]

The Government argues that the plaintiffs' arguments are even more tenuous with respect to Canada, noting that prior to the approval and implementation of NAFTA, the United States-Canada Free Trade Agreement eliminated tariffs and eliminated or reduced other trade barriers between the two nations.[87] Although the United States and Canada agreed to suspend the operation of the earlier

---

[85] 504 U.S. at 569-70.

[86] See 139 Cong. Rec. H9894 (daily ed. Nov. 17, 1993) (statement of Rep. Vento); id. at H9879 (statement of Rep. Lewis); id. at H9898-H9899 (statement of Rep. Ford); id. at H9904 (statement of Rep. Wyden); id. at H9906 (statement of Rep. Linder); id. at H9917 (statement of Rep. Fawell).

[87] Pub. L. No. 100-449, 102 Stat. 1851 (1988).

agreement while both parties are participants in NAFTA, the suspension of NAFTA would cause the earlier agreement to once again come into force. Thus, the Government argues that the plaintiffs' complaints regarding the movement of businesses to Canada will surely not be remedied by the eradication of NAFTA.

The Government claims that Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d 968 (D.C. Cir. 1988) and Greater Tampa Chamber of Commerce v. Goldschmidt, 627 F.2d 258 (D.C.Cir. 1980), illustrate that, in this case, the plaintiffs' reliance on the predicted actions of independent actors – the governments of Mexico and Canada and the heads of businesses – makes a finding of redressability impossible. In Dellums, the D.C. Circuit considered a claim by an unemployed uranium miner in New Mexico who challenged the Nuclear Regulatory Commission's decision to grant a license to import uranium from South Africa. Recognizing that the miner's inability to find employment constituted injury in fact, the court nonetheless found that the plaintiff lacked standing because he did not and could not show that it was substantially likely that the relief he sought would redress his injury. The court found that the chain of inferences suggested by the plaintiff to show that a reversal of the regulatory commission's decision would remedy his situation was too tenuous to satisfy the redressability element of the standing inquiry.[88] The court noted that even if the commission were to ban the importation of uranium from South Africa into the United States and the plaintiff could show that such a ban would benefit the uranium mining industry in the United States as a whole, such a showing would still fall short of the requisite showing to establish standing. The court found that the plaintiff would have to show that the revival in the industry would occur in New Mexico (the plaintiff's home state) and that it would benefit him if it did.[89] Thus, the court held that a plaintiff does not have standing "when the effectiveness of the relief requested depends on the

---

[88] See Dellums, 863 F.2d at 973.

[89] See id. at 974.

unforeseeable actions of a foreign nation."[90]

Similarly, in Goldschmidt the plaintiffs challenged the validity of an executive agreement regulating air travel between the United States and the United Kingdom, claiming that the agreement was invalid because it was a treaty that should have been submitted for Senate approval. The D.C. Circuit found that even if it did declare the agreement invalid, the plaintiffs had failed to establish that the United Kingdom would react by changing its demands or requirements, and that, therefore, the remedy was not substantially likely to redress the plaintiffs' injuries.[91]

The Government asserts that, as in Dellums and Goldschmidt, the plaintiffs have failed to show that declaring NAFTA unconstitutional would be substantially likely to cause Canada and Mexico to alter their trade policies or to cause American companies to return to or remain in the United States.[92] Further, the Government alleges that the plaintiffs have failed to show that any such resurgence would truly remedy their injuries. This court's inability to control or predict the actions of Canada and Mexico and thus, its inability to determine whether a given remedy will redress the plaintiffs' injuries clearly shows that the plaintiffs lack standing in this case according to the

[90] Id. at 976.

[91] Goldschmidt, 627 F.2d at 263

[92] The Government asserts that the chain of inferences required to establish plaintiffs' redressability claim is even more tenuous than that required in Dellums, and that to create a link between the plaintiffs' alleged injuries and NAFTA, this court would have to infer that: (1) all the current investment and trade policies of the governments of Mexico and Canada are due to NAFTA; (2) the American companies that moved their operations to Mexico and Canada did so largely because of NAFTA; (3) if the President were ordered to withdraw from NAFTA, the governments of Canada and Mexico would change their current investment and trade policies; (4) these changes would make investment in Mexico and Canada less attractive to American companies; (5) these changes would result in American companies leaving Mexico and Canada; (6) American companies that decide to leave Mexico and Canada would not relocate their operations to other third-countries or would not shut down their operations entirely; and (7) those American companies that return to the United States would locate their operations in areas that would provide employment opportunities to members of the plaintiff-organizations. Plaintiffs have failed, argues the Government, to show that there is a substantial likelihood that any of these changes would come to pass if NAFTA were declared unconstitutional.

Government. Further, according to the Government's reading of Allen v. Wright, Simon v. Eastern Kentucky Welfare Rights Organization, and Dellums, a change in economic incentives alone, without a showing that the change is likely to lead to a reaction that redresses the alleged injury, is insufficient to establish standing. Thus, the Government argues that the plaintiffs must not only show that the relief they seek is likely to result in a change in economic incentives to American companies in the trade policies of the United States, Mexico and Canada, they must also establish that the American companies that have moved or might move their operations to Canada or Mexico will either return to or remain in the United States.

The plaintiffs argue that the Government's reliance on Dellums and Goldshmidt is misplaced. In Dellums, the plaintiffs contended that a ban on the importation of uranium hexofloride, when combined with existing sanctions against South Africa, would "be the proverbial 'straw that breaks the camel's back' and lead to the collapse of the apartheid system."[93] The court in Dellums found that it was completely implausible to suggests that halting the import of uranium from South Africa into the United States would lead to the collapse of apartheid and that it was unlikely that a ban on such imports would lead to any upsurge in the United States uranium mining industry, especially in light of the "dismal" state of the industry as compared to that found in other uranium mining nations.[94] Plaintiffs also note that the miner in Dellums made "no claim that the market opening created by a ban on the importation of South African uranium hexafloride would not merely be absorbed by other foreign suppliers . . ."[95] In Goldschmidt, the plaintiffs acknowledged that the United Kingdom would not agree to any modification of the flight limits that had been agreed to in the executive agreement

---

[93] Dellums, 863 F.2d at 975-76.

[94] Id. at 973-74, 976.

[95] Id. at 973.

at issue, thus leading the court to decide that a given remedy was unlikely to result in relief.[96] Thus, the plaintiffs argue that the likelihood of response by a foreign nation in this case is clearly much greater than in Dellums or Goldschmidt. Here, unlike the other two cases, there exists a clearly established pattern of trade practices on the part of the relevant foreign nations which reveals what their behavior would most likely be like in the absence of the Agreement. Further, the plaintiffs again argue that even those involved in the approval and implementation of NAFTA are aware of the fact that the changes brought on by the Agreement would not have come if not for its existence.

The plaintiffs argue that Simon and Allen both involved similarly speculative claims. In Simon, the court found that the plaintiffs had not established that their injuries would be remedied by a declaration invalidating an Internal Revenue Service Revenue Ruling suggesting that hospitals did not have to provide free medical care to the indigent to qualify as charitable organizations under the Internal Revenue Code. The plaintiffs alleged only that the Revenue Ruling encouraged hospitals not to perform such services for the indigent. The court found that the connection between the Revenue Ruling and the injury was simply too tenuous to establish that the invalidation of the ruling would redress the plaintiffs' injuries.[97] In Allen, the court found that an injunction ordering the IRS to deny tax exempt status to racially segregated schools was not likely to redress the plaintiffs' claimed injury – denial of an integrated education.[98]

The plaintiffs argue that the redressability claims addressed in Dellums, Goldschmidt, Simon and Allen, and, in fact, all the cases cited by the Government were far more speculative than those

---

[96] See Goldschmidt, 627 F.2d at 263. Interestingly, the Goldschmidt court also noted that there was no reason to believe that the Senate would not approve the agreement if it were to be submitted as a treaty, and thus no reason to believe that an order would redress the plaintiffs' injuries. Id. Such is not the case here, as NAFTA clearly failed to garner a two-thirds majority when voted on by the Senate.

[97] Simon, 426 U.S. at 30-31, 42-44.

[98] Allen, 468 U.S. at 757-59.

presented in this case.[99] According to the plaintiffs, they have, unlike the plaintiffs in the above-noted cases, sought relief that will logically remedy their injuries by, to some degree, eliminating the clearly identified source of those injuries. Thus, the plaintiffs liken their redressability argument to those presented in cases such as Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150 (1970) and Investment Co. Inst. v. Camp, 401 U.S. 617 (1971), where the Court found that a company has standing to challenge a government decision that confers a benefit on its direct competitors without

---

[99] The plaintiffs argue that the Supreme Court's finding of standing in Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221 (1986), when compared to this case, was based on far less evidence with respect to the likely outcome of a court decision on another country's actions. In Japan Whaling, the Supreme Court held that although there could be no assurance that the application of an import ban would be effective in inducing Japan to conform to international whaling quotas, environmental groups had standing to challenge a decision by the Secretary of Commerce not to prohibit certain imports from Japan in response to that nation's failure to abide by those quotas.

The Government argues that, contrary to the plaintiffs' description, the Japan Whaling court had before it a substantial amount of information indicating what the impact of a judicial decision on Japan's willingness to abide by the whaling quotas would be. In Talenti v. Clinton, 102 F.3d 573 (D.C.Cir. 1996), the D.C. Circuit, in addressing the plaintiff's standing, stated:

Talenti claims that his standing to bring a challenge to the inaction of the Executive Branch is established by the Supreme Court's opinion in Japan Whaling Ass'n v. American Cetacean Society. In that case, wildlife conservation groups sought to compel the Secretary of Commerce to certify that Japan was conducting fishing operations in violation of international whaling agreements. Such a certification would have required the Executive Branch to impose economic sanctions against Japan. Rejecting challenges to justiciability, the Court reached the merits of the claim and held that the statute did not mandate certification.

We hold that Japan Whaling is readily distinguishable. In that case, once the Secretary of Commerce made the requested certification, the Secretary of State was mandated to sanction the offending nation by halving its allocation within the United States' fishery conservation zone. There was, in addition, a track record suggesting that the threat of sanctions would compel compliance with the whaling agreements. Violations of the whaling agreements had been certified on five separate occasions – each under a prior law making the imposition of sanctions discretionary. On each occasion the threat of sanctions had caused the offending nations to conform their fishing operations.

102 F.3d at 578. The Government contends that the plaintiffs have failed to establish the existence of any "track record" with respect to Canadian and Mexican trade and investment policy and have, therefore, even under Japan Whaling, failed to establish redressability.

having to establish exactly what would transpire in the absence of that benefit.[100]

## D. Second Conclusion of the Court

I conclude that the institutional plaintiffs have sufficiently alleged injuries that are fairly traceable to NAFTA and the Implementation Act and there is substantial likelihood that their injuries would be redressed by a favorable decision. I reject the Government's argument that NAFTA is separate and distinct from its implementing legislation. It is obvious that the Agreement and the Implementation Act were designed to be and intended to be applied in tandem.

If there is a violation, it is a continuing violation. Some previously accrued injuries may not be redressable, but that is not to say that future injuries may not be avoided. I cannot conclude that a declaration that NAFTA was unconstitutionally made and implemented would be ignored by the Executive Branch. The President, acting in good faith, could give the six month notice to revoke the Agreement. Such action would address and would be substantially likely to redress the institutional plaintiffs' injuries.[101]  I will not assume that the President will ignore established law. I will not conclude that the President, like Andrew Jackson, would state that since the court has made its decision, it could enforce it. I agree with Justice Story, who said in response, "The Court has done its duty. Let the Nation now do theirs. If we have a Government, let its command be obeyed; if we have not, it is as well to know it at once, and look to the consequences." I believe that if a controlling

---

[100] The Government points out that the Camp "competitive injury" cases address the "injury in fact" prong of the standing analysis rather than the question of whether the plaintiffs' requested relief is "substantially likely" to redress their injuries. Citing Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 507 (9th Cir. 1988), the Government contends that the mere fact that the Camp Courts found that the plaintiffs had been injured by governmental actions in favor of their competitors did not relieve the plaintiffs of their burden of showing that their requested remedy would redress their injuries.

[101] The relief requested in this case is clearly not as speculative as that sought in cases such as Dellums, Goldshmidt, Simon and Allen. NAFTA clearly and admittedly represents one of the causes of the plaintiffs' alleged injuries. The United States' repudiation of NAFTA would likely have a profound effect on those businesses that have moved to Mexico or Canada in reliance on NAFTA's provisions and on the future choices of American industry with respect to those nations, and would be substantially likely to result in benefits for the plaintiffs.

court declares NAFTA to be unconstitutional, that decree will be obeyed and it is substantially likely that at least some of the institutional plaintiffs' alleged injuries will be redressed.[102]

## III. Political Question

The central issue in this case concerns the question of what procedure the United States must follow to adopt and implement a particular international trade agreement. According to the Government, this question is not the type of question that can be properly addressed by the judiciary. Rather, argues the Government, because the text of the Constitution fails to dictate the proper procedure and because the Constitution has clearly granted both the legislative and judicial branches an enormous amount of authority in the areas of foreign affairs and commerce, the choice of what procedure to use is committed to the discretion and expertise of the legislative and executive branches by virtue of the political question doctrine.

The political question doctrine is part of Article III's case or controversy consideration and has its roots in separation of powers concerns.[103] The political question doctrine differs, however, from other "case or controversy" and jurisdictional analyses. As observed by Ronald Rotunda and John Nowak in their Treatise on Constitutional Law,

An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review. Unlike other restrictions on judicial review – doctrines such as case or controversy requirements, standing, ripeness and prematurity, abstractness, mootness, and abstention – all of which can be cured by different factual circumstances, a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny.

Rotunda and Nowak, 1 Treatise on Constitutional Law § 2.16 (2d ed. 1992).

In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court enumerated six features that can

---

[102] As noted above, the Supreme Court, in Franklin v. Massachusetts, left open the question "whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty." 505 U.S. 802. Similarly, this court will not reach that issue. Neither will this court address whether or not giving notice of the termination of an agreement amounts to a purely "ministerial" act.

[103] See Baker v. Carr, 369 U.S. 186, 210 (1962).

be used to identify a nonjusticiable case:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

396 U.S. at 217. Any one of the above-listed characteristics may be sufficient to preclude judicial review.[104]

In Goldwater v. Carter, 444 U.S. 996 (1979), Justice Powell's concurrence suggested that

the Baker analysis could be condensed into a three-question inquiry:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government?
>
> (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise?
>
> (iii) Do prudential considerations counsel against judicial intervention?[105]

The Government has used this framework in addressing the political question issue. The plaintiffs

have responded to the Government's assertions with respect to each of the questions and, in addition,

provided a general argument in favor of the court's jurisdiction in this case.

The considerations raised by the political question doctrine, although jurisdictional in nature,

require the court, in this case, to examine issues that are central to the merits of the case. For

instance, much of the discussion concerning the "textual commitment" prong of the Baker analysis

will involve language, arguments and case citations that are repeated, to some degree, in the parties'

---

[104] Id.

[105] See 444 U.S. at 998.

discussions on the merits of the case.[106] Some repetition is regarded by the court as a necessary evil, as it is important that the political question issue be addressed prior to a full discussion of the merits and as the parties have often used the same language, arguments and citations for different purposes in addressing the two issues.

## A. Textual Commitment: The Authority of the President and Congress in the Areas of Foreign Affairs and Commerce

The Government argues that this case presents a classic example of a matter committed by the text of the Constitution to the political branches of the federal government, pointing to the vast amount of power conferred on the President and Congress by the text of the Constitution in the areas of foreign affairs and foreign commerce.

The Supreme Court has recognized that the President is the Nation's "guiding organ in the conduct of our foreign affairs," in whom the Constitution vests "vast powers in relation to the outside world."[107] In Department of Navy v. Egan, 484 U.S. 518 (1988), the Court noted that it has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive.'"[108] The breadth of the President's foreign affairs powers rise from his role as Chief Executive,[109] and Commander in Chief.[110] The President's authority in the foreign affairs arena is further strengthened by his enumerated powers to "make Treaties" with the advice and consent of

---

[106] Counsel for the Government has acknowledged that, in analyzing the political question doctrine for the purposes of this case, the court must "peek at the merits," in determining whether the power to decide how to adopt and implement a given international agreement has been textually committed to the political branches of the federal government.

[107] Ludecke v. Watkins, 335 U.S. 160, 173 (1948).

[108] 484 U.S. at 529.

[109] U.S. Const. Art. II, § 1, cl. 1.

[110] Id. Art. III, § 2, cl. 1.

two-thirds of the Senate present,[111] to "appoint Ambassadors . . . and Consuls,"[112] and to receive Ambassadors and other public Ministers.[113]

Congress's enumerated powers in the realm of foreign affairs include its power to declare war,[114] its broad power to regulate commerce with foreign nations,[115] and the Senate's advice and consent role in the constitutionally-outlined treaty-making process.[116] Other relevant delegations of power, according to the Government, include the Congress's power to raise revenue,[117] and the power to lay and collect taxes, duties, imposts and excises.[118]

The Government asserts that the textual grants of authority to the President and Congress in the areas of foreign affairs is comprehensive, placing plenary authority over international agreements in the hands of the political branches of the federal government, and leaving no role for the Judiciary.[119] The Government further notes the Supreme Court's recognition that the power of the political branches of the federal government includes the authority to conclude international "agreements that do not constitute treaties in the constitutional sense," as noted in United States v.

_____

[111] Id. Art. II, § 2, cl. 2.

[112] Id.

[113] Id. Art. II, § 3.

[114] Id., Art. I, § 8, cl. 11.

[115] Id. Art. I, § 8, cl. 3.

[116] Id. Art. II, § 2, cl. 2.

[117] Id. Art. I, § 7, cl. 1,

[118] Id. Art. I, § 8, cl. 1.

[119] In Antolok v. United States, 873 F.2d 369 (1989), the D.C. Circuit commented that "nowhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, in any fashion in the making of international agreements." This language, according to the Government, supports the idea that the judiciary should not intervene to invalidate decisions made by Congress and the President concerning foreign affairs or foreign commerce.

Case 4:98-cv-01794-RBP   Document 42   Filed 07/23/99   Page 48 of 156

Page -48-

Curtiss-Wright Export Corp.,[120] Based on the broad scope of the Presidential and Congressional powers specifically provided for in the Constitution's text and the Supreme Court's recognition of the power of the political branches to complete non-treaty international agreements, the Government argues that foreign affairs and foreign commerce are, in terms of the Baker criteria, areas committed by the text of the Constitution to the Executive and Legislative branches, and that the plaintiffs' claims are, therefore, nonjusticiable.[121]

The Government argues that, despite providing a lengthy exposition on the origins of the Treaty Clause (below), the plaintiffs fail to make any attempt to reconcile their interpretation of the Clause with the enumerated powers of both the President and the Congress, and that the plaintiffs' arguments therefore fail to address the issue of whether and to what extent Congress's broad foreign commerce power overlaps, limits or conflicts with the provisions of the Treaty Clause. Even if they attempted to do so, argues the Government, the plaintiffs would fail to establish the existence of any limits on the power. The Government notes that neither the political branches nor the courts have ever recognized such limitations, and asserts that Justice White's concurrence in Downes v. Bidwell, 182 U.S. 244, 313 (1901), supports the contention that the Treaty Clause should not be interpreted

_____

[120] The plaintiffs argue that the Curtiss-Wright Court's recognition that the federal government has "the power to make such international agreements as do not constitute treaties in the constitutional sense," 299 U.S. 304, 318, necessarily implies that certain agreements do constitute treaties in the constitutional sense. Further, plaintiffs maintain that, although the cases cited by the Government may stand for the idea that certain international agreements may be approved by a majority vote of Congress, they certainly do not support the contention that the political branches are free in every case to choose freely between the procedures outlined in the Treaty Clause and other methods of approval. The plaintiffs argue that if the Treaty Clause means anything, it means that some kinds of international agreements cannot be made without the approval of two-thirds of the Senate.

[121] The Government compares this case to Nixon v. United States, 506 U.S. 224 (1993), where the Supreme Court found that because the constitutional authority to try impeachments was textually committed to the Senate, a challenge to the Senate's impeachment procedures was nonjusticiable.

to curtail Congress's power under the Foreign Commerce Clause.[122]

_____

[122] The Government's citation is to a section of Justice White's concurrence that discusses whether, upon the United States' acquisition of territory, such territory becomes absolutely incorporated into the United States, thus causing every provision of the Constitution which would apply under that situation to becomes controlling in such acquired territory. With respect to that question, Justice White states:

Let me come . . . to a consideration of the express powers which are conferred by the Constitution, to show how unwarranted is the principle of immediate incorporation, which is here so strenuously insisted on. In doing so it is conceded at once that the true rule of construction is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth. Undoubtedly, the power to carry on war and to make treaties implies also the exercise of those incidents which ordinarily inhere in them. Indeed, in view of the rule of construction which I have just conceded--that all powers conferred by the Constitution must be interpreted with reference to the nature of the government and be construed in harmony with related provisions of the Constitution--it seems to me impossible to conceive that the treaty-making power by a mere cession can incorporate an alien people into the United States without the express or implied approval of Congress. And from this it must follow that there can be no foundation for the assertion that, where the treaty-making power has inserted conditions which preclude incorporation until Congress has acted in respect thereto, such conditions are void and incorporation results in spite thereof. If the treaty-making power can absolutely, without the consent of Congress, incorporate territory, and if that power may not insert conditions against incorporation, it must follow that the treaty-making power is endowed by the Constitution with the most unlimited right, susceptible of destroying every other provision of the Constitution; that is, it may wreck our institutions. If the proposition be true, then millions of inhabitants of alien territory, if acquired by treaty, can, without the desire or consent of the people of the United States speaking through Congress, be immediately and irrevocably incorporated into the United States, and the whole structure of the government be overthrown. While thus aggrandizing the treaty-making power on the one hand, the construction at the same time minimizes it on the other, in that it strips that authority of any right to acquire territory upon any condition which would guard the people of the United States from the evil of immediate incorporation. The treaty-making power, then, under this contention, instead of having the symmetrical functions which belong to it from its very nature, becomes distorted,--vested with the right to destroy upon the one hand, and deprived of all power to protect the government on the other.

And, looked at from another point of view, the effect of the principle asserted is equally antagonistic, not only to the express provisions, but to the spirit of the Constitution in other respects. Thus, if it be true that the treaty-making power has the authority which is asserted, what becomes of that branch of Congress which is peculiarly

## 1. Plaintiffs' Response

The plaintiffs do not contest the Government's assertion that the political branches have substantial authority over foreign affairs and commerce. However, they contend that, as in I.N.S. v. Chadha, 462 U.S. 919 (1983), what is at issue is not the authority of a branch of government over a certain subject matter, but whether that branch "has chosen a constitutionally permissible means of implementing that power."[123] Thus, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."[124] The plaintiffs argue that the "textual commitment" element of the Baker analysis requires more than a showing that the federal government has plenary authority in an area. Further, while the Government stresses the importance of the United States' ties with the foreign nations involved with NAFTA and other international agreements, the plaintiffs note that the Supreme Court has recognized that "foreign commitments" cannot relieve the government of the obligation to "operate within the bounds laid down by the Constitution," and that the prohibitions of the Constitution . . . cannot be nullified by the Executive or by the Executive and

_____

the representative of the people of the United States, and what is left of the functions of that body under the Constitution? For, although the House of Representatives might be unwilling to agree to the incorporation of alien races, it would be impotent to prevent its accomplishment, and the express provisions conferring upon Congress the power to regulate commerce, the right to raise revenue,--bills for which, by the Constitution, must originate in the House of Representatives,--and the authority to prescribe uniform naturalization laws, would be in effect set at naught by the treaty-making power.
Downes, 182 U.S. at 311-13.

[123] Chadha, 462 U.S. at 940-41. In Chadha, the Supreme Court held that the section of the Immigration and Nationality Act authorizing a one-House veto power over executive department decisions made pursuant to the Act was unconstitutional. The Court held that such an action was essentially legislative in nature and should, therefore, be subject to the constitutional requirements of bicameral passage by majority vote and presentment to the President. Thus, although the Court recognized the Congress's plenary power to legislate in the area of immigration, it held that such power was still subject to limitations included in the text of the Constitution and to judicial review.

[124] Japan Whaling, 478 U.S. at 229-30 (quoting Baker v. Carr, 369 U.S. at 211).

Senate combined."[125] Thus, courts have the authority to invalidate treaties that violate the Constitution, despite the power of the Executive and Legislative branches in the areas of foreign affairs and commerce.[126]

Suggesting that the terms of the Treaty Clause allow the political branches of the government to exercise unfettered discretion in determining whether to subject a particular international agreement to the rigors of the Clause's procedural requirements is to ignore the language of the Constitution, according to the plaintiffs. The plaintiffs contend that, if an agreement constitutes a treaty within the meaning of Article II, there is only one way in which it can be adopted – the Treaty Clause. Thus, as stated by the Supreme Court in Weinberger v. Rossi, 456 U.S. 25 (1982), "[s]ubmission of Art. II treaties to the Senate for ratification is . . . required by the Constitution."[127]

Plaintiffs point to the Court of Claims decision in Atkins v. United States, 556 F.2d 1028 (Ct.Claims 1977), as further support for their contention that the Government's "textual commitment" argument is deeply flawed. In Atkins, the court faced the question of whether a claim

---

[125] Reid v. Covert, 354 U.S. 1, 14, 17 (1957).

[126] See Id., see also The Cherokee Tobacco, 78 U.S. (11 Wall.) 616, 620 (1870). The Ninth Circuit has commented that there "is no doubt that the power to make treaties is circumscribed by the substantive provisions of the Constitution, and that the courts are competent to pass on the constitutionality of treaties." In re Aircrash in Bali, 684 F.2d 1301, 1309 (9th Cir. 1982), cert. denied, 493 U.S. 917 (1989).

[127] Weinberger v. Rossi, 456 U.S. 25, 30 n.7 (1982). The Court's statement came within the context of an examination of the degree to which Congress has distinguished between treaties and other international agreements. The Court stated:

Congress has not been consistent in distinguishing between Art. II treaties and other forms of international agreements. For example, in the Case Act, 1 U.S.C. § 112b(a) (1976 ed., Supp.IV), Congress required the Secretary of State to "transmit to the Congress the text of any international agreement, ... other than a treaty, to which the United States is a party" no later than 60 days after "such agreement has entered into force."

456 U.S. 30. The Court then, in a footnote, stated:

In this context, it is entirely logical that Congress should distinguish between Art. II treaties and other international agreements. Submission of Art. II treaties to the Senate for ratification is already required by the Constitution.

Id. at n.7.

that a judicial pay act violated the Article III Compensation Clause was nonjusticiable. The court recognized that the Constitution placed the power to set judges' salaries in the hands of the legislative and executive branches, but noted that the grant of authority contained an express limitation on that power, declaring that "those salaries, once set, shall not be diminished."[128] The court thus questioned:

> How can it be said that the matter . . . is totally committed by the [Constitution] to determination by Congress and the President, without opportunity for judicial intervention, when the [Constitution] contains language that pointedly limits the kind of determination they may make?

Id. The plaintiffs argue that the Treaty Clause contains the same type of pointed limitation on the political branches' authority to conclude treaties, requiring two-thirds Senate approval.

With respect to the Government's citation to Downes v. Bidwell, the plaintiffs simply point out that the language cited is that of a concurring justice, and that the case involved violations of the structure of constitutional provisions not at issue in this case.

## B. Judicially Manageable Standards

The Government also contends that a decision as to whether a particular international agreement should be approved as a treaty or through some other procedure would require this court to consider areas beyond its judicial expertise, as there are, according to the Government, no judicially manageable standards for determining whether an international agreement should be approved pursuant to the Treaty Clause as opposed to some other procedure. While recognizing that it is the role of the courts to interpret the Constitution, the Government argues that Baker v. Carr clearly establishes that this role does not empower the courts to make decisions in the absence of judicially manageable standards.[129] Both the constitutional text and historical precedent support this conclusion, according to the Government.

Citing Marbury v. Madison, 5 U.S. (1 Cranch) 60 (1803), Powell and Chadha, the plaintiffs

---

[128] Atkins v. United States, 556 F.2d 1028, 1052 (Ct.Claims 1977).

[129] Baker, 369 U.S. at 217.

respond that interpretation of the text of the Constitution is not only judicially manageable, but is at the very essence of the judiciary's duty. Writing for a three-judge district court panel in Dyer v. Blair, 390 F.Supp. 1291 (E.D.Ill. 1975), Justice Stevens wrote, "The mere fact that a court has little or nothing but the language of the Constitution as a guide to its interpretation does not mean that the task of construction is judicially unmanageable."[130] According to the plaintiffs, the Supreme Court's opinions in United States v. Munoz-Flores, 495 U.S. 385, 395-95 (1990), Powell, 395 U.S. at 548-49 and Chadha, 462 U.S. at 942, support the contention that there exists no lack of judicially manageable standards where the underlying determination to be made is legal in nature, i.e., concerning the interpretation of a legal text such as the Constitution, even in the absence of clearly defined textual terms.[131] Thus, argue the plaintiffs, the lack of a constitutionally-provided definition for the term "treaty" does not deprive this court of judicially manageable standards by which to rule on the merits of this case.

## 1. The Government's Manageability Arguments With Respect to the Constitutional Text and Judicial Precedent

The Government notes that although the Constitution does not provide definitions for the terms "treaties," "agreements," and "compacts," it does mention each term. The term "treaty" is used both in the Treaty Clause,[132] and in the Compact Clause.[133] The Treaty Clause states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur." The Compact Clause refers to the power of

---

[130] Dyer v. Blair, 390 F.Supp. 1291, 1302 (E.D.Ill. 1975)

[131] The plaintiffs point out that the Court has been willing to interpret and strictly apply the provisions of the Appointments Clause despite the fact that "the Framers provided little guidance" as to how key terms in the provision should be construed. Morrison v. Olson, 487 U.S. 654, 671 (1988).

[132] U.S. Const., art. II, § 2, cl. 2.

[133] Id., Art. I, § 10, cl. 3.

the states to deal with foreign powers, completely prohibiting the states from making "treaties" with foreign nations. However, the Compact Clause differentiates between "treaties" on the one hand, and "agreements" and "compacts" on the other, providing that states may not enter into "agreements or compacts" with foreign powers without the consent of Congress. Thus, while completely preventing states from entering into "treaties" with foreign powers, the Constitution allows them to enter into "agreements or compacts" provided they obtain the consent of Congress. With respect to the federal government's involvement in international agreement-making, the Treaty Clause, as noted above, explicitly outlines a process by which at least some treaties may be made. However, the text of the Constitution does not define the term "treaties", does not delineate the difference between treaties and those other international agreements it mentions, does not address the procedures by which other international agreements might be completed, and does not explicitly state that treaties are the exclusive means by which the federal government may make agreements with foreign powers or that the Treaty Clause procedure is the only manner in which a treaty may be made.

The Government contends that the lack of specificity within the constitutional text has resulted in a lack of judicially manageable standards for the resolution of this case, and that Supreme Court case law has borne out this proposition. In Goldwater v. Carter, 444 U.S. 996 (1979), members of Congress challenged the President's unilateral termination of a treaty. A plurality of the Court determined that the case was nonjusticiable because the text of the Constitution failed to provide any guidance on the issue. Joined by three other members of the Court, Justice Rehnquist noted that although the Constitution provides a clear outline of the Senate's role in the making of a treaty, the document fails to discuss the Senate's (or Congress's) role in the termination of treaties. Justice Rehnquist thus concluded that "in light of the absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties . . ., the instant case . . . 'must surely be controlled by political

standards,'" rather than judicially manageable standards.[134]

Similarly, in Nixon v. United States, 506 U.S. 224 (1993), the Court found that because the Constitution did not place any limits on the Legislative branch's discretion in dictating the procedures surrounding impeachment proceedings, a former judge's claim, that the rules and procedures used by the Senate in trying impeachments were improper, was not justiciable. The Court noted that in Powell v. McCormack it had held that the judiciary could review the House of Representatives' finding as to a Member's qualifications because the Constitution specifically addressed those qualifications. The Nixon court contrasted the textual constraints placed upon the House membership qualifications with those placed upon the impeachment process, pointing out that the Constitution makes no mention whatsoever of the process by which the Senate is to try impeachments.[135] The Government argues that this case is analogous to Goldwater and Nixon in that the constitutional provision at issue does not provide an identifiable textual limit on the authority granted by the Constitution. Just as the Impeachment Clause fails to identify the proper process by which to try impeachments and the Treaty Clause fails to outline the Senate's role in the abrogation and/or termination of treaties, the Treaty Clause fails to explicitly outline the circumstances, if any, under which its procedures must be adhered to. Thus, argues the Government, this case presents a nonjusticiable issue.

The Government urges this court to follow in the footsteps of Dole v. Carter, 569 F.2d 1109 (10th Cir. 1977). In Dole, the Tenth Circuit "decline[d] to enter into any controversy relating to distinctions which may be drawn between executive agreements and treaties," in determining that a claim challenging the constitutionality of an international agreement made without the consent of two-thirds of the Senate was nonjusiciable. The Government claims that the plaintiffs' characterization of

---

[134] Goldwater v. Carter, 444 U.S. 996, 1003 (1979) (quoting Dyer v. Blair, 390 F.Supp. 1291, 1302 (N.D.Ill. 1975).

[135] Nixon, 506 U.S. at 236-38.

the Tenth Circuit's <u>Dole</u> decision is misleading.[136]   The issue in the case was "whether the understanding between the United States and Hungary is a treaty or an executive agreement not requiring Senate action."[137]   Given the Tenth Circuit's express recognition of the controversy surrounding the distinction between executive agreements and "treaties," and its refusal to address the issue, the Government argues that the <u>Dole</u> decision is directly applicable to this case.

## 2.   Plaintiffs' Response to the Government's Assertions Regarding Manageability and the Judiciary's Ability to Construe Constitutional Text

The plaintiffs contend that the absence of a definition for the term "treaty" within the Constitution's text does not confer unfettered discretion upon the political branches to decide whether a particular agreement is or is not a treaty requiring Treaty Clause procedures.  The Supreme Court has, according to the plaintiffs, repeatedly rejected suggestions to the contrary with respect to other constitutional provisions.  Thus, in <u>Chadha</u>, the Court found justiciable a claim calling for it to interpret the language of the Presentment Clause, which failed to specify exactly which actions required the concurrence of both Houses of Congress.[138]

Similarly, in <u>United States v. Munoz-Flores</u>, the Court was confronted with the question of whether a criminal statute requiring courts to impose a monetary "special assessment" on persons convicted of federal misdemeanors was a "bill for raising revenue" according to the Origination Clause of the Constitution.[139]  The Constitution does not provide any guidance on exactly what kinds of bills amount to bills "for raising revenue."  The Court, in electing to decide the issue on the merits, rejected the contention that in the absence of clear guidance in the text of the Constitution, such a determination should be considered a political question, stating:

---

[136] See, <u>infra</u>, (III)(B)(2).

[137] <u>Dole</u>, 569 U.S. at 1110.

[138] 462 U.S. at 981.

[139] Art. I, § 7, cl. 1.

To be sure, the courts must develop standards for making [such] determinations, but the Government suggests no reason that developing such standards will be more difficult in this context than in any other. Surely a judicial system capable of determining when punishment is "cruel and unusual," when bail is "[e]xcessive," when searches are "unreasonable," and when congressional action is "necessary and proper" for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges.

495 U.S. at 395-96.

Finally, despite the fact that "[t]he line between 'inferior' and 'principal' officers [as used in Article II, Section 2, clause 2 of the Constitution] is one that is far from clear, and the Framers provided little guidance as to where it should be drawn,"[140] the Supreme Court has found itself able to define the parameters of such terms and, consequentially, to interpret the effect of the provision.[141]

The plaintiffs contend that, contrary to the Government's position, the Supreme Court's Nixon and Goldwater decisions are consistent with their analysis of Powell and Chadha, supra. The Impeachment Clause at issue in Nixon provides that "[t]he Senate shall have the sole power to try all Impeachments."[142] The Clause contains three express procedural safeguards (that the Senators be under oath or affirmation, that two-thirds of the Senate vote to convict, and that the Chief Justice preside over any impeachment of the President). The plaintiffs argue, based on pages 229-36 of the Nixon decision, that the Court concluded that the challenge to the Senate's decision to delegate certain proceedings to a committee was non-justiciable as a result of its finding that the Framers had made a considered judgment to vest in the Senate the sole power to try impeachments subject only to the three safeguards. Also significant, according to the plaintiffs, is the Nixon Court's express recognition that, unlike Powell, a decision that the case was nonjusticiable would not allow the Senate

---

[140] Morrison v. Olson, 487 U.S. 654, 671 (1988).

[141] See Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 880-82 (1991); Buckley v. Valeo, 424 U.S. 1, 126 (1976).

[142] U.S. Const., Art. I, § 3, cl. 6.

to "defeat" any "separate provision of the Constitution."[143]

In Goldwater, Justice Rehnquist, one of the four justices who concluded that the question of whether the President had the power to unilaterally terminate a treaty was a nonjusticiable political question stated that, "while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to the body's participation in the abrogation of a treaty."[144] The plaintiffs note that even given this distinction, four justices expressly disagreed with the position that the case involved a nonjusticiable political question. The ninth justice, Justice Marshall, simply concurred in the result of the case, leaving no indication of his position on the political question issue. Thus, argue the plaintiffs, Goldwater fails to support the Government's claim that this case involves a political question beyond the reach of the Judiciary.

The plaintiffs contest the Government's reliance on Dole v. Carter, explaining that the Dole court's conclusion was limited to the facts before it, that the scope and basis of the court's ruling is difficult to discern, and that this case, unlike Dole, does not require the court to determine the wisdom of the underlying alleged political decision. In Dole, the Tenth Circuit refused to decide whether an agreement by the President to return the Hungarian crown jewels to that country constituted a treaty requiring Senate ratification. In so refusing, the court found that there was "no way for [the court to] ascertain [] the interest of the United States . . . in the controversy."[145] As noted above, the Dole court specifically limited its decision to the facts before it. Further, while the Dole court believed that a ruling in that case would have required the court to examine the wisdom

---

[143] Nixon, 506 U.S. at 237. The Government points out that both Powell and Chadha involved situations where the Court was called upon to review actions that arguably transgressed specific textual limits. See Powell, 462 U.S. at 521, Chadha 462 U.S. at 942. The Government argues that because the Congress's power under the Foreign Commerce Clause, unlike the grants of power in Powell and Chadha, is not subject to any textual limitation, this court lacks any judicially manageable standards by which to limit Congress's power.

[144] Goldwater, 444 U.S. at 1003.

[145] Dole, 569 F.2d at 1110.

of the President's action, this case, according to the plaintiffs, involves no such issue. The plaintiffs assert that the question presented in this case is purely a matter of law, requiring the court to undertake a regular judicial function. They argue that to the extent the Dole decision suggests otherwise, it conflicts with those cases cited above and should be ignored.

### 3. Historical Practice

The Government, as noted above, argues that historical precedent supports the process used to negotiate, approve and implement NAFTA. In the absence of judicially manageable standards for deciding the constitutionality of the procedure used, the Government asserts that the courts have no role to play in determining what procedure should be used. Thus, rather than asserting its own views, the Supreme Court has, in cases such as Mistretta v. United States, 488 U.S. 361 (1989) and The Pocket Veto Case, 279 U.S. 655, 689-90 (1929), given considerable weight to the established practices of the political branches in their respective areas of expertise.[146]

The Government contends that long-standing practice supports the contention that international trade agreements such as NAFTA may be validly concluded through the procedure used in this case. This procedure has its roots, according to the Government, in the grants of authority given to the President by Congress in the various trade acts passed early in this century. Such acts included the McKinley Tariff of 1890, authorizing the President to make determinations with regard to tariffs, the Dingley Tariff of 1897,[147] doing the same, and the Reciprocal Trade Act of 1934,[148]

---

[146] In Mistretta, the Court considered historical practice with respect to the allocation of authority in federal sentencing. The Court held in The Pocket Veto Case that "long-settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions." Similarly, in concurring with the Court's decision in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), Justice Frankfurter commented that the consistent operation of the Constitution over time "fairly establishes that it has operated according to its true nature." 343 U.S. at 610.

[147] Act of July 24, 1897, ch. 11, 30 Stat. 151.

[148] Pub. L. No. 73-316, 48 Stat. 943 (1934).

granting the President significant authority in the completion of tariff arrangements, including the power to conclude executive agreements.

Beginning in the 1940's, international agreements negotiated by the President began to be submitted to the entire Congress for majority approval. The Atomic Energy Act of 1946,[149] contained a provision stating that international agreements approved by Congress would supersede inconsistent provisions of the Act. The Arms Control and Disarmament Act of 1961[150] authorized the President to enter into multilateral agreements to be presented to Congress for subsequent approval, as did the Trade Expansion Act of 1962.[151]

The Government notes that an impasse often resulted when the President submitted pre-negotiated international agreements to Congress for majority approval. Often, Congress would be unwilling to approve international agreements as negotiated and settled upon by the President and the foreign governments involved.[152] As Deputy Special Representative for Trade Negotiations William R. Pearce stated in 1973, "our trading partners are reluctant to negotiate with us until they have some assurance that agreement can be implemented, and implemented rather promptly."[153]

To resolve the problems caused by the occurrence of and potential for impasse, Congress, in the Trade Act of 1974, created a streamlined legislative mechanism for the approval of international trade agreements. The result was the "fast-track" procedure. In order to avoid conflict, calls for renegotiation, and stalling during the approval phase, the fast track procedure calls for the President to confer with the Congress and the private sector before and during the negotiating process in

---

[149] Ch. 724, § 8, 60 Stat. 755, 756.

[150] Pub. L. No. 87-297, § 33, 75 Stat. 631, 634 (1961)

[151] Pub. L. No. 87-794, § 226, 76 Stat. 872, 876 (1962).

[152] See Harold Koh, Congressional Controls on Presidential Trade Policymaking After I.N.S. v. Chadha, 18 N.Y.U. J. Int'l L. & Pol. 1191, 1200-01 (1986).

[153] Trade Reform: Hearings on H.R. 6767 Before the House Comm. On Ways and Means, 93d Cong. 394 (1973).

exchange for a prompt vote on the unamended proposed agreement and accompanying legislation.[154]

The process is considered valuable and efficient because:

> The consultation and notification requirements provide the opportunity for Congressional views and recommendations with respect to provisions of the proposed agreement and possible changes in U.S. law or administrative practice to be fully taken into account and any implementing problems resolved prior to entry into the agreement and introduction of the implementing bill. At the same time, the process ensures the Executive branch and foreign countries of expeditious action on the final agreement and implementing bill without amendments.

H.R. Rep. No. 103-361(I), at 11, reprinted in 1993 U.S.C.C.A.N. at 2561.[155]

Since its creation, the fast track procedure has been used extensively in the negotiation and approval of major international trade agreements.[156] Declaring the process used to approve of NAFTA unconstitutional would, according to the Government, repudiate 24 years worth of international trade agreements and reject a procedure that both the Executive and Legislative branches consider both constitutional and effective.[157]

The Government suggests that, in employing the fast track procedure, the President's

---

[154] See 19 U.S.C. § 2112.

[155] The Government notes that the fast track procedure provides both the Senate and the House with a much more significant opportunity to gather information and contribute opinions than does the treaty-making procedure outlined in the Treaty Clause. See Bruce Ackerman and David Golove, Is NAFTA Constitutional?, 108 Harv. L. Rev. 799, 904-05 (1995) (Hereinafter "Ackerman and Golove").

[156] International agreements passed pursuant to the fast track procedure include the Tokyo Round of the General Agreement on Tariffs and Trade ("GATT"), Pub. L. No. 96-39, 93 Stat. 144 (1979), the United States-Israel Free Trade Agreement, Pub. L. No. 99-47, 99 Stat. 82 (1985), the United States-Canada Free Trade Agreement, Pub. L. No. 100-449, 102 Stat. 1851 (1988), the Uruguay Round of GATT, Pub. L. No. 103-465, 108 Stat. 4809 (1994), and NAFTA.

[157] For more on the fast track procedure with respect to trade agreements, see, e.g. C. O'Neal Taylor, Fast Track, Trade Policy, and Free Trade Agreements: Why the NAFTA Turned Into a Battle, 28 Geo. Wash. J. Int'l L. & Econ. 1 (1994); Harold Hongju Koh, Fast Track and United States Trade Policy, 18 Brook. J. Int'l L. 143 (1992).

authority is "at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."[158] Based on the President's broad authority, created by virtue of Congress's delegation of power, the Government argues that declaring the use of the fast track procedure unconstitutional would be to declare that "the Federal Government as an undivided whole lacks power" to execute international agreements such as NAFTA.[159] Such a conclusion would, according to the Government, fly in the face of the Supreme Court's decisions in Mistretta and Youngstown by failing to give proper deference to the decisions of the Executive and Legislative branches.

### 4. Plaintiffs' Historical Practice Argument

The plaintiffs maintain that the cases cited by the Government in support of their assertion that historical practice weighs in favor of a finding that this case involves a nonjusticiable political question do not address justiciability, but consider historical precedent in judging the constitutionality of a statutory scheme or in arriving at a proper interpretation of constitutional provisions. Thus, the plaintiffs assert that the Government has failed to establish that historical precedent is relevant to the political question determination.

In further addressing the Government's historical practice argument, plaintiffs note that there exists general agreement as to the fact that there are some kinds of international agreements that do not require approval pursuant to the strictures of the Treaty Clause. The fact that the Government has provided a list of agreements not passed pursuant to the Treaty Clause is, therefore, unremarkable, according to the plaintiffs. However, the plaintiffs argue that the exception allowing some international agreements to escape Treaty Clause procedure applies only to "such international agreements as do not constitute treaties in the constitutional sense."[160] Thus, the Weinberger court stated that "[s]ubmission of Art. II treaties to the Senate for ratification is . . . required by the

---

[158] See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952).

[159] See id., 343 U.S. at 636-37.

[160] United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936).

Constitution."[161] Plaintiffs argue that although some agreements fall within the exception, this does not suggest that agreements of the nature and scope of NAFTA may be treated as anything other than Article II treaties subject to the requirements set out in the Treaty Clause.

The plaintiffs argue, however, that the Government's argument that numerous significant international agreements have, in the past 24 years, been passed as Congressional-Executive agreements (agreements negotiated by the executive and approved by a majority of Congress) pursuant to the fast track procedure, is greatly weakened by the fact that each of the agreements cited by the Government received approval of two-thirds of the Senate.[162] Thus, argue plaintiffs, in each of the instances cited by the Government, the question of whether the agreement was properly approved could not have been addressed. Further, in the one instance where there was a question as to whether two-thirds approval would be achieved – the establishment of the World Trade Organization – several Senators voiced the view that the agreement was a treaty and that it could not be adopted without a two-thirds majority in the Senate.[163]

---

[161] Weinberger, 456 U.S. at 30 n.7. See supra, note 127, for a discussion of the context of this statement.

[162] The Senate approved the Tokyo Round of the GATT by a 90-4 vote. See Bill Summary and Status for the 96th Congress. The Agreement Establishing the World Trade Organization was approved by a vote of 76 to 24. 140 Cong. Rec. S15, 379 (daily ed. Dec. 1, 1994). The Senate approved the U.S.-Canada Free Trade Agreement by an 83-9 margin. Vote Profile Report, HR 5090, CR #332, 1988 Senate Vote No. 332 (LEXIS-NEXIS). The U.S.-Israel Free Trade Agreement was approved by the Senate on a voice vote. 131 Cong. Rec. S7027 (daily ed. May 23, 1985). The plaintiffs assert that the vote was clearly by a two-thirds margin and note that the implementing legislation passed the House unanimously, thus indicating the uncontroversial nature of the agreement. See 131 Cong. Rec. H2898 (daily ed. May 7, 1985).

[163] See 140 Cong. Rec. S8850 (1994)(resolution proposed by Strom Thurmond); id. at S886, 15120 (Senator Helms); id. at S8864, 8871-72 (Senator Pressler); id. at S8872, 15104 (Senator Byrd); id. at S15126 (Senator Heflin).

The Government counters the plaintiffs' assertions regarding the votes taken on other international agreements by arguing that the mere approval of two-thirds of the Senate does not equate to passage pursuant to the Treaty Clause. The Government points out that Senators may, under the Treaty Clause, consider a measure for an indefinite length of time, but that, under the fast-track procedure, they are forced to vote an agreement up or down within sixty days of

While the Government asserts that the trade agreements it cites are of a scope similar to NAFTA, the plaintiffs point out that the House Ways and Means Committee described NAFTA as "the most comprehensive trade agreement ever negotiated . . ." Further, the plaintiffs note that numerous agreements that are much less comprehensive in nature than NAFTA have been categorized by Congress and the President as treaties. Specifically, they note agreements regarding investment practices.[164] The plaintiffs argue that the practice of categorizing such agreements as treaties is relevant in that Chapters 11-16 of NAFTA contain provisions pertaining to investment practices that are far more comprehensive than those contained in the other agreements that have been acknowledged to be treaties, and the investment provisions of NAFTA comprise one of the Agreement's eight parts.

Plaintiffs go on to suggest that to the extent some agreements that should have been approved as treaties have been implemented pursuant to lesser procedural safeguards, this court, like the Chadha court, is authorized to put a stop to what the plaintiffs describe as an evasion of constitutional requirements. "That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date."[165]

## C. Prudential Considerations Involved in the Political Question Analysis

The Government makes note of several other factors that it considers relevant to the political

_____

receipt.

[164] See Treaties and Other International Agreements: The Role of the United States Senate, Study Prepared for the Senate Committee on Foreign Relations by the Congressional Research Service (Comm. Print 1993) at 217-18.

[165] Powell, 395 U.S. at 544. The plaintiffs also refer to Lawrence H. Tribe's article Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221 (1995) (hereinafter "Tribe"), wherein Tribe, in concluding that the judiciary has the authority to rule that the political branches' procedures with respect to the approval of certain international agreements violates constitutionally mandated requirements, argues that "the American people . . . are . . . entitled to the safeguards provided by the Senate supermajority requirement of the Treaty Clause," and "in the end . . . , historical argument based on the legitimating power of precedent proves unpersuasive." Tribe, at 1283.

question issue, including: (1) the necessity of federal uniformity; (2) the potential effect of an adverse judicial decision on the nation's economy and foreign relations; (3) the reliance of governments and businesses on the positive effects of NAFTA; and (4) the respect courts should pay to coordinate branches of the federal government.

## 1. The Necessity of Federal Uniformity

According to the Government, this case presents a situation in which it is important for the branches of the federal government to speak with one voice. In Baker v. Carr, the Supreme Court recognized the special importance of the United States speaking with one voice with respect to foreign affairs.[166] The Court has further observed that "federal uniformity is essential" in the area of

---

[166] Baker, 369 U.S. at 211. With respect to the political question doctrine's applicability to foreign relations issues, the Court stated:

Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to analyze representative cases and to infer from them the analytical threads that make up the political question doctrine. We shall then show that none of those threads catches this case.

Foreign relations: There are sweeping statements to the effect that all questions touching foreign relations are political questions. (Citing, e.g., Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726, ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative--'the political'--departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."). Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views. (Citing Doe v. Braden, 16 How. 635, 657, 14 L.Ed. 1090). Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action. For example, though a court will not ordinarily inquire whether a treaty has been terminated, since on that question 'governmental action . . . must be regarded as of controlling importance,' if there has been no conclusive 'governmental action' then a court

foreign commerce,[167] and that "the Federal Government must speak with one voice when regulating commercial relations with foreign governments."[168] A decision of this court declaring NAFTA unconstitutional would, the Government argues, clearly disturb this principle. The Government suggests that this consideration should be seen as weighing rather heavily in favor of a finding that this case involves a non-justiciable political question.

Without directly rejecting the idea that, in many cases, there exists a legitimate interest in having the federal government speak with one voice, the plaintiffs argue that the theory has no place in the analysis of the treaty-making procedures. To begin with, they note that treaty-making, as outlined in the Constitution, involves two distinct voices – that of the Senate and that of the President. The plaintiffs contend further that their suit seeks only to ensure that the federal government allows those full voices that are authorized by the Constitution to be heard with respect to the treaty-making process.

---

can construe a treaty and may find it provides the answer. Though a court will not undertake to construe a treaty in a manner inconsistent with a subsequent federal statute, no similar hesitancy obtains if the asserted clash is with state law.

While recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing,' and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area. Similarly, recognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them seeking, for example, to determine whether the situation is such that statutes designed to assure American neutrality have become operative. Still again, though it is the executive that determines a person's status as representative of a foreign government, the executive's statements will be construed where necessary to determine the court's jurisdiction. Similar judicial action in the absence of a recognizedly authoritative executive declaration occurs in cases involving the immunity from seizure of vessels owned by friendly foreign governments.

369 at 210-13. (Citations generally omitted).

[167] Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448 (1979).

[168] Michelin Tire Corp. v. Commissioner, 423 U.S. 276, 285 (1976).

## 2. The Effect of an Adverse Decision of the Economy and Foreign Relations of the United States

The Government contends that a decision of this court in opposition to the positions of the Executive and Legislative branches could have a profound negative effect on this nation's economy and ability to deal with foreign powers. Granting plaintiffs' requested relief in this case would not only affect the validity of NAFTA, but would potentially undermine every other major international trade agreement made in the past twenty to thirty years.[169] In reporting to Congress on the effects of NAFTA in 1997, the President stated that "[c]ooperation between the Administration and the Congress on a bipartisan basis has been critical in our efforts to reduce the deficit, to conclude trade agreements that level the global playing field for America, to secure peace and prosperity along America's borders, and to help prepare all Americans to benefit from expanded economic opportunities."[170] The Government argues that the Judiciary should refuse to diverge from the course set by the other two branches of government.

## 3. Reliance of Governments and Businesses on the Positive Effects of NAFTA

According to the Government, the myriad individual decisions and governmental measures which have been carried out in reliance on NAFTA and the positive effect of such changes,[171] demonstrate "an unusual need for unquestioning adherence to a political decision already made."[172]

---

[169] See Ackerman and Golove at 925 n.519.

[170] Study on the Operation and Effect of the North American Free Trade Agreement (1997) (transmittal letter from the President).

[171] The Government notes that the President's 1997 Study on the Operation and Effect of the North American Free Trade Agreement II, 12-24, concluded that NAFTA had a positive effect on the economies of both the United States and Mexico, providing increases in net exports, jobs, income and investment in the United States and aiding Mexico in weathering a deep financial crisis.

[172] Baker, 369 U.S. at 217.

NAFTA took effect on January 1, 1994. The Government argues that since that time, the governments, businesses and citizens of the United States, Mexico and Canada have conducted their business affairs in reliance on the lowered tariffs and reduced trade restrictions resulting from NAFTA's implementation. A decision declaring NAFTA unconstitutional could clearly have a destabilizing effect on governmental relations and business in all three countries and should thus, according to the Government, be avoided.

## 4. The Respect Due to Coordinate Branches

Finally, the Government argues that a review by the Judiciary of the process by which the President and Congress enter into international agreements would intrude upon the respect due coordinate branches of government. Justice Powell, in concurring with the Goldwater decision, concluded that the Court was not in a position to decide the constitutionality of the approval process of an agreement where the political branches acted in cooperation to conclude such an agreement.[173] Similarly, Justice Rehnquist's Goldwater concurrence stated that "[t]he Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach an impasse."[174] Since no such impasse has been reached with respect to international trade agreements, the Government argues, this court should defer to the decisions of coordinate branches of government. Along those lines, the Government notes that the Senate has not insisted upon its alleged right to approve NAFTA and other trade agreements by a two-thirds margin. Again citing Justice Powell's Goldwater concurrence, the Government contends that when the Senate sees no reason to contest the President's decision to submit an agreement to the whole Congress, "it is not [the Court's] task to do so."[175] Thus, the Government argues that, as in Goldwater, the Judiciary should refuse to intervene.

---

[173] Goldwater, 444 U.S. at 997.

[174] Id. at 1005, n.1.

[175] Id. at 995.

The plaintiffs, in responding to the Government's argument on this issue, simply state that, according to Powell, "Our system of government requires that federal courts on occasion interpret the Constitution in a manner" that conflicts with the actions of the political branches, and that such conflict "cannot justify the courts' avoiding their constitutional responsibility."[176]

### D. Plaintiffs' General Political Question Argument

The plaintiffs argue that this case does not involve a political question, but a crucial question of constitutional law, contending that since Marbury v. Madison, 5 U.S. (1 Cranch) 60 (1803), it has been recognized that "[i]t is emphatically the province and duty of the judiciary to say what the law is" in the United States.[177] Further, the plaintiffs argue that it is "the province and duty of the judicial department to determine . . . whether the powers of any branch of the government, . . . have been exercised in conformity to the Constitution; and if they have not to treat their acts as null and void."[178] Baker tells us that the purpose of the political question doctrine is to prevent courts from intruding into areas that are constitutionally committed to a coordinate branch of government.[179] The plaintiffs contend that the Government's entire political question argument is misguided in that, although the doctrine does prevent the courts from intervening in areas where a coordinate branch of government has plenary authority that is not somehow limited by the Constitution, the doctrine does not, under any circumstances, act to bar review of acts by the political branches that effectively nullify constitutional limits on their power.

The plaintiffs note that this case clearly involves questions of whether the Constitution requires treaty ratification to take a certain form and whether an agreement that is alleged to be a treaty was ratified according to constitutional mandates. Thus, this case, according to the plaintiffs

[176] Powell, 395 U.S. at 548.

[177] Marbury v. Madison, 5 U.S. (1 Cranch) 60, 73 (1803)

[178] Kilbourn v. Thompson, 103 U.S. (13 Otto) 168, 199 (1880).

[179] Baker, 369 U.S. at 210-11.

involves an issue clearly addressed in the Constitution and clearly requiring constitutional interpretation by the Judiciary. The plaintiffs claim that because the constitutional provision at issue was intentionally crafted to protect minority interests, there exists no reason to expect that the majority of Congress or the President would raise objections to the elimination of such protection. Under this analysis, the fact that the President and Congress have mutually agreed to implement the fast-track procedure and ignore the Treaty Clause does not legitimize the practice. Rather, it presents an illustration of that which the Framers allegedly meant to avoid – majority control over the creation of treaties. The plaintiffs point out that absent judicial intervention, the one-third of the Senate that the provision was meant to involve will never be able to assert its rights given the majoritarian policy that is currently being employed.

### 1. The Framers' Adoption of the Treaty Clause

An examination of the history surrounding the adoption of the Treaty Clause, according to the plaintiffs, reveals that the Framers, in adopting the Clause, were not as concerned with procedural issues as they were with the allocation of power that the procedure would create. The decision to put the treaty-making power in the hands of the Senate and to require a supermajority for approval was, according to the plaintiffs, based on states' rights concerns and cannot, therefore, be waived by the President and Congress in the interests of expediency and majoritarianism. The plaintiffs' rendition of the delegates' discussions concerning the treaty-making power during the Constitutional Convention suggests that the decisions to place the power in the hands of the Senate and to require a supermajority vote were: (1) based on the Framers' express concern with the formation of commercial treaties and experiences with regional tensions under the Articles of Confederation; (2) the result of careful consideration; and (3) considered extremely significant by the Framers.[180]

---

[180] The contention that the Treaty Clause procedure was the direct result of the Framers' concerns about states' rights and regionalism is central to the plaintiffs' claims, both for the purposes of their argument on the political question issue and for making their substantive arguments.

The plaintiffs' discussion of the delegates' adoption of the Treaty Clause is based primarily, if not completely, on the research contained in an article written in 1979 by Arthur Bestor, a History Professor Emeritus at the University of Washington.[181] According to Bestor, the initial drafting of the Treaty Clause at the Constitutional Convention was undertaken by the Committee of Detail, which was assigned the task of preparing a draft of the Constitution after the Convention had agreed on certain broad principles.[182] The Committee began its work with a memorandum prepared by Edumund Randolph of Virginia, which contained a list of "powers destined for the Senate peculiarly," two of which were "to make treaties of commerce" and "to make peace."[183] In the committee's final

---

[181] Arthur Bestor, Respective Roles of Senate and President in the Making and Abrogation of Treaties – The Original Intent of the Framers of the Constitution Historically Examined, 55 Wash. L. Rev. 1, (1979) (hereinafter "Bestor"). Other authorities addressing the origins of the Treaty Cluase include e.g., Solomin Slonim, Congressional-Executive Agreements, 14 Columbia Journal of Transnational Law 434 (1975) (hereinafter "Slonim"); Jack N. Rakove, Solving a Constitutional Puzzle: The Treatymaking Clause as a Case Study, I Persp. In Amer. Hist. (n.s.) 233, 236-50 (1984).

[182] Bestor, at 82. Notable is the fact that neither the Virginia Plan nor the New Jersey Plan proposed any change in the treaty-making arrangements made operative by the Articles of Confederation, and would have left the treaty-making power in the hands of the Congress. 1 Records of the Federal Convention of 1787, 20-22, 242-45 (M. Farrand, rev. ed. 1937) (hereinafter "Farrand"). Under the Articles of Confederation and Perpetual Union adopted by the Continental Congress on November 15, 1977 (ratified in March 1781), Congress had the "sole and exclusive right and power," with exceptions, to enter into treaties and alliances. Nonetheless, the Articles forbade (the unicameral) Congress to enter into any treaty or alliance unless nine states assented thereto. Article IX. When, during the Constitutional Convention, the Committee of the Whole initially accepted the revised version of the Virginia Plan, the power to make treaties remained with the Congress. Farrand, at 228-32. Changes in the Articles of Confederation's treaty-making procedure were not considered until the adoption of the Connecticut Compromise, which introduced the principle of equal state representation in the Upper House. Professor Solomin Slonim has suggested that the record indicates that the timing of the proposed changes indicates that the States, especially the smaller ones, sought to place power over foreign affairs in the Senate due to their jealousy over the national government's powers in that area. Slonim, at 437-48.

[183] Id. at 83-84.

draft, the language was broadened to assign to the Senate the power "to make treaties."[184]

The proposed draft, as submitted by the Committee, was objected to by the larger States, as they felt that they "would not have the weight to which they felt entitled when it came to the making . . . of commercial treaties."[185] When the draft was reported to the Convention floor, Gouverneur Morris of Pennsylvania immediately proposed an amendment that would give the House a role in effecting treaties.[186] The amendment was defeated,[187] but this and other issues concerning the draft Treaty Clause proved so contentious that the entire provision was referred back to the Committee.[188] When the matter returned to the floor – this time after revisions by the Committee on Postponed Parts – the proposed Treaty Clause, while giving the President a role in the treaty-making process, continued to exclude the House from participation.[189] James Wilson of Pennsylvania then proposed, as Morris had before, that the House be included in the treaty-making process, but the proposal was again voted down.[190]

Bestor's rendition of the proceedings leading to the adoption of the Treaty Clause depicts the decision on whether to require a majority or a supermajority for the approval of a treaty as more contentious than the decision to leave the matter solely in the hands of the Senate. However, the majority vs. supermajority debate, according to Bestor, involved sectional biases and interests rather

---

[184] Id. at 88.

[185] Id. at 95.

[186] Id. at 109-10.

[187] Id.

[188] Id. at 106-08.

[189] Id. at 113-14, 123.

[190] Id. at 123-24.

than size-based concerns.[191] As their interests often varied significantly from the more industrialized and more numerous Northern States, Southern States sought to require supermajority approval for the ratification of treaties.[192] Bestor argues that the Framers' concerns stemmed from one specific incident that occurred just a year before the Constitutional Convention. The incident involved a proposed commercial navigation treaty with Spain, which was viewed as benefitting the more numerous Northeastern States at the expense of the Southern States. As the Articles of Confederation required that any treaty be approved by nine of the thirteen states (more than a two-thirds majority), the Southern States were able to prevent the ratification of the agreement. This incident allegedly revealed the importance of a supermajority requirement to the Southern States, who realized that a majority vote in the Senate could result in a foreign policy skewed in favor of the North.[193]

The initial draft of the Treaty Clause, as prepared by the Committee on Detail, did not include a two-thirds requirement for treaty ratification.[194] When the Treaty Clause was referred to the

---

[191] Id. at 97. Professor Louis Henkin has explained the intent behind the Senate's Treaty Clause role as follows:

... [T]he Framers did not provide for 'advice and consent' by Congress, but by the Senate alone. The Senate would not be acting as part of the legislature but in a special, executive capacity. For this role the Framers selected the body that was to be the smaller, less representative, less accountable, chamber of Congress. And, it appears, the Framers selected the Senate for this special treaty-making role, because it was to have those undemocratic characteristics. The Senate was also to be the special representative and guardian of state interests. Consent of two-thirds of the Senate, I note, was probably seen as not too different in effect from the consent of nine States required under the Articles.
Louis Henkin, Treaties in a Constitutional Democracy, 10 Mich J. Int'l L. 406, 409-10 (1989).

[192] Id. at 97. Under the Articles of Confederation, nine votes out of a possible thirteen were required for treaty ratification. Articles of Confederation, art. IX.

[193] See discussion in Slonim, at 439-446.

[194] Id. at 100-01.

Committee on Postponed Parts, a two-thirds requirement was added.[195] The proposed alteration met considerable resistance, with Wilson objecting to "the power of a minority to control the will of the majority,"[196] and Rufus King arguing that the requirement that all treaties be approved by the President created a "check that did not exist in [the Articles of Confederation]," making it less crucial to insist upon the supermajority requirement as a check.[197] Suggestions for revision of the measure

_____

[195] Id. at 113-14.

[196] Id. at 128.

[197] Id. In addition to his comments cited, supra, at note 190, Professor Henkin has also suggested that the Framers did not intend, through the Senate supermajority requirement, to create a more difficult treaty-making procedure, but to put in place a procedure that was easier than requiring approval from both Houses of Congress:

Before the Constitution all international agreements were made by Congress. The Constitutional Convention considered proposals to require the advice and consent of both houses to the making of treaties, and rejected them largely because they would have made the process too difficult and cumbersome. The requirement of consent of the Senate only can be seen, then, as "settling for less," and the two-thirds requirement in the Senate as a lesser substitute for the consent of the House of Representatives also. If so, the consent of both houses (even if only by simple majority) is an even greater safeguard and should surely be no less effective that the consent of the Senate alone (even by two-thirds).

Louis Henkin, Foreign Affairs and the Constitution (1972). In responding to Henkin's analysis, Professor Slonim states the following:

In general, the possible arguments suggested by Henkin are premised on the assumption that the legislative history of the treaty-making clause is not clear, or at least that it lodges the treaty-making power in the Senate on the basis of technical considerations such as the need for secrecy and dispatch, the greater size of the House, and the frequent changes in House membership. According to these arguments, however, the Founding Fathers would have preferred to vest the power in both Houses of Congress if that had been feasible. Various other authorities including Quincy Wright, and Myres McDougal and Asher Lans, have likewise maintained that no clear picture emerges from the Constitutional Convention concerning the motives behind the formulation of the treaty-making clause, and that policy considerations were not determinative. They conclude, therefore, that "an executive agreement ratified by joint resolution differs from a treaty largely in name only."

It is respectfully submitted that when taken together with evidence supplementary to the debates, the full record of Constitutional Convention (the "Convention") demonstrates quite convincingly that the underlying consideration prompting the delegates

involved proposals to return to the simple majority requirement and proposals to require two-thirds of the entire Senate, rather than just those Senators present. In the end, the delegates adopted a provision requiring approval from two-thirds of those Senators present.[198]

Thus, the record indicates, according to Bestor, that the Framers carefully considered the decision to require a two-thirds Senate majority for the treaty-making process, and made the decision with the intention of promoting minority interests.[199] This requirement was seen as especially

_____

to vest the treaty-making power in the Senate was the desire of the States to retain maximal control over foreign affairs. The final clause on the treaty-making power emerged as the product of several basic conflicts which had beset the Constitutional Convention: clashes between "nationalists" and "federalists," between large and small States, and between North and South. By means of a compromise, the President was given a role in the treaty-making process, while the vote required in the Senate was raised from a simple majority to two-thirds. Against this background, it becomes evident that the latter requirement was a deliberate policy decision designed to ensure protection of factional interests, rather than merely a less stringent alternative to a majority vote in both Houses.

Slonim, at 435-37.

[198] Id.

[199] Id. at 128; See 2 Farrand at 540 (quoting James Wilson of Pennsylvania). Not all commentators concur with Bestor's conclusions regarding the adoption of the Treaty Clause. Professors Myers McDougal and Asher Lans, two of the early advocates of the congressional-executive agreement as an alternative to the Treaty Clause, contend that "three salient facts emerge" from what we know of the discussions of the Framers regarding the apparatus they created for the governance of foreign affairs: (1) the Framers spent comparatively little attention to the matter; (2) "with a few exceptions, the delegates . . . sought to remove the determination of foreign policy at least in the immediate future as far as possible form popular control"; (3) the language used by the Framers "clearly permits utilization of other methods than that provided in the treaty clause for securing validation of international agreements . . ."

McDougal and Lans note that in determining by what procedure the treaty-making power was to be exercised, the proposal to include the House in the process was defeated on two separate occasions, but state that "[w]hile it was subsequently stated that exclusion of the House was necessary to retain the adherence of the small states to the union, relatively few suggestions of this character were made at the Convention itself." They claim that the more likely and more documented reason for the exclusion of the House lies in the perceived need for expediency in the process. The delegates concluded, according to McDougal and Lans, that the House would not be as well suited as the Senate to take part in the advice and consent procedure. McDougal and Lans claim that another reason the House was excluded was the fact that it was to be composed

important in the ratification of commercial agreements.[200] Thus, according to the plaintiffs, the

Framers explicitly outlined a specialized procedure limiting the political branches' admittedly vast

power over the making of international agreements that amount to treaties.[201]

---

of members elected directly from the citizens of the United States, as opposed to the more elitely-selected President and Senate. They contend, though, that this reason for exclusion does not evidence the Framers' intent that the House not have any opportunity to be involved in the creation of international agreements, but the intent that there be some way to avoid House participation.

The authors argue that the two-thirds rule was accepted solely for expediencies' sake, and as a result of the fact that the delegates were "tired." They also note that each of the votes establishing the two-thirds requirement were extremely close. In determining why the two-thirds requirement was left in the document, McDougal and Lans examine several theories claiming that the provision remained as a result of the concerns of small states concerning specific issues. They conclude that the arguments based on small-state concerns are no more plausible than any other argument, noting that the voting patterns did not completely bear out the claim that it was the small states who wished to avoid a majority vote provision (they point out that several small states voted in favor of majority vote proposals). McDougal and Lans argue, based on the writings of Charles Warren, that one definite conclusion can be drawn from what we know about the debate on this issue. That conclusion: "no justification of the two-thirds rule was ever put forth in terms of political principle." Warren contends that "You will search the debates on the Constitution relative to the insertion of the two-thirds clause, and you will search them in vain to find any political theory on which the two-thirds clause was founded." Myres McDougal and Asher Lans, II Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy, 54 Yale L.J. 534 (1945).

[200] Bestor, at 129-31, See 1 Farrand at 53 (quoting George Mason of Virginia)(favoring the two-thirds requirement "[a]s Treaties are to be the Laws of the Land & Commercial Treaties may be so framed as to be partially injurius").

[201] In Edwards v. Carter, 580 F.2d 1055 (D.C. Cir. 1978), cert. denied, 436 U.S. 907 (1978), the D.C. Circuit found that it was "clearly understood at the state ratifying conventions," that the Convention had "made ratification of treaties more difficult" by requiring a two-thirds majority in the Senate. 436 U.S. at 1060. The Edwards court expressly stated that the Framers adopted the Treaty Clause's "supermajority requirement . . . to serve as a check" on certain kinds of government action. 580 F.2d at 1060. However, the court also recognized that the Constitution, "on its face," permits foreign commerce to be regulated either through the Treaty Clause or through the Foreign Commerce Clause, and that the Constitution sometimes permits "Congress to accomplish through legislation what may concurrently be accomplished through other means provided in the Constitution." Id. at 1058. The Government argues that the court's Commerce Clause reference clearly indicates the court's view that the Constitution leaves open the question of when the Treaty Clause must be adhered to as opposed to those instances where

## 2. Judiciary's Power to Intervene to Rectify the Political Branches' Failure to Adhere to Constitutionally-Mandated Procedures

The plaintiffs argue that when the political branches of government have failed to adhere to specific constitutional limits on their authority, the courts are empowered to resolve a claim based on that failure. In making this argument, the plaintiffs call attention to the Supreme Court's decisions regarding a number of constitutional provisions, including the Qualifications Clause,[202] Article I's outline of the legislative process,[203] and the Appointments Clause.[204]

In Powell, as noted supra, the House had attempted to "exclude" by majority vote a duly elected representative who satisfied the criteria to serve as a representative as outlined in Article I, § 2. The Constitution, however, only permits the House to "expel" members by a two-thirds vote. The Supreme Court held that the political question doctrine did not bar review despite the fact that the Constitution is silent on the proper procedure for "exclusion," and that decision of the matter would intrude into the innermost workings of a coordinate branch. Because the relevant historical materials indicated that the Framers inserted limits on Congress's ability to expel members for the purpose of preventing it (Congress) from overruling the desires of the electorate, the Powell court determined that the Constitution could not be read to "effectively nullify" those limitations by granting Congress unbound and unreviewable discretion to exclude representatives it found

---

the Commerce Clause authorizes congressional action. The plaintiffs, however, note that the Edwards court's reference to the Foreign Commerce Clause is mere dicta and that, given the court's recognition of the role of the Treaty Clause's supermajority requirement, the court could not have meant to suggest that Congress is free to adopt as legislation, through majority vote, international agreements that constitute treaties. Such freedom, argue the plaintiffs, would eliminate the effectiveness of the "check" on governmental action.

[202] See, generally, Powell v. McCormack, 395 U.S. 486.

[203] See I.N.S. v. Chadha, 462 U.S. 919 (1983).

[204] See Edmond v. United States, 117 S.Ct. 1573 (1997); Freytag v. Commissioner of Internal Revenue, 501 U.S. 868 (1991).

objectionable.[205] The Court held that:

> [D]etermination of [this case] require[s] no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a "lack of respect due [a] coordinate [branch] of government," nor does it involve an "initial policy determination of a kind clearly for non-judicial discretion." Baker v. Carr, 369 U.S. at 217.

395 U.S. at 548. The Court went on to note that:

> Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.

Id. at 548-49. The plaintiffs contend that the Judiciary's responsibility to intervene in contravention of a practice employed by the political branches of the government is even more acute when, as in both Powell and this case, a minority's interest is at stake.

Chadha involved the question of whether the Congress could include a legislative veto provision within a statute, thus altering the method by which legislation is to be passed pursuant to Article I. The Court found that the issue in the case was not whether Congress enjoyed plenary authority over matters involving immigration (which it does), but whether "Congress [had] chosen a constitutionally permissible means of implementing that power."[206] Dismissing the argument that the Judiciary should defer to the political departments on matters of procedure or form, the Court stated that "[n]o policy underlying the political question doctrine suggests that Congress or the Executive, or both acting in concert and in compliance with Article I, can decide the constitutionality of [their action]; that is a decision for the courts."[207]

The Constitution's Appointments Clause appears in the same sentence of Article II, Section 2 as the Treaty Clause. The plaintiffs contend that the Supreme Court's jurisprudence with respect

---

[205] Powell, 395 U.S. at 533-37, 548.

[206] Chadha, 462 U.S. at 940-41.

[207] Id. at 941-42.

to the application of the Appointments Clause's structural restraints lends credence to their contention that this court has the authority and responsibility of addressing whether the structural restraints of the Treaty Clause should be applied in this case. The Court has held that the Appointments Clause imposes a "significant structural safeguard," carefully apportioning the power to appoint United States officers between the Executive and Legislative branches.[208] The Court has concluded that:

> The Appointments Clause prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint. Because it articulates a limiting principle, the Appointments Clause does not always serve the Executive's interests. For example, the Clause forbids Congress to grant the appointment power to inappropriate members of the Executive Branch. Neither Congress nor the Executive can agree to waive this structural protection. . . . The structural interests protected by the Appointments Clause are not those of any one branch of government but of the entire Republic."

Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 880 (1991). The plaintiffs argue that the same reasoning should be applied to this court's analysis of the political question doctrine with respect to the Treaty Clause.

The plaintiffs contend that the Powell, Chadha and Freytag decisions weigh heavily in favor of this court deciding this case on the merits rather than dismissing under the rubric of the political question doctrine. These cases involved powers that were committed to the political departments by the Constitution but which were, according to the Supreme Court, subject to review when utilized in a manner inconsistent with the relevant constitutional provisions. The plaintiffs argue that Congress and the President have ignored a Constitutional mandate explicitly circumscribing the parameters within which they can exercise their authority. Use of the fast track procedure, according to the plaintiffs, amounts to little more than an agreement between the President and a majority of Congress to ignore the minority protections built into the Treaty Clause, effectively preventing the Senate minority from ever asserting their right to prevent the approval of an agreement constituting

---

[208] Edmond v. United States, 117 S.Ct. 1573, 1579-80 (1997).

a "treaty." In responding to the plaintiffs' argument, the Government simply notes that the Senate has, in other contexts, insisted on its claimed prerogatives under the Treaty Clause without resorting to judicial intervention.

The plaintiffs assert that this court must, in light of the above-cited cases and based on the text and structure of the Constitution as well as materials evidencing the intent of the Framers, accept its responsibility to decide whether NAFTA is a "treaty" within the meaning of the Treaty Clause. They argue that this conclusion is confirmed by numerous cases which have, despite the lack of specific constitutional definition, ruled on the constitutionality of international agreements with respect to the treaty clause. Such cases, according to the plaintiffs, include Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 569-73 (1840) (construing the scope of the Treaty Clause), Holden v. Joy, 84 U.S. (17 Wall.) 211, 242-43 (1872) (same), Edwards v. Carter, 580 F.2d 1055 (same), Securities and Exchange Commission v. International Swiss Investment Corp., 895 F.2d 1272, 1275 (9th Cir. 1990) (holding that an unratified treaty is without force until ratified by two-thirds of the Senate), In Re Sutherland, 53 F. 551 (D.Or. 1892 (same).[209]

_____

[209] The plaintiffs claim that the decisions in the following cases are similar to those already cited: The Diamond Rings, 183 U.S. 25 (1982) (ruling that a subsequent Senate resolution passed by only a majority could have no effect on the Court's interpretation of a properly ratified treaty), Weinberger, 456 U.S. 25 (1982) (construing the term "treaty" in a statute), B. Altman & Co. v. United States, 224 U.S. 583 (1912) (same).

The Government asserts that the plaintiffs' arguments against the application of the political question doctrine are all based on the conclusory allegation that NAFTA is a treaty and their refusal to acknowledge the textual grants of authority the Constitution provides the Executive and Legislative branches. The Government claims that although the plaintiffs repeatedly assert that an agreement constituting a treaty must be submitted to the Senate for supermajority approval, they never clearly articulate what makes NAFTA a treaty. The Government contends that the plaintiffs' argument fails to provide any basis for their assertion that agreements of the nature and scope of NAFTA are to be considered treaties and completely disregards the fact that numerous other agreements of a similar nature and scope, as listed above, have been approved of via the same procedure employed with respect to NAFTA. Nor do the plaintiffs, according to the Government, attempt to offer any judicially manageable standards for determining what characteristics differentiate those international agreements that must be approved as treaties from those that may be ratified through some other means. The failure of the Constitution to differentiate between treaties, agreements and compacts, while still mentioning

## E. Third Conclusion of the Court

I conclude that the institutional plaintiffs' claims are not barred by the political question doctrine. I conclude that the issues of whether NAFTA and the Implementation Act, considered separately or jointly, constitute a treaty as contemplated by Article II, Section 2 and , if so, whether they were appropriately made and adopted by appropriate alternative means are legal issues subject to judicial review, interpretation and declaration. I conclude that the Constitution does not solely commit these procedural issues to the President and/or Congress.[210] I conclude that there are

---

each, argues the Government, leaves this court without any standards for determining if the strictures of the Treaty Clause should have been adhered to with respect to NAFTA.

The plaintiffs respond by arguing that the issue of what constitutes a "treaty" goes to the heart of the issue in this case and should not be argued on a motion to dismiss based on the political question doctrine. The question before the court in connection with the motion to dismiss is, according to the plaintiffs, whether they, as plaintiffs, have a right to go forward and seek a determination of whether NAFTA constitutes a treaty. Thus, argue the plaintiffs, consideration of whether NAFTA is a treaty in connection with the motion to dismiss is premature at this stage.

[210] While I recognize that the Supreme Court, in Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918), has held that, "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative--'the political'--departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision," I conclude that the Supreme Court, in so stating, has only meant to limit the Judiciary's role in substantive policy-making and that this case does not involve an examination or inquiry into the propriety of the substantive political decisions made by the political branches with respect to NAFTA or whether NAFTA is in the best interests of the Nation. Neither does this court inquire into whether the political branches of the government ultimately have the authority to create an agreement and implementation act such as NAFTA, but whether they have exercised their authority to do so in a constitutionally permissible manner and through constitutionally permissible procedures.

As Professor of Law Michael Glennon of the University of California at Davis has observed with respect to foreign affairs decision-making:

To permit the Executive to proceed unencumbered by judicial review would work a radical reallocation of constitutional power. If the Court declines to intervene when the Executive poses a fundamental threat to the separation of powers, the Executive, not the judiciary, becomes the ultimate arbiter of the meaning of the Constitution. Judicial abstention in such circumstances is unjustified for the same reason that it was unjustified in the face of electoral paralysis in Baker: operating alone, the political system is incapable of reestablishing an equilibrium of power, and the courts must step in to restore it.

judicially discoverable and manageable standards with reference to these issues. Constitutional interpretation of even vague constitutional provisions is a standard judicial practice. The issues do not involve policy determinations of a non-judicial nature. Respect for coordinate branches is no more an issue than it is in a myriad of other areas of judicial review. I am particularly persuaded by the Powell,[211] Chadha,[212] and Freytag[213] cases. There is no unusual need for unquestioning adherence

Glennon, Foreign Affairs and the Political Question Doctrine, 83 American Journal of International Law 814, 819-20 (1989). Arguably, the Constitution established a framework for the creation of some international agreements which requires two-thirds Senate approval. Judicial abstention in with regard to this issue would allow the political branches to act in whatever manner they see fit with respect to international agreement-making. Clearly, if the Constitution mandates a given procedure for the exercise of a given power, it cannot, at the same time, preclude the Judiciary, the branch whose role it is to interpret its provisions, from assuring that such a mandate is adhered to by the political branches.

[211] The Powell Court, found that Article I, § 5 of the Constitution might represent a "textually demonstrable commitment" to Congress to judge member qualifications based on the qualifications expressly set forth in that section. 935 U.S. at 548. Thus, to the extent that Congress made decisions based on those express criteria, the Court recognized that such decisions might not be subject to judicial review. However, the Court held that any potential textual commitment only extended to the judgment of the express qualifications outlined in the Constitution. In so deciding, the Court stated that:

[T]he Convention adopted [Madison's] suggestion limiting [Congress's] power to expel. To allow essentially that same power to be exercised under the guise of judging qualifications, would be to ignore Madison's warning . . . against vesting an improper and dangerous power in the Legislature. Moreover, it would effectively nullify the Convention's decision to require a two-thirds vote for expulsion.

935 U.S. at 547-48. This case presents a similar situation. If the plaintiffs' contention that the Treaty Clause was intended to represent the exclusive manner by which to adopt some international agreements is correct, allowing Congress and President to adopt these international agreements through alternative means and pursuant to alternative sources of power would be to ignore the intent of the Framers and would effectively nullify the arguably intended effect of the Treaty Clause.

[212] In Chadha, the Court stated:

It is correct that this controversy may, in a sense, be termed 'political.' But the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by the courts because the issues have political implications in the sense urged by Congress. Marbury v. Madison was also

to political decisions which arguably violate the Constitution. If courts have the power to determine the constitutionality of the substantive provisions of international agreements, as established by Reid v. Covert, I see no reason why courts do not also have both the authority and responsibility to determine whether the procedures used to adopt such agreements conform to Constitutional requirements.[214] There has been no specific announcement by the President or Congress related to the application of the Treaty Clause which might cause embarrassment. I can perceive no prudential considerations which caution against judicial intervention.

It is thus unquestionable to this court that deciding what constitutes a "treaty" subject to the Treaty Clause, although difficult, if not impossible to determine with certainty, is a legal issue, not a political question. I further conclude that if it is decided that such a "treaty" is involved, whether the Treaty Clause is exclusive is also a legal, not a political question. Further, I conclude that the application of the Foreign Commerce Clause and other enumerated power clauses to documents which otherwise constitute "treaties" under the Treaty Clause raises a legal question. All these issues

---

a "political" case, involving as it did claims under a judicial commission alleged to have been duly signed by the President but not delivered. But "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." Baker v. Carr, 369 U.S. at 217

462 U.S. at 942-42. Thus, the Chadha Court found that it had the power to address the issue of the constitutionality of the legislative veto included in the Immigration and Nationality Act and to determine what constituted legislative action requiring adherence to the bicameralism and presentment requirements.

[213] I find the Freytag Court's observations regarding the nature of the Appointments Clause particularly instructive. See, infra, (III)(D)(2). If, as the plaintiffs contend, the Treaty Clause is meant to prevent Congress and the President from creating international agreements too freely, neither Congress nor the President may waive the requirements set out in that Clause and courts are empowered to prevent them from doing so. Although the Constitution provides little guidance as to how one is to distinguish between "inferior officers" and other executive department functionaries, the Freytag Court found itself able to make such a determination. Similarly, although the Treaty Clause does not expressly delineate the difference between a treaty subject to the Treaty Clause procedure and a non-treaty, I conclude that the Judiciary has the authority and the ability to differentiate between them.

[214] See supra, note 56.

involve constitutional interpretation just as do issues involving the intent and scope of the First, Fourth and Fourteenth Amendments, etc. The difficulty of decision does not change the nature of the issue.

## IV. The Constitutionality of NAFTA

As stated above, the Treaty Clause states that the President "shall have the Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur." Art II, § 2. The plaintiffs' ultimate argument in this case is that the Treaty Clause should be read as an exclusive grant of power with respect to those international agreements that may be called "treaties," and that NAFTA falls within the bounds of the proper definition of the term. The plaintiffs acknowledge that the text of the Constitution fails to establish a test for determining when an international agreement is a "treaty" as opposed to some other type of agreement, and attempt to show that the intentions of the Framers, historical practice, federal court decisions and well-reasoned law review texts all advocate the use of a test that focuses on the importance of an agreement and the degree to which an agreement constrains sovereignty to determine when an agreement must be subjected to the Treaty Clause procedures.

The Government argues that the relevant factors all weigh in favor of a conclusion that the Constitution's Treaty Clause should not be read as an exclusive grant of power, and that the enumerated powers of the President and Congress in the areas of foreign affairs and commerce are sufficient to establish their authority to conclude international commercial agreements without following the strictures of the Article II treaty-making process. According to the Government, plaintiffs' arguments attempting to differentiate between treaties and non-treaties are irrelevant, as they ignore the fact that the provisions of NAFTA were enacted as valid domestic legislation via the Implementation Act – an Act that the Government asserts is no different than any other legislation passed by Congress. Given the fact that it is well-settled law that if federal legislation falls within the substantive scope of an enumerated power, it is constitutional despite its potential impact on the

states,[215] and the fact that Congress has the power to legislate in the areas of tariffs and domestic and foreign commerce, the Government argues that the plaintiffs have no legitimate basis upon which to challenge NAFTA legislation. The Government further asserts that the plaintiffs' proposed test for differentiating between treaties and non-treaties is the result of a misreading of the historical materials and legal precedents as well as an unjustified adherence to the views of a minority of legal scholars.

The parties' arguments on the merits of this case suggest that this court's decision will turn on its resolution of two distinct issues: (1) What is a "treaty" and do NAFTA and its implementing legislation qualify as a "treaty" as contemplated by the Treaty Clause; and, if so, (2) does the Treaty Clause represent the exclusive procedure by which such a "treaty" can be negotiated, approved and ratified? I will attempt to grasp this constitutional mercury.

## A. Article II "Treaties"

As noted above, the text of the Treaty Clause does not provide any insight into what factors or characteristics make an international agreement a "treaty in the constitutional sense." Thus, the Supreme Court has recognized that the Treaty Clause is worded in "general terms, without any description of the objects intended to be embraced by it."[216]

### 1. Plaintiffs' Argument

#### a. Essential Characteristics: Importance and Effect on Sovereignty

In arguing what distinguishes a treaty from other types of international agreements, the plaintiffs cite the Supreme Court's language in Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 572 (1840), where Chief Justice Taney opined that the distinction drawn in the Constitution between treaties and other agreements reflected the Framers' familiarity with the writings of Emmerich de

---

[215] See, e.g., Perez v. United States, 402 U.S. 146, 150-54 (1971); Darby v. United States, 312 U.S. 100, 114-15 (1941).

[216] Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 569 (1840).

Vattel.[217] From the Court's language in Holmes, the plaintiffs conclude that although it is not possible to identify more precisely what the word "treaty" was understood to encompass at the time of the Framers, it is evident that the term referred to an agreement having greater consequences than non-treaty agreements.

The plaintiffs acknowledge that drawing lines between treaties and other kinds of international agreements is often difficult, but, citing Professor Tribe, maintain that "the difficulty of drawing such a line does not mean that the distinction can be discarded."[218] Thus, argue the plaintiffs, the Supreme

---

[217] See also, U.S. Steel Corp v. Multistate Tax Comm'n, 434 U.S. 452, 462 n.12 (1978); Weinfield, What Did the Framers of the Federal Constitution Mean by "Agreements or Compacts"?, 3 U. Chi. L. Rev. 453 (1936).

[218] Tribe at1266 (1995). In addressing the constitutionality of the approval of the World Trade Organization ("WTO") as a congressional-executive agreement in both an exhaustive law review article and in testimony before the Senate Committee on Commerce, Tribe, although voicing his approval of the WTO as a policy matter, nevertheless concluded that he "could see no way to avoid the conclusion that the agreement creating the WTO and bringing the United States within that body needed to be treated as a treaty." Tribe at 1234 n.47; see L. Tribe, GATT Implementing Legislation: Hearings on S. 2467 Before the Senate Committee on Commerce, Science and Transportation, 103rd Cong., 2d Sess. 1994 at 309 (hereinafter "WTO Hearings") (The President did not submit the WTO as a treaty, which prompted a discussion in the Senate as to the propriety of the President's choice. However, the issue was arguably mooted when the Senate passed the agreement by a two-thirds vote). Tribe asserted that "the WTO . . . is a 'treaty' under any defensible interpretation of that term." Tribe's position with respect to NAFTA is identical, as he has been quoted as saying, "Short of creating a government for the Western Hemisphere, NAFTA does everything else a treaty could do." Estella Duran, "NAFTA Unconstitutional, Steelworkers' Suit Says," Boston Globe, July 14, 1998.

Tribe's arguments, as presented in his 1995 article, represent a response to the arguments made by Bruce Ackerman and David Golove in their 1995 article cited supra. In their article Ackerman and Golove argue that, despite any arguable intentions to the contrary on the part of the Framers and despite the fact that pre-1930's precedent and practice weigh against it, the President and Congress may elect to ignore the Treaty Clause procedure and conclude any international agreement as a congressional-executive agreement. They characterize the Treaty Clause's two-thirds requirement as a "failure in the original constitutional design," and a "mistake [] . . . that must be chalked up against the Framers." Id. at 802, 866. Due to the gross inadequacy of the Treaty Clause procedure with respect to modern day international relations, it was perfectly proper, according to Ackerman and Golove, for the President and Congress to develop a method for approving of international agreements that is "superior to the one envisioned by the Framers . . ." Id. at 900. Recognizing that the Constitution was never amended

Court has been willing to draw the line between "inferior" and "principal" officers for purposes of the Appointments Clause and to enforce its interpretation of those terms, Morrison v. Olson, 487 U.S. 654, at 671; Freytag, 501 U.S. 868, at 880, and to develop definitions of the kinds of agreements that are subject to the Compact Clause, U.S. Steel Corp., 343 U.S. at 463-64, despite the fact that the text itself lent little aid in making such determinations.

The plaintiffs argue that the writings of Vattel, and the distinction made in the Compact

_____

to rectify the "mistake," Ackerman and Golove conclude that such amendment became unnecessary because "[t]he people in the mid-1940's, exercising their popular sovereignty through an act of informal lawmaking . . . transformed the meaning of the Treaty Clause to constitute the modern congressional-executive agreement and render it interchangeable with the traditional treaty." David M. Golove, Against Free-Form Formalism, 73 N.Y.U. L. Rev. 1791, 1800 (1998) ("Golove"); See also Ackerman and Golove at 803.

The plaintiffs consider it significant that the arguments presented in the Ackerman and Golove article focus on a theory advocating the validity of informal constitutional amendments. Both the plaintiffs and Tribe agree that this method of constitutional interpretation and amendment is unacceptable. The Government has not argued in favor of this approach and has, in fact, expressly disavowed it. The Supreme Court has stated, "In the absence of a properly passed constitutional amendment," courts cannot "erode the structure envisioned by the Framers." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 838 (1995). The plaintiffs maintain that the arguments presented by Ackerman and Golove both acknowledge and prove that any interchangeability argument is dependent upon the notion that the Constitution may be amended outside of Article V of the Constitution.

Important to note, however, is that in writing his 1998 article, Against Free-Form Formalism, Golove, although defending the conclusions and theories presented in the article he co-wrote with Ackerman, presents a much more textually-based argument in favor of the interchangeability of the congressional-executive agreement with the "treaty." Golove's article stresses the fact that the Constitution's text is unclear as to whether the Treaty Clause is to represent the exclusive method by which to conclude international agreements, while noting the vast amount of power apparently conferred on the Congress by Article I and on the President under Article II. He concludes that although an exclusive reading of the Treaty Clause is clearly plausible, it is no more plausible than reading the Clause as a permissive power, to be used in situations where efficiency or secrecy are tantamount or where it is politically prudent to allow the Senate to perform its Treaty Clause function. While I do not totally reject the Ackerman and Golove article, I reject the premise that the Constitution can be amended other than through the operation of Article V. As the Supreme Court held in Chadha, "policy arguments supporting even useful 'political inventions' are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised." 462 U.S. at 945.

Clause evidence the fact that the term "treaty" was used by the Framers to refer to agreements of particular importance. Thus, John Sparkman, author of the article Checks and Balances in American Foreign Policy, 52 Ind. L. J. 433 (1977), refers to "the traditional distinction between the treaty as the proper instrument of a major commitment and the executive agreement as the instrument of a minor one."[219]

The plaintiffs argue that the Supreme Court's analysis of the Compact Clause's application to international agreements made by the states is relevant to the question of what kinds of agreements amount to treaties. They note that the Court's Compact Clause analysis has traditionally centered upon a given agreement's impact on sovereignty. Since 1893, the Supreme Court has held that state agreements are subject to the Compact Clause, and therefore to congressional approval, only if they "tend [] to increase . . . political power in the States, which may encroach upon or interfere with the just supremacy of the United States."[220] The plaintiffs conclude, based on the Court's analysis, that the notion of sovereignty was central to the Framers' conception of how different types of international agreements should be concluded.[221]

The Plaintiffs maintain that placing particular emphasis on the effect a given agreement has on sovereignty accords with the Framers' overriding objective in adopting the supermajority requirement – the protection of state interests from overreaching by the federal government.[222] The

_____

[219] 52 Ind. L. J. at 438; see also Edwin Borchard, Shall the Executive Agreement Replace the Treaty?, 53 Yale L. J. 664, 669-70 (1944) (arguing against the use of the executive and congressional-executive agreement as a replacement for the Treaty Clause).

[220] Virginia v. Tennessee, 148 U.S. 503, 519 (1893); U.S. Steel, 434 U.S. at 468.

[221] I note that the sovereignty concerns applicable to states vis-a-vis the federal government are not directly applicable to strictly federal actions.

[222] Tribe has maintained that "[t]he history of the framing of the Treaty Clause leaves no doubt that the Senate's special role as guarantor of state sovereignty and of interstate equality was central to the special role the Senate was given in matters of treaty ratification." WTO Hearings, at 309.

Page -89-

recognition that agreements impinging domestic sovereignty must be ratified as treaties was evinced, argue the plaintiffs, during a series of hearings held by the Senate in 1947 regarding the proposed International Trade Organization ("ITO").[223] The plaintiffs point specifically to the concerns voiced by Senate Finance Committee Chair Eugene M. Millikin who, noting that the ITO might be vested with greater authority than that granted to the United Nations under its Charter, opined that the agreement adopting the ITO appeared to be a treaty.[224] Millikin expressed particular concern with the ITO's potential ability to interfere with and react to United States domestic policy.[225] He stated that an agreement should be treated as a treaty when its implementation results in "substantial disparagement of our sovereignty."[226]

The plaintiffs cite a number of situations in which legal scholars or Senators have characterized agreements as requiring Article II Treaty Clause procedures as a result of their potential effect on sovereignty,[227] arguing that the most complete articulation of this point was provided in the

---

[223] See Trade Agreements Systems and the Proposed International Trade Organization Charter: Hearings Before the Senate Finance Committee, 80th Cong., 1st Sess. (1947). The ITO was intended to be one of the specialized agencies of the United Nations, but was never established due to the opposition of the United States Senate.

[224] Id. at 25, 81-83, 164-65, 167-69, 171-72, 351, 358-60, 464-68, 642-44.

[225] Id. at 24-25, 164-66, 169-72.

[226] Id. at 168-69.

[227] See Memorandum by Arthur Rovine, Assistant Legal Advisor, Department of State, Reply to Second Memorandum of Senate Office of Legislative Counsel Concerning Certain Middle [East] Agreements (reprinted in 122 Cong. Rec. s.3374-79 (February 17, 1976)); Treaty Powers Resolution: Hearings on S. Res. 486, Before the Senate Committee on Foreign Relations, 94th Cong., 2d Sess. at 4 (1976) (Senate resolution expressing the position of the Senate that "any international agreement, which involves a significant political, military, or economic commitment to a foreign country constitutes a treaty and should be submitted to the Senate for its advice and consent"); H. Rep. No. 95-1535, 95th Cong., 2d Sess. at 64 (1978) (noting that the Senate had passed Treaty Powers Resolution as a rider to an appropriations bill but that it was deleted in conference); Executive Agreements with Portugal and Bahrain: Hearings Before the Senate Committee on Foreign Relations, 92nd Cong., 2d Sess. at 3 (1972); S. res. 214, 92nd Cong., 2d Sess. (1972).

Senate's deliberations regarding the agreement establishing the WTO. During the hearings, both

Professor Tribe and his colleague from the Harvard Law School, Professor Anne-Marie Slaughter,

endorsed the view that agreements having a substantial impact on sovereignty must be regarded as

treaties.[228] Slaughter claimed that the analysis should focus on "the degree to which an international

agreement . . . [has] a direct impact on matters normally regulated by state and federal legislative

processes."[229] Tribe has argued that because the implementation of the WTO would subject both

federal and state governments to binding arbitration, displacing the states from their normal role in

our system of government, because the WTO extended beyond conventional trade matters such as

tariffs and customs to include domestic issues like health and safety and environmental concerns, and

because the agreement reordered state and federal power, giving the President authority to decide

whether state laws should be stricken, that the WTO agreement had to be regarded as a treaty.[230]

The plaintiffs note that, in addition to the statements made by Tribe and Slaughter, Senators

Pressler, Byrd, Heflin, Hollings, Thurmond and Helms made statements highlighting the significance

of the WTO Agreement and calling for the agreement to be ratified pursuant to the Treaty Clause.[231]

---

[228] WTO Hearings at 286-90, 296-312.

[229] Id. at 287.

[230] Id. at 302-10.

[231] In the WTO hearings, Senator Pressler invoked Senator Millikin's statements in the 1947 ITO debate:

And [Millikin] says the proper distinction between [an executive agreement and a treaty] is that when we go beyond conventional matters, duties, customs, matters in foreign trade, and commerce to surrender sovereignty, that is the point where the proper field of treaty comes in . . . whenever you come to a matter where sanctions may be invoked against the United States by an international body, then you have entered the legitimate field for treaties. That sounds to me like exactly what we are talking about here.

WTO hearings at 335 (Sen. Pressler).

Senator Byrd declared that "the weight of the [WTO] agreement . . . is such that it rises to the importance of a treaty and should be treated as a treaty." 140 Cong. Rec. S8872 (1994). See also id. at § 15104 (1994)("the approval mechanism that ought to have been used . . . for the WTO . . . is the constitutional procedure for treaty ratification")(Sen. Byrd).  Senator Byrd

The plaintiffs thus assert that a treaty is distinguishable from a non-treaty by its relative importance and the degree to which it constrains the sovereignty of federal and state governments in the United States.

### b. The Test Applied: NAFTA's Importance and Effect on Sovereignty

The plaintiffs maintain that the same reasons that supported the argument that the WTO is a treaty should be employed to establish that NAFTA is a treaty, noting that NAFTA is "the most comprehensive trade agreement ever negotiated."[232] The plaintiffs point out that NAFTA consists of twenty-two separate chapters of laws, supplemented by several lengthy annexes, and that the Agreement subjects whole new arenas of economic activity to international trade discipline, greatly increasing the United States' obligations in several other areas. The plaintiffs argue that NAFTA requires the United States to "ensure that all necessary measures are taken in order to give effect to

emphasized the same features of the WTO agreement as Tribe had cited, under which the enforcement of state or federal laws dealing with domestic matters could be challenged and subjected to sanctions. Byrd's conclusion was that this "will diminish the sovereignty of the states we represent." Id. at S15105-06. Senator Heflin likewise argued that "our sovereignty will be threatened under this new system of the WTO," and the only way in which the WTO agreement properly could be effectuated was through "treaty ratification." Id. S15125-26. See also id. at S8871 (1994)(Sen. Pressler). Senators Hollings, Thurmond and Helms also went on record with the view that the WTO Agreement amounted to a treaty. See WTO Hearings at 325 (Sen. Hollings); 140 Cong. Rec. S8850 (1994)(resolution proposed by Senator Thurmond, stating that "[t]raditionally the United States has entered into international obligations that impact on domestic sovereignty and law that have the legal structure and permanence that the WTO has, by using treaty ratification procedures"); id. at S8860, 15120 (Sen. Helms).

Professor Ackerman testified in the WTO Hearings along the lines later developed in his Harvard Law Review article. WTO Hearings at 312-17. In response, Senator Hollings stated that, contrary to Ackerman's thesis, the Foreign Commerce Clause does not empower Congress to make agreements such as the WTO Agreement, particularly because the Agreement goes far beyond tariff provisions and affects domestic law. Id. at 323, 325. Senator Stevens criticized Ackerman's position as "just saying, really, that a treaty is anything the President decides is a treaty." Id. at 329.

Relying principally on their assessment of twentieth-century congressional practices, some Senators declared that the WTO Agreement should not have to be ratified as a treaty. See 140 Cong. Rec. S8869 (Sen. Pell); id. at S15079 (Sen. Moynihan); id. at S15112 (Sen. Hatch).

[232] H.R. Rep. No. 103-361, at 8 (1993) (reprinted in 1993 U.S.C.C.A.N. at 2558).

the provisions of [the] Agreement, by state and provincial governments."[233] They further contend that NAFTA subjects the laws, regulations and practices of all United States governmental bodies to extensive mandates, including mandates in areas in which the United States has never before allowed such international interference. Thus, argue the plaintiffs, NAFTA is the first international agreement to include protections for trade secrets, the first to provide protections for intellectual property, the first to include extensive trade services regulations, comprehensive health and safety regulations, and regulations concerning the government's procurement of services, and the first providing all companies from specific foreign countries investing in this country with sweeping protections against governmental action.[234]

The plaintiffs emphasize that NAFTA's provisions reach far beyond conventional trade concerns, restricting the circumstances under which the federal government may establish standards pertaining to health and safety and other matters "that may, directly or indirectly, affect trade," and making it extremely difficult for state and local as well as the federal government to adopt such standards.[235] Further, Chapters 7 and 9 of NAFTA require governments to take affirmative steps toward the harmonization of standards in a myriad of areas and to pursue equivalence of health and safety and technical standards.[236] NAFTA's provisions with respect to other areas, such as trade in services, non-discrimination and non-residency rules, and licensing or certification measures for

[233] NAFTA, Article 105, p. 728.

[234] See NAFTA Statement of Administrative Action, H.R. Doc. 103-159, pp. 89, 134, 185-87. See also NAFTA Chapter 11, pp 1099-1127.

[235] See NAFTA, Article 709, p. 971; Article 901, p. 998; Article 712, p. 971-74; and Articles 717, 718, pp. 976-80.

[236] See id., Article 905, p. 1000; Article 713(1), p. 972; Article 902, p. 998; Article 904(4), p. 999; Article 909, pp. 1004-06; Articles 714, 906, and 908, pp. 973, 1000-04.

certain services are, according to the plaintiffs, equally far-reaching.[237]

The plaintiffs also note that international bodies are given authority by NAFTA to determine, through binding arbitration and other means, when United States domestic laws must yield to the Agreement's provisions.[238]  If a decision by the international (Mexico, United States and Canada) arbitration panel that hears a case finds that a local, state or federal law is inconsistent with the United States' obligations under NAFTA, or impairs benefits that a party reasonably expected to receive under NAFTA, the United States is obligated "wherever possible" to remove the measure or suspend its implementation.[239]  Refusal to do so can result in the injured nation's imposition of trade sanctions on the United States until the situation is resolved.[240]  Calling attention to proceedings that are now pending under the Chapter 20 provisions and the United States' response thereto, the plaintiffs argue that the very threat of sanctions has constrained the freedom of the federal government and interfered significantly with the sovereignty of the United States.  Further, the plaintiffs note that investors may utilize the Chapter 11 mandatory binding arbitration procedures  to challenge various federal, state and local laws that allegedly "expropriate" their investments, thus giving them the ability to challenge laws that, while beneficial to the citizens and governments involved, harm the company's bottom line. Finally, the plaintiffs contend that NAFTA's Chapter 19 binding arbitration process for resolving countervailing duty and anti-dumping disputes represents an extreme constraint on the ability of the United States to enforce unfair trade laws as it chooses and a "sacrifice of sovereignty which" they contend "certainly [should] have required a treaty to accomplish."[241]

---

[237] See id., Articles 1202-03, p. 1129; Article 1205, p. 1129; Article 1201(1), p. 1128; Article 1210(1), pp. 1131-32; Article 1302, pp. 1142-46; and Article 1411, pp. 1158-59.

[238] See NAFTA, Chapter 20; Chapter 11; Chapter 19.

[239] Id. Article 2018(2), p. 1274.

[240] See id., Article 2019(1), pp. 1274-75.

[241] L. Tribe, WTO Hearing at 337 (concerning the same scheme within the Canadian Free Trade Agreement).

Referring to their account of the scope of NAFTA's provisions and the extensive enforcement measures contained within the Agreement, the plaintiffs argue that NAFTA's impact on sovereignty is uniquely sweeping. They note that it is beyond dispute that a number of federal, state and local laws, including many concerning the areas of environmental protection, consumer protection, insurance regulation, economic development incentives, food, health and safety, and packaging and labeling, are arguably inconsistent with NAFTA and thus subject to challenge and repeal. The fact that many of these laws fall squarely within areas that states have traditionally been left to regulate, argue the plaintiffs, only compounds the magnitude of the infringement on sovereignty.[242]

The plaintiffs assert that an examination of NAFTA's scope and degree of enforceability, in addition to revealing the degree to which the Agreement infringes on the sovereignty of both the federal government and the various state governments, illustrates the fact that the Agreement is, in comparison to other international agreements, much more influential and transformative. The Clinton Administration's U.S. Trade Representative Barshefsky claims that only five of the trade agreements entered into by the United States in recent years are of truly "historic proportions."[243] In his testimony before the House Subcommittee on Trade on February 11, 1999, Barshefsky noted that of those five, only the WTO Agreement and NAFTA contain enforcement provisions. The plaintiffs argue that NAFTA's provisions are much more extensive than those found within the WTO Agreement, as NAFTA includes elaborate investor-protection provisions of a type that the United

---

[242] Thus, Robert Stumberg in his article, The New Supremacy of Trade: NAFTA Rewrites the Status of States (November 3, 1993), identified forty-nine different provisions and/or chapters of the Florida Code that could be challenged on the ground that they were inconsistent with NAFTA. Similarly, Robert W. Benson has concluded that NAFTA "jeopardizes federal, state and local laws," in a wide range of areas. Memorandum by Robert W. Benson re: Will the North American Free-Trade Agreement Jeopardize Federal State and Local Laws? (reprinted in 139 Cong. rec. H9819-21).

[243] See Remarks of U.S. Trade Representative Barshefsky on Upcoming WTO Ministerial, January 20, 1999.

States has previously only entered into pursuant to treaties.[244]

Based on the above analysis, plaintiffs contend that NAFTA compromises state and federal sovereignty to an unprecedented degree and should, therefore, have been submitted to the Senate pursuant to the provisions of the Treaty Clause.[245]

### 2. The Governments' Arguments Regarding the Definition of the Term "Treaty"

In opposing the plaintiffs' suggested test for differentiating between treaties and non-treaties, the Government acknowledges that there may be a type of international agreement that could only be put into effect pursuant to the procedures outlined in the Treaty Clause,[246] but claims that such situations arise only when the Constitution fails to provide the President and/or Congress with the authority to negotiate and conclude a given agreement through alternative means.[247]  To the extent

---

[244] See Congressional Research Service, Treaties and Other International Agreements: The Role of the United States Senate, S. Pt. 103-53, 103rd Cong., 1st Sess. at 217-18 (November 1993); Mark S. Bergman, Bilateral Investment Protection Treaties, 16 N.Y.U. J. of Int'l Politics 1 (1985).

[245] The plaintiffs also consider it significant that NAFTA may symbolize something more than a simple trade agreement to the governments and people of the United States and Mexico. They argue that by acceding to NAFTA, the United States intended to do nothing less than enter into a long-standing alliance with Mexico and to create levels of interdependence between the United States, Mexico and Canada that had been inconceivable without the Agreement.  Because, as noted previously, the Framers meant to subject agreements constituting "treaties, alliances and confederations" to the rigors of the Treaty Clause, the nature of the NAFTA "alliance," argue plaintiffs, requires adherence to the Treaty Clause.

[246] The Government, citing Missouri v. Holland, 252 U.S. 416, 433 (1920), suggests that an international agreement whose domestic consequences could not be accomplished by statute would probably require Treaty Clause approval.  The Justice Department's Office of Legal Counsel has conceded that the Treaty Clause and the congressional-executive agreement are not entirely interchangeable: "[W]e do not dispute Professor Tribe's view that some [international] agreements may have to be ratified as treaties.  Thus, Professor Tribe is incorrect in asserting that we believe that the treaty ratification process and the ordinary legislative process are interchangeable."  18 U.S. Op. Off. Legal Counsel No. 38, 3 n.13 (1994).  This position appears to somewhat oppose the position taken by the Government here.

[247] The Department of Justice's Office of Legal Counsel produced two memoranda in support of this contention.  The documents represent what the Government characterizes as

that it recognizes that some subset of international agreements which must be ratified as Article II treaties does exist, however, the Government argues that it has not been defined by the text of the Constitution, the historical practice of the political branches or in Supreme Court precedent. Because of its claims regarding the vast powers of the President and Congress in the areas of foreign affairs and commerce, the Government's "alternative means" argument arguably includes any agreement involving commerce, trade, war, peace, property, and almost any other subject imaginable. Thus, the Government's argument effectively amounts to an "interchangeability" argument, claiming that the President and Congress may utilize congressional-executive agreements in place of the Treaty Clause procedure under almost any circumstances. With respect to this case, the Government argues that the constitutional text, historical practice and Supreme Court precedent all clearly point to the conclusion that the negotiation, approval and implementation of NAFTA and its implementing legislation fall within the scope of the powers of the President and the Congress, and that this is certainly not a case where the Treaty Clause process was mandated by the Constitution.

### a. Deficiency of Plaintiffs' Proposed Test

The test suggested by the plaintiffs as the method by which to distinguish those international agreements that "rise to the level of treaties" from those that do not, according to the Government, lacks any basis in the Constitutional text or in controlling legal authority. The plaintiffs' suggested test places significance upon two primary factors: (1) the number and degree of changes that will be created by the implementation of the agreement; and (2) the degree to which the agreement constrains state or federal sovereignty. This "features" test, as the Government calls it, is purportedly based on: (1) the text of the Treaty Clause; (2) the "undisputed" intent of the Framers; (3) one hundred and fifty

_____

"comprehensive responses" to the arguments forwarded by Tribe during his WTO Hearing testimony and in his Yale Law Review Article. See Memorandum to Ambassador Michael Kantor, United States Trade Representative, From Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, at 5, n.8 (July 29, 1994) ("OLC Mem. # 1"); Memorandum to Ambassador Michael Kantor, United States Trade Representative, From Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (November 22, 1994) ("OLC Mem. # 2").

years of historical practice; and (4) the analysis provided by law review articles. The Government contends, however, that the plaintiffs' examination of the text of the Constitution and the intent of the Framers fails to uncover any evidence of a convincing and identifiable test for distinguishing constitutional treaties from non-treaties, that the plaintiffs have misconstrued the extent to which the Framers were concerned with sovereignty, and that the plaintiffs' reliance on law review articles to fill in the gaps of their theory evinces the weakness of their proposed test. Further, the Government claims that an analysis of the plaintiffs' proposed test in light of historical precedent proves the inadequacy of the suggested method of differentiation.

### b. Constitutional Text and Framers' Intent With Respect to the Term "Treaty"

The plaintiffs' contention that the constitutional text somehow indicates that treaties and non-treaties are distinguishable on the basis of their relative "importance" is, as noted above, based on the Framers's alleged familiarity with the writings of Emmerich de Vattel, who they claim differentiated treaties from non-treaties based upon the relative importance of the agreement. As they are unable to locate any other source for the Framers' ideas about different types of international agreements, the Government argues, the plaintiffs conclude that Vattel's distinction should be read into the Constitution. The Government argues that the plaintiffs' reliance on the writings of Vattel is misplaced in that the distinctions made by Vattel were based on whether the agreement was to have long-term effects and the degree of permanence that the agreement carried with it.[248] The

---

[248] In examining the definition of the terms "treaty," "compact," and "agreement," the Supreme Court, in U. S. Steel Corp. v. Multistate Tax Commission, 434 U.S. 452 (1978), observed that:

Some commentators have theorized that the Framers understood those terms in relation to the precisely defined categories, fashionable in the contemporary literature of international law, of accords between sovereigns. See, e. g., Engdahl, Characterization of Interstate Arrangements: When Is a Compact Not a Compact?, 64 Mich.L.Rev. 63 (1965); Weinfeld, What Did the Framers of the Federal Constitution Mean by "Agreements or Compacts"?, 3 U.Chi.L.Rev. 453 (1936). The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel. 1 J. Kent,

Government also notes that some scholars analyzing Vattel's work have concluded that the author

considered the terms "convention," "agreement," and "arrangement" to represent forms of the general

category called "treaties."[249] Further, the Government notes that even the Supreme Court has

acknowledged that a determination of what the Framers truly meant when they used the word

"treaty" is difficult in light of the fact that "[w]hatever distinct meanings the Framers attributed to the

terms" treaty, alliance, confederation, agreement and compact in the Constitution, "those meanings

were soon lost."[250] Thus, the Government contends that the plaintiffs' conclusions about the meaning

of the term "treaty," to the extent that they are purportedly derived from the Framers' understanding

_____

Commentaries on American Law 18 (1826). In 1775, Benjamin Franklin acknowledged
receipt of three copies of a new edition, in French, of Vattel's Law of Nations and
remarked that the book "has been continually in the hands of the members of our Congress
now sitting . . . ." 2 F. Wharton, United States Revolutionary Diplomatic
Correspondence 64 (1889), cited in Weinfeld, supra, at 458. Vattel differentiated between
"treaties," which were made either for perpetuity or for a considerable period, and
"agreements, conventions, and pactions," which "are perfected in their execution once for
all." E. Vattel, Law of Nations 192 (J. Chitty ed. 1883). Unlike a "treaty" or "alliance,"
an "agreement" or "paction" was perfected upon execution:

> "[T]hose compacts, which are accomplished once for all, and not by successive
> acts,--are no sooner executed then they are completed and perfected. If they are
> valid, they have in their own nature a perpetual and irrevocable effect . . . ." Id.,
> at 208.

This distinction between supposedly ongoing accords, such as military alliances, and
instantaneously executed, though perpetually effective agreements, such as boundary
settlements, may have informed the drafting in Art. I, § 10. The Framers clearly
recognized the necessity for amicable resolution of boundary disputes and related
grievances. See Virginia v. West Virginia, 246 U.S. 565, 597-600, 38 S.Ct. 400,
404-405, 59 L.Ed. 1272 (1918); Frankfurter & Landis, The Compact Clause of the
Constitution--A Study in Interstate Adjustments, 34 Yale L.J. 685, 692-695 (1925).
Interstate agreements were a method with which they were familiar. Id., at 694, 732-734.
Although these dispositive compacts affected the interests of the States involved, they did
not represent the continuing threat to the other States embodied in a "treaty of alliance,"
to use Vattel's words. E. Vattel, supra, at 192.

434 U.S. 462 n.12.

[249] See Golove at 1942, n.361.

[250] U. S. Steel, 434 U.S. at 463.

of the works of Vattel, are, at best, based on ambiguous passages from the author's works and, more likely, based upon a complete misconception of the author's and the Framers' beliefs about what is and what is not a "treaty."

The Government argues that the debates concerning the Constitution's framing and ratification do not offer support for the plaintiffs' attempt to distinguish between those international agreements that impact sovereignty and those that do not. According to the Government, the portion of the plaintiffs' test that accounts for an agreement's effect on sovereignty is, in fact, not supported by anything in the historical record. The Government argues, citing an article written by Myres McDougal and Asher Lans, two Yale Law Professors, that "no justification of the two-thirds rule was ever put forth in terms of political principle."[251] Even if the plaintiffs are correct in asserting that the supermajority requirement is the result of the Framers' concerns about conflicts between Southern States and Northern States, the Government argues, such concerns only evidence a desire to protect the States from regionalism, rather than a desire to prevent federal encroachment on state sovereignty. Further, the Government questions whether the Senate was vested with a share of the treaty-making power as a result of its perceived connection with the States or because of other practical concerns that made it the more appropriate body. The Government argues, citing Jay's language in Federalist 64 and Hamilton's statements in Federalist No. 75, that the Framers' choice of the Senate appears to have been based, in large part, on the fact that it was better equipped, due to its small size, to serve in an advisory role and to promote secrecy and efficiency.

### c. Historical Practice Regarding the Definition of the Term "Treaty"

The Government also argues that the plaintiffs' proposed test is inconsistent with historical practice, noting that a number of "important" international agreements have been concluded through

---

[251] McDougal and Lans at 540-544.

procedures other than those outlined in the Treaty Clause.[252]  The Government highlights two specific

early incidents where such agreements were completed without the advice and consent of the Senate:

(1) the 1813 agreement entered into by President Madison concerning the transfer of prisoners of war

between the United States and Great Britain via a "lengthy and formal" document; and (2) the Rush-

Bagot Agreement of 1817, concluded by President Monroe, purportedly pursuant to his executive

---

[252] The Government cites those agreements listed, supra, at note 162, in addition to the
following: the agreements allowing the Republic of Texas and the Kingdom of Hawaii to join the
Union, Joint Resolution of Dec. 29, 1845, 9 Stat. 108, Joint Resolution of July 7, 1898, 30 Stat.
750; the agreement creating a commercial sphere of influence in the Final Protocol Relating to
Matters Arising Out of the Boxer Rebellion of 1900, 2 Malloy Treaties at 2006; the agreement
recognizing the Soviet Union through the Litvinov Assignment of 1933; the agreement marking
the United States' participation in the International Labor Organization, Joint Resolution of June
19, 1934, 49 Stat. 2712 (1934); the agreement setting the terms for Germany's surrender in the
Second World War, Act of Military Surrender May 7, 8, 1945, 59 Stat. 1857; and the Bretton
Woods Agreement.

The Government also notes that a number of relatively insignificant agreements, such as
those deciding where the World Fair was to be held, have been dealt with through the Treaty
Clause procedure, thus weakening the plaintiffs' claim that the treaty/non-treaty determination is
dependent upon the relative importance of the agreement at issue.

The plaintiffs argue that each of the agreements cited by the Government fails to support
its contention.  They note that the 1813 agreement and the 1817 Rush-Bagot agreements were
agreements arising out of the War of 1812, and maintain that they were both concluded pursuant
to the President's power as the Commander in Chief.  Further, plaintiffs point out that prior to the
1940's sole executive agreements of this nature were considered non-binding due to the fact that
they were not ratified as treaties.  See Ackerman and Golove, at 819-20 and n.70; Borchard, Shall
the Executive Agreement Replace the Treaty?, 53 Yale L.J. 664, 679 (1944).  The other
agreements cited by the Government are distinguished by plaintiffs as follows: (1) the agreements
concerning the Boxer Rebellion and the surrender of Germany invoked the President's
Commander in Chief power; (2) the Litvinov Assignment was passed pursuant to the President's
specialized ability to settle foreign claims; (3) the annexation of Texas and Hawaii were
accomplished without any formal written agreements and therefore involved no document to
ratify; (4) the 1934 decision to participate in the ILO imposed no actual obligations on the United
States, See Ackerman and Golove, at 853, and was approved unanimously by the Senate, id.; (5)
the adoption of the Bretton Woods agreement represents one of the first examples of the political
branches' attempt to unconstitutionally circumvent the strictures of the Treaty Clause.

authority.[253] The Rush-Bagot agreement, contends the Government, is especially notable for its great importance – the agreement limited naval armaments on the Great Lakes and is considered a precursor of the unarmed border with Canada – and for the fact that, although President Monroe eventually had doubts about whether the Constitution vested the Chief Executive with power to conclude such an agreement and did, in fact, end up submitting it to the Senate for ratification, the agreement went into effect nearly a year before the Senate provided its formal two-thirds approval.[254] In any case, the Government argues that these two agreements indicate the fact that the Framers and Ratifiers of the Constitution did not intend to draw a distinction requiring so-called "important" international agreements to follow Treaty Clause procedures. Rather, the Government argues that the concerns of early Presidents, particularly Monroe, appear to have focused on whether "powers vested . . . by the Constitution" rendered the executive branch "competent to enter into" a given agreement.[255]

The Government argues that the plaintiffs' attempts to group the historical exceptions to their test into identifiable groups amounts to nothing more than a recognition that when alternative constitutional powers are concerned, the Supreme Court and the political branches have recognized that there exist alternatives to the Treaty Clause. Thus, just as the President could not function as Commander in Chief without the ability to conclude agreements without reference to the Treaty Clause, the Government argues, Congress cannot properly perform its role as the regulator of foreign commerce if it cannot act in conjunction with the President in the making of international commercial agreements.

---

[253] See Congressional Review of International Agreements: Hearings on H.R. 4438 Before House Comm. on International Relations, 94th Cong. 165 (Memorandum from the Department of State on the Intention of the Framers of the Constitution with Respect to International Agreements Other than Treaties).

[254] Id.

[255] Id.

### d. Supreme Court Precedent

The Supreme Court's decisions in Belmont, Pink, and Dames and Moore, according to the Government, clearly refute the validity of the plaintiffs' proposed test. All three cases involved international agreements of substantial importance and had a substantial effect on federal and state sovereignty, yet were upheld by the Court despite the fact that they were not approved pursuant to the Treaty Clause. Thus, in Belmont, the Court upheld the Litvonov Assignment, a sole executive agreement, in the face of contrary state law. In construing the impact of the New York state law that appeared to conflict with the negotiated agreement, the Court held that "no state policy can prevail against the international compact here involved."[256] Justice Sutherland, writing for the Court, further noted that:

> Plainly the external powers of the United States are to be exercised without regard to state laws or policies . . . And while this rule in respect of treaties is established by the express language of cl. 2, Art. VI, of the Constitution, the same rule would result in the case of all international compacts and agreements from the very fact that complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several States.

Id. at 331. In Pink, the Court used similar language in upholding the Litvinov Assignment.[257] The agreement construed by the Court in Dames & Moore was, according to the Government, even broader and more pervasive in its impact on federal and state sovereignty than was the Litvinov Assignment. The Government asserts that under the plaintiffs' test, the agreement construed in that case, the Algiers Accords that ended the hostage crisis in Iran, suspended the claims against Iran and its state enterprises pending in federal and state courts, and transferred those claims to an international claims tribunal, should have been submitted to the Senate as an Article II treaty. The Government argues that the relative importance of the agreement and its effect on sovereignty surely should have resulted in such submission, if the plaintiffs' test is the correct one. Nonetheless, the

---

[256] 301 U.S. at 324.

[257] See 315 U.S. at 233-34.

Court held that the President had not exceeded his constitutional authority, noting the "longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate," and finding that the President has "some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate."[258]

The Government argues that, despite the plaintiffs' attempt to minimize the importance of these decisions based on the fact that they merely involved the settlement of foreign claims, the agreements involved in Belmont, Pink and Dames & Moore dealt with extremely important issues and resulted in substantial restraints on federal and state sovereignty. The plaintiffs' attempts to pass the Court's decisions off as exceptions to an otherwise universal rule, according to the Government, represents nothing more than an effort to artificially exclude from consideration relevant Supreme Court decisions and should therefore be ignored.

Lacking support from the text, from the language of the Framers, from historical practice and from Supreme Court precedent, the Government argues, the plaintiffs are left to rely primarily on the writings of academics, primarily Professor Tribe, to legitimize their claim that sovereignty considerations are significant in determining when an agreement must be subject to the Article II procedures. The Government notes that Tribe has not only admitted that he is in the minority with respect to his views on the Treaty Clause,[259] but has, on occasion, expressed doubt as to whether his view is the correct one.[260] In any case, the Government asserts that the views expressed by a scholar

_____

[258] 453 U.S. at 679-80 and 682.

[259] Tribe, at 1276.

[260] Tribe's 1988 treatise on constitutional law states: "But it does appear settled that a hybrid form of international agreement--that in which the President is supported by a Joint Resolution of Congress--is coextensive with the treaty power." In the same section Tribe says, "United States v. Belmont has been read as intimating that the permissible scope of executive agreements is largely, if not completely, co-extensive with that of treaties." Laurence Tribe, American Constitutional Law § 4-5, at 228 n.18, 229 (2d ed. 1988). Further, even after testifying at length regarding the lack of constitutionality of approving the WTO as a congressional-executive agreement, Tribe expressed some doubts about his position, noting the strength of the

in a law review article or in testimony before Congress, without support from other sources, certainly fail to form a firm foundation upon which to base a constitutional analysis.

### e. The Government's Assertions Regarding the Scope and Impact of NAFTA

In addition to arguing that the plaintiffs' proposed test lacks legitimacy, the Government argues that NAFTA does not represent the deep-seeded incursion on state and local sovereignty that the plaintiffs would have this court believe and that the Agreement may, therefore, fail to amount to a "treaty" even under the plaintiffs' proposed test. The Government notes that the plaintiffs have not identified a single state or local statute or regulation that has been struck down as a result of NAFTA, nor do they cite a single instance in which either Mexico or Canada has brought a state or local law before a NAFTA dispute settlement panel. Rather, the plaintiffs' contentions regarding the potential impact of NAFTA on state and local laws are based on predictions made in 1993 that remain unverified, according to the Government, and have been discredited by the passage of time. Further, the plaintiffs have, according to the Government, ignored the fact that all of the changes in federal law that have been brought about by NAFTA are embodied in the Implementation Act, which the Government argues is clearly constitutional.

The Government also contends that the changes in federal law caused by the Implementation Act are far more modest than plaintiffs would have this court believe, commenting that the plaintiffs have failed to specifically identify any new federal regulation put in place by the Implementation Act reflecting the sort of radical infringement of federal sovereignty that plaintiffs are concerned about. For instance, the Government notes that the binational panel procedures for reviewing dumping and

Clinton Administration's arguments in favor of its submission of the Uruguay Round Agreements as congressional-executive agreements. 140 Cong. Rec. 29926 (daily ed. Nov. 30, 1994) (Letter to Hon. George J. Mitchell, et. al., From Laurence Tribe, Nov. 28, 1994). Although Tribe has again reinstated his view that the Treaty Clause should be read exclusively and that agreements like the WTO should be approved pursuant to the Treaty Clause, the Government argues that his lack of confidence should raise concerns about the significance of his theory.

countervailing duties cited by the plaintiffs as an example of a provision involving a substantial sacrifice of federal sovereignty are not new, but were actually put in place under the United States-Canada Free-Trade Agreement. Similarly, NAFTA's Chapter 20 dispute settlement provisions are, according to the Government, substantially similar to those contained in the United States-Canada Agreement.

In examining the various NAFTA provisions that they allege create infringements on sovereignty, the plaintiffs, according to the Government, repeatedly exaggerate and mischaracterize the substance of those provisions. Hence, the Government argues that the plaintiffs' characterization of the Chapter 20 dispute settlement provisions fails to provide an accurate description of the function of those measures. According to the Government, the Chapter 20 procedure, rather than acting as a constraint on federal and state sovereignty, actually protects that sovereignty by restraining the degree to which Canada and Mexico can influence federal, state and local decision-making. Chapter 20 does this, argues the Government, by limiting the circumstances under which Canada and Mexico may seek to challenge those United States laws they view as conflicting with NAFTA.

Further, the Government argues that the Chapter 20 panels have no power to actually overturn United States law. Rather, the panels issue reports that allow the United States to decide what course of action to take in the event a given law is found to violate NAFTA. Although NAFTA expresses a preference for the alteration of the law in Article 2018(2), calling for a change toward conformity "[w]henever possible," the Government notes that such language does not mandate a change. Failure to alter a law to conform to NAFTA gives the injured nation the right to unilaterally impose trade sanctions on the United States. The United States is bound by the Agreement not to reciprocate such sanctions. Of course, in the absence of this arrangement, the governments of Canada and Mexico would be free to set tariff levels at whatever point they see fit. The Government argues that by setting strict rules, timelines and procedures for dispute settlement, NAFTA somehow bolsters United States sovereignty.

The Government contends that the plaintiffs have simply failed to accurately describe the

workings and effect of some of the provisions they have cited. Thus, while the plaintiffs decry the provisions of Chapter 7 imposing rules designed to prevent governments from adopting protectionist import restrictions on the pretext that they are designed to protect human, plant or animal health, the Government notes that those provisions were included in the Agreement at the insistence of the United States and take full account of United States' practices in those fields.[261] Similarly, although the plaintiffs maintain that Chapters 7 and 9 of NAFTA "hem in" the ability of federal and state regulators to adopt health and safety and environmental standards and to conduct certain food, health and safety inspections, the Government argues that there is no basis within NAFTA for such assertions and notes the plaintiffs' failure to identify any incidences of such restrictions on United States regulators or inspectors.

Plaintiffs argue that Article 714's call on the signee governments to "pursue equivalence" in their respective health and safety measures "to the greatest extent practicable," may result in the United States placing authority to enforce federal, state and local laws in the hands of another country. Arguing that the Article 712 provision amounts to an aspirational statement rather than a binding commitment, as noted in the Statement of Administrative Action, page 546, the Government concludes that the plaintiffs' fears lack any grounding in reality. Finally, the Government notes that the plaintiffs' concerns regarding Article 714's alleged transfer of United States food safety enforcement to foreign governments is belied by the explicit language of Article 714(2) and by the language of Article 712(2).

The plaintiffs' descriptions of NAFTA's provisions are, according to the Government, full of inaccuracies and misconceptions akin to those described above. The plaintiffs' rendition of NAFTA thus, according to the Government, distorts the degree to which sovereignty is constrained by the Agreement's provisions. The Government argues that, without the aid of such misleading arguments, the plaintiffs are unable to show that NAFTA imposes the unique and unprecedented restraints on

---

[261] See Statement of Administrative Action, at 555.

sovereignty that would make it a treaty even under their own analysis. Arguing that plaintiffs' test lacks any basis in the Constitutional text, the language of the Framers, historical practice or Supreme Court precedent, and that NAFTA may very well not even amount to a treaty under that test, the Government concludes that this court must rule in favor of the constitutionality of NAFTA and its Implementation Act.

## B. The Exclusivity of the Treaty Clause

The Government argues that the Treaty Clause of Article II is not the exclusive means for entering into an international agreement such as NAFTA or for adopting legislation implementing such an agreement. To begin with, the Government notes that the plaintiffs concede the existence of some kinds of valid and binding international agreements that do not constitute Article II treaties. This concession, comments the Government, is unsurprising in light of the fact that there exist several types of non-Article II treaty international agreements that have been well-established as valid under United States law. Such agreements include: (1) congressional-executive agreements – agreements negotiated by the President that are either pre- or post-approved by a simple majority of Congress;[262]

---

[262] The Government asserts the well-established nature of this type of international agreement by citing the following: Restatement (Third) of the Foreign Relations Law of the United States, § 303, note 8, ("Congressional-Executive agreements have in fact been made on a wide variety of subjects, and no such agreement has ever been effectively challenged as improperly concluded"); Louis Henkin, Foreign Affairs and the Constitution, 175-76 (1975) ("[T]he constitutionality of the Congressional-Executive agreement is established, [and] is used regularly at least for trade and postal agreements"); CRS Report, at 58 ("[T]he constitutionality of this mode of [congressional-executive] agreement-making is well established"); Ackerman and Golove at 908-09 ("Congress's enumerated powers would be read generously, with the aid of the Necessary and Proper Clause, to include the power to approve binding international obligations negotiated by the President"); Harold Koh, Congressional Controls on Presidential Trade Policymaking After "I.N.S. v. Chadha", 18 N.Y.U. J. Int'l L. 1191, 1195 n.13 (1986) ("[T]reaties and congressional-executive agreements are now generally treated as interchangeable instruments of U.S. foreign policy"); John H. Jackson, The General Agreement on Tariffs and Trade in United States Domestic Law, 66 Mich. L. Rev. 25, 253 (1967) (It is generally settled that under out Constitution international 'treaty' obligations can be established . . . [b]y an executive agreement of the President, acting under authority delegated by an act of Congress"); McDougal and Lans at 181 ("[P]ractice under the Constitution . . . has confirmed beyond doubt . . . that the treaty-making power is no barrier to Congressional authorization or sanction of agreements").

(2) executive agreements authorized expressly or implicitly by an existing treaty; and (3) presidential or sole executive agreements – agreements concluded unilaterally by the President pursuant to his constitutional authority.[263] The Government notes that nothing in the Constitutional text elevates the Article II treaty ratification process over Article I's law making powers. Plaintiffs' claims represent, according to the Government, nothing more than an attempt to engraft an artificial and illegitimate hierarchy onto the Constitution.

The plaintiffs argue that the Government's argument as to exclusivity is persuasive only to the extent that it promotes the position that some international agreements do not rise to the level of treaties and do not require approval of two-thirds of the Senate. They argue that acceptance of the executive agreement and/or the congressional-executive agreement as all-purpose alternatives to the Treaty Clause represents an acceptance of the principle that the Constitution may be amended without reference to Article V of the Constitution. They note that in the 1930's and 1940's when advocates of the congressional-executive agreement first garnered significant support for their use, there was a widespread recognition of the fact that in order to make the practice constitutional an amendment would be necessary. A movement in favor of such an amendment took place in 1943-45, but was abandoned when advocates decided that it was "ridiculous to suppose that two-thirds of the Senate would voluntarily surrender its treaty-making prerogatives by supporting a formal constitutional amendment."[264] Thus, according to Tribe, rather than properly amending the Constitution, politicians

---

Not all commentators have concurred with the Government's conclusion. See Tribe at 1221; Edwin Borchard, Shall the Executive Agreement Replace the Treaty? 53 Yale L.J. 664 (1944); Treaties and Executive Agreements – A Reply, 54 Yale L.J. 616 (1945) (offering a direct response to the arguments presented by McDougal and Lans).

[263] See Restatement, § 303; CRS Report, at 52-68. According to Foster v. Nielson, 2 Pet (27 U.S.) 263, 314 (1829), the Constitution's Supremacy Clause, Art. VI, cl. 2, clearly establishes that treaties that are self-executing or have been implemented through legislation are the "Supreme Law of the Land." The Government argues that United States v. Pink bestows the same status upon international executive agreements.

[264] Ackerman and Golove at 807.

and academics chose to ignore the intent of the Framers and historical precedent in favor of political prudence and "strategic compromise." Tribe at 1280-86.

The plaintiffs reject the Government's characterization of the broad powers of the President and Congress with respect to international agreement-making. They claim that the Government's description of the powers of the President is so broad as to leave nothing beyond the scope of unilateral executive agreements as long as such agreements deal with "foreign affairs." Similarly, the Government's characterization of Congress's power lacks any defined boundaries, and , in effect, amounts to a total interchangeability argument.[265]

The parties' arguments addressing the extent to which the Treaty Clause represents an exclusive grant of authority can be more or less broken down into several sub-sections. The parties first address the text of the Constitution and the proper manner of examining that text. Next, they look at the intent of the Framers with respect to the relevant Constitutional provisions and the historical practices that have arisen out of those provisions. Finally, the parties examine the (allegedly) relevant federal court decisions.

### 1. Government's Textual Analysis With Respect to Exclusivity

To be certain, the Constitutional text does not *explicitly* state that the Treaty Clause procedure is the exclusive method by which the federal government may conclude an international agreement that constitutes a "treaty." Given the absence of express textual proscriptions of Presidential or Congressional power in the area of international agreement-making, the Government suggests that the text of the Constitution clearly allows the political branches to conclude international agreements through alternative methods. Thus, citing Curtiss-Wright, Dames & Moore, Weinberger, United States v. Pink, 315 U.S. 203, 229-30 (1942), United States v. Belmont, 301 U.S.

---

[265] See Armen Varian, Approval of SALT Agreements by Joint Resolution of Congress, 21 Harv. Int'l L. J. 421, 440-41 (1980) (stating that "[g]iven the nearly unlimited scope of legislative power at present exercised by Congress . . . application [of this 'congressional power' test] would serve less to define the scope of non-treaty agreements than to endorse their interchangeability with treaties in nearly all situations").

324, 330-31 (1937), and B. Altman, the Government contends that the Supreme Court has sanctioned the federal government's use of international agreements that "do not constitute treaties in the constitutional sense."[266] According to the Government, Belmont, establishes that the President may, on his own authority or in tandem with Congress, enter into international agreements without adhering to the strictures of the Treaty Clause. 301 U.S. 324, 330 (1937). Finally, the Government maintains that the Supreme Court's decision in Field v. Clark, 143 U.S. 649, 694 (1892), stands for the proposition that Congress as a whole may direct and participate in the making of international agreements.

According to the Government, the text of the Constitution, as interpreted by the Supreme Court, allows for the utilization of executive agreements whenever there exists constitutional authority outside of the Treaty Clause allowing the President to negotiate and conclude an international agreement and allowing Congress to enact the legislation required for a given agreement's implementation. The Government, citing the Constitutional authority granted to both the President and Congress, and noting that the Supreme Court has characterized Congress's power to regulate "Commerce with foreign Nations" as "broad," "comprehensive," "plenary," "and "complete,"[267] argues that NAFTA and the Implementation Act fall squarely within the combined enumerated powers of the two political branches. Further, it argues that the Agreement and the Act stand at the intersection of Congress's and the President's power over foreign commerce and foreign affairs, respectively, and that each provision of the Implementation Act could, therefore, have been enacted in the absence of any agreement with Mexico and Canada.

While acknowledging that NAFTA could have been ratified as a treaty, the Government contends that the congressional-executive agreement process was certainly acceptable, that the Treaty

---

[266] Curtiss-Wright, 299 U.S. 304, 318.

[267] United States v. 12,200-Ft. Reels of Super 8MM Film, 413 U.S. 123, 125-26 (1973) (citations and quotations omitted)

Clause does not expressly prohibit the employment of an alternative procedure, and that the congressional-executive agreement method may have been the Constitutionally preferable method by which to approve of and implement NAFTA.[268] Thus, the Supreme Court, in holding that a later act of Congress may override a treaty, stated that the House's action with respect to such legislation "does not render it less entitled to respect in the matter of its repeal or modification than a treaty . . . If there be any difference in this regard, it would seem to be in favor of an act in which all three of the bodies [the President, House and Senate] participate."[269]

## 2. Plaintiffs' Textually-Based Exclusivity Argument

The plaintiffs argue that the text of the Constitution supports their contention that international agreements that have the substance of a treaty cannot be adopted without the approval of two-thirds of the Senate. In doing so, they begin by contending that the most "natural" reading of the Treaty Clause is one that reads the clause as creating the exclusive method by which to conclude that certain class of international agreements called "treaties". They, like Tribe, argue that basic provisions of the Constitution that define the locus of power for certain governmental actions are properly construed as creating the exclusive means by which to exercise those powers.[270] Both the plaintiffs and Tribe assert that the Treaty Clause represents such a provision. They therefore argue that any other reading of the Treaty Clause renders it a "dead letter," and allows the corruption of one of the Constitution's fundamental provisions.

The plaintiffs argue that the language of the Compacts Clause, U.S. Const., Art. I, § 10, clauses 1 and 3, is perfectly consistent with the contention that the Treaty Clause represents the

---

[268] The Government notes that, in addition to the Congress's Foreign Commerce Clause power, the Origination Clause of Article I, section 7, may weigh in favor of initiating the approval of international trade agreements affecting tariff rates in the House of Representatives, as such agreements might be construed as "bills for raising revenue."

[269] Head Money Cases, 112 U.S. 580, 599 (1884).

[270] See Tribe 1241-48.

exclusive method by which to conclude certain international agreements. The Compacts Clause was, as noted above, meant to represent an absolute bar with respect to the States' ability to enter into treaties with foreign powers. However, the Clause permits the States to enter into other international agreements with the consent of Congress. The plaintiffs argue that to the extent the Compact Clause evidences the Framers' recognition of a distinction between treaties and other international agreements, the Treaty Clause indicates that they intended to limit the federal government's method of concluding those things called treaties, while leaving open the question of how the federal government is to make other international agreements. Thus, the plaintiffs argue that in addressing "treaties" and not those other international agreements termed "agreements" and "compacts", the Treaty Clause clearly establishes that those agreements that do constitute treaties must be subjected to its more rigorous procedural requirements in order to be considered valid.

Plaintiffs contend that the powers of the President and Congress in the areas of foreign affairs and commerce do not authorize them to adopt treaties without the concurrence of two-thirds of the Senate. Citing Emmerich de Vattel's The Law of Nations, which the Framers allegedly relied upon to some degree in forming their conceptions of the term "treaty," the plaintiffs argue that the Framers certainly considered the term "treaty" to include commercial agreements.[271] They again note that the supermajority requirement was included in the Constitution as a result of the Framers' fear that "commercial Treaties may be so framed as to be partially injurious." The plaintiffs note the fact that the concern surrounding commercial treaties was so focused that when a proposal was made at the Constitutional Convention to exempt peace treaties from the supermajority requirement, the proposal was objected to solely on the grounds that peace treaties could be worded so as to influence commercial interests.[272] Plaintiffs also cite Solomon Slonim's article entitled Congressional-Executive

---

[271] Emmerich de Vattel, The Law of Nations, §§ 26-34, at 144-48 (Joseph Chitty trans., T. & J. W. Johnson 1863).

[272] See Bestor, at 130-31.

Agreements, 14 Colum. J. of Transnat'l L. 434 (1975), where, in addressing the origins of the Treaty Clause, Slonim stated: "[I]t is clear that the fear of adverse effects of commercial treaties on sectional interests had prompted the raising of the majority vote to two-thirds."[273] Thus, the Government's position that the Foreign Commerce Clause allows Congress to adopt all agreements dealing with foreign commerce without the consent of two-thirds of the Senate directly conflicts, according to the plaintiffs, with the intentions of the Framers.

The plaintiffs maintain that Congress's power to regulate a subject does not grant it the power to do so in any manner it sees fit, but, rather, Congress is limited to passing legislation.[274] The plaintiffs argue that the Government's notion that treaties, or their equivalent, may be established through a purely legislative act is contrary to the Framers' conception of the legislative function. In Federalist No. 75, Alexander Hamilton commented that "[t]he essence of the legislative authority is to enact laws," and that "[t]he power of making treaties [does not] relate [] . . . to the enactment of new [laws] . . .. Its objects are contracts with foreign nations."[275] Similarly, Jay defended the Framers' decision not to entrust treaty-making to the legislature.[276] Plaintiffs thus argue that there exists a definite difference between legislative action and international agreement-making.

### 3. The Government's Position Regarding The Framers' Intent and Historical Precedent

Further evidencing the correct construction of constitutional provisions regarding international trade agreements, according to the Government, is the historical precedent set by the executive and

---

[273] Slonim at 442.

[274] Article I, § 1 refers to legislative powers.

[275] Federalist No. 75 at 450 (Alexander Hamilton).

[276] Federalist No. 64, at 393-94 (John Jay).

legislative branches.[277] The Government claims that examples of the political departments' use of alternatives to the Treaty Clause procedure are numerous and that a number of prominent early-American statesmen were of the opinion that the Treaty Clause could be avoided whenever Congress could claim an enumerated power in a given field. Further, the longstanding use of the fast-track procedure in connection with major international trade agreements and the well-established use of executive and congressional-executive agreements in general,[278] according to the Government, weighs heavily in favor of a finding that the procedure used to approve and implement NAFTA is constitutional.

While the plaintiffs point to the Framers' discussions regarding the Treaty Clause and conclude that the historical record clearly indicates that the Framers intended the Treaty Clause to be read as an exclusive grant of power protecting minority interests, the Government argues that

---

[277] As in its political question argument, the Government, cites Printz v. United States, 1117 S.Ct. 2365, 2370 (1997) and The Pocket Veto Case, 279 U.S. 655, 689-90 (1929), in asserting the importance of precedent in determining the proper interpretation of constitutional provisions, and argues that the Supreme Court's language in Dames & Moore, 453 U.S. at 686 and Haig v. Agee, 453 U.S. at 300-01 establishes that precedent is especially influential with respect to constitutional questions in the foreign relations arena.

[278] The Government notes that the Congressional Research Service ("CRS") has reported that from 1930 to 1992, the United States entered into 14, 069 international agreements. See Congressional Research Service, Treaties and Other International Agreements: the Role of the United States Senate, 14 (Senate Print 1993) (hereinafter CSR Report). Of those agreements, only 891 were concluded pursuant to the procedures outlined in the Treaty Clause. Id. According to the CRS, international agreements not approved as treaties have involved a wide range of subject matters, including postal conventions, intellectual property rights, acquisition of territory, participation in various international organizations, foreign trade, foreign military assistance, foreign economic assistance, atomic energy cooperation, and international fishery rights. Id. In addition to stressing the prevalence of international executive agreements in recent times, the Government also suggests that the use of international executive agreements of various forms in place of Article II treaties is not a recent phenomena. According to a letter written by Acting Attorney General McGregor in April of 1947, while the United States entered into almost 2,000 written international agreements between 1789 and 1939, only about 800 of those agreements were treated as Article II treaties. See Letter of April 25, 1947, from McGregor to Senator H. White, Chairman of the Senate Interstate and Foreign Relations Committee.

available evidence surrounding the adoption of the Treaty Clause and the Framers' conception of its operation fails to provide convincing evidence in favor of any one interpretation of the Clause. The Government notes that early in the nation's history, prominent statesmen maintained that legislation passed pursuant to Congress's foreign commerce power could be used to accomplish anything that the treaty-making procedure could be used to do. Thus, as early as 1796, Representative Albert Gallatin argued that the Foreign Commerce Clause could be used to limit the Treaty Clause.[279] Further, the Government notes that in 1844, the Senate Foreign Relations Committee, in urging the rejection of the Prussian and Germanic Confederation Treaty, commented that:

> [T]he legislature is the department of government by which commerce should be regulated and laws of revenue be passed. The Constitution, in terms, communicates the power to regulate commerce and to impose duties to that department. It communicates it, in terms, to no other. Without engaging at all in an examination of the extent, limits, and objects of the power to make treaties, the committee believes that the general rule of our system is indisputably that control of trade and the function of taxing belong, without abridgment or participation, to Congress.

Compilation of Reports of the Senate Committee on Foreign Relations, 1789-1901, S. Doc. No. 231, 56th Cong., 2d Sess., pt. 8, at 36 (1901). Similarly, when the Senate refused to pass a treaty annexing Texas in 1845, President Tyler "advised the House of Representatives: 'The power of Congress is . . . fully competent in some other form of proceeding to accomplish everything that a formal ratification of the treaty could have accomplished[.]'"[280]

---

[279] 5 Annals of Cong. 466-74 (1796).

[280] Louis Henkin, Constitutional Conflicts Between Congress and the President, 227-28 (1991). In addressing the apparent conflict between the enumerated powers of the Congress and the procedures required by the Treaty Clause, Thomas Jefferson wrote that:

> "The Constitution must have meant . . . to except (from the treaty-making process) those subjects of legislation in which it gave a participation to the House of Representatives.¹ This last exception is denied by some on the ground that it would leave very little matter for the treaty power to work on. The less the better say others."

Thomas Jefferson, Manual of Parliamentary Practice, Sec. 52. James Madison may also have considered the Treaty Clause nothing more than an option, as he wrote:

> "In this particular case (the treaty-making power) a concurrence of two-thirds at least is made necessary, as a substitute or compensation for the other branch of the legislature,

Acknowledging that there exists substantial historical disagreement over whether Congress's Foreign Commerce Clause power may be used to accomplish anything that could be accomplished pursuant to the Treaty Clause, the Government notes that, in any case, there certainly existed an early recognition among American statesmen that the Treaty Clause is not the exclusive means by which to conclude an international agreement. Thus, in 1790, Congress gave the President statutory authority to arrange for the repayment of the nation's war debts,[281] and, two years later, gave the Postmaster General the authority to conclude agreements with foreign nations concerning the reciprocal receipt and delivery of mail.[282]

The use of alternative methods of concluding international agreements extended into the area of foreign trade as well, with Congress developing a practice of approving tariff concessions and rules of trade conduct through bicameral legislation.[283] During the late 1800's Congress began to provide

_____

which on certain occasions could not be conveniently a party to the transaction." James Madison, "Helvidius" letter No. 1, Writings (Hunt ed.), Vol. 6, p. 140; E.S. Corwin, The President's Control of Foreign Relations, p. 18.

Quincy Wright, former Professor of International Law at the University of Minnesota and author of the book Control of American Foreign Relations, Macmillan (1922), has stated that Madison and Jefferson were of the opinion that "the treaty-making power of the President and Senate was never intended to deprive Congress of the concurrent power to give effect to international agreements or to authorize international agreements on subjects within its delegated powers." Thus, states Wright, Madison and Jefferson believed that

[W]hile the requirements of secrecy, speed, and sectional policy made it "convenient" to give the President and Senate the power to make treaties, the Senate at that time being a small body evenly balancing the sections, it was expected that this power would only be employed when circumstances required, and would not affect the capacity of "the whole Congress" to use its constitutional powers, in order to justify the President in using his constitutional power to negotiate with foreign governments.

Quincy Wright, The United States and International Agreements, 38 Amer. J. Int'l L. 341 (1944).

[281] Act of Aug. 4, 1790, ch. 34, § 2; 1 Stat. 139.

[282] Act of Feb. 20, 1792, ch. 7, § 6, 1 Stat. 239.

[283] See Act of June 13, 1798, 1 Stat. 565; Act of December 19, 1806, Stat. 411; Act of March 1, 1809, 2 Stat. 528. The Government contends that, according to Bowsher v. Synar, 478 U.S. 714, 723-24 (1986), these early congressional enactments provide "weighty" evidence of the

legislative pre-approval of international tariff and trade agreements negotiated by the President. The McKinley Tariff Act of 1890, for example, gave the President the authority to enter into comprehensive trade negotiations with foreign nations, allowed him to permit certain products into the country duty-free, and allowed him to suspend such status when foreign nations failed to adequately reciprocate such treatment.[284] The constitutionality of this provision of the Tariff Act, under which the President concluded ten trade agreements, was recognized by the Supreme Court in Field v. Clark, 143 U.S. 649 (1892).[285] Similarly, the Court acknowledged the constitutionality of an executive agreement concluded pursuant to the provisions of the Dingley Tariff of 1897[286] in B. Altman & Co., 224 U.S. at 601. Under the Reciprocal Trade Act of 1934,[287] Congress gave itself the power to review the President's initiatives through provisions that terminated the President's tariff proclamation authority after a few years. This allowed Congress to extract concessions from the President in exchange for legislative approval of the agreements he negotiated.[288] Pursuant to his authority under the 1934 Trade Act, the President concluded thirty-two bilateral trade agreements between 1934 and 1945, as well as the multilateral General Agreement on Tariffs and Trade.[289] The Government stresses that none of the above-noted presidential agreements were ever submitted to the Senate for its advice and consent, yet all were considered valid. Further, the Government argues that the examples noted above represent only an infinitesimal fraction of the overall number of

proper interpretation of the Constitution.

[284] 26 Stat. 567 (1890).

[285] See Samuel B. Crandall, Treaties: Their Making and Enforcement 122 (1916).

[286] 30 Stat. 151.

[287] Pub. L. No. 73-316, 48 Stat. 943 (1934) (hereinafter the "1934 Trade Act"),

[288] See § 2(c), 48 Stat. at 944.

[289] See Koh, Congressional Controls on Presidential Trade Policymaking After I.N.S. v. Chadha, 18 N.Y.U. J. Int'l L. & Pol. At 1195-97.

international agreements that have been concluded without following the Treaty Clause procedure.

In concurring with the Supreme Court's decision in Youngstown, Justice Frankfurter suggested that historical practice is an important indicator of what is proper under the Constitution:

The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply imbedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of text or supply them. It is an inadmissibly narrow conception of American constitutional law to confine it to words of the Constitution and to disregard the gloss which life has written upon them.

343 U.S. 579, 610-11 (1952). The Government, while acknowledging that an illegality cannot be legitimized by the passage of time, argues that this is a case in which the plaintiffs have employed an "inadmissibly narrow" construction on the constitutional text, attempting to discredit the relevant historical precedents which indicate the proper manner in which to construe the Constitution.

The Government suggests that the plaintiffs' characterization of the Representatives' views at the Jay Treaty debate and the views of the Nation's founding statesmen is one-sided. It notes that Congressman Holland of North Carolina, who was also a delegate to the ratifying convention in his state, argued that the Constitution had only been adopted on the understanding that the Treaty Clause was restricted in the case of commercial agreements by the Foreign Commerce Clause.[290] Further, both Thomas Jefferson and James Madison argued that Congress's enumerated powers trumped those of the Treaty Clause and that the Treaty Clause could not, therefore, be used to ratify international agreements dealing with subjects of legislation delegated to Congress by the Constitution.[291] Although the Government concedes that Constitutional practice has not resulted in the arrangement envisioned by Jefferson and Madison, their views, along with those of Representative Holland, indicate that the question of the exclusivity of the Treaty Clause vis-a-vis the Foreign Commerce Clause was at least less than settled during the time of the Framers.

_____

[290] See 5 Annals of Cong. 546 (1796).

[291] T. Jefferson, Manual of Parliamentary Practice (1797-1801) § 52; 5 Annals of Cong. 487-95 (1796) (Madison).

Also incorrect, argues the Government, is the plaintiffs' assertion that the Framers viewed treaties as "fundamentally distinct" from statutes. Pointing to Thomas Jefferson's statement to the effect that treaties are legislative acts differing from other laws only in that they require the consent of a foreign nation, and John Jay's statement that "[t]here are few who will not admit that the affairs ·of trade and navigation should be regulated by a system cautiously formed and steadily pursued; and that both our treaties and our laws should correspond with and be made to promote it," the Government contends that the Framers viewed treaties as differing from legislation only to the extent that they involved contractual relations with foreign nations, but not with respect to their role in creating domestic law.[292]

The Government argues that to the extent that the Framers did consider treaties to be fundamentally different from statutes, the distinction is unimportant for the purposes of this case in that the distinction tells us nothing about whether Congress has exceeded its Article I authority in approving and implementing NAFTA. Further, the Government maintains that, contrary to the plaintiffs' allegations, Congress did not perform an action that a subsequent Congress cannot undo, arguing that a future Congress can vote to amend or repeal the implementing legislation as noted in Article 2205 of the Agreement, which allows a country to withdraw from the agreement on six months written notice.

Although it concedes that the Framers understood the term "treaty" to include "commercial agreements," the Government argues that such a concession does not lead to the conclusion that the Treaty Clause was meant to limit Congress's ability to legislate pursuant to its Foreign Commerce Clause power. The Government asserts that the concurrence of Justice White, joined by Justices Shiras and McKenna and the dissent of Chief Justice Fuller, joined by Justices Harlan, Brewer and Peckham in Downes v. Bidwell stand for the principle that the Treaty Clause should not be

---

[292] See Jefferson, Manual of Parliamentary Practice § 52; Federalist No. 64 (Jay).

interpreted to curtail Congress's power under the Foreign Commerce Clause.[293]

## 4. Plaintiffs' Intent/Historical Practice Argument

As in their political question argument, the plaintiffs assert that the impetus for the adoption

of the supermajority requirement was a concern for the preservation of sectional interests. They note

that even Ackerman and Golove, stalwart defenders of the congressional-executive agreement,

acknowledge that "[T]he two-thirds rule served as a fundamental protection for minority interests .

. . The Treaty Clause . . . expressed principles that then seemed paramount to many Americans

[including] the protection of regional interests against easy sacrifice by the dominant majority.[294]

---

[293] Justice White's language is noted above (Downes, 182 U.S. 244, 313). The language within Justice Harlan's dissent cited by the Government states:

'It need hardly be said that a treaty cannot change the Constitution, or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our government.' The Cherokee Tobacco, 11 Wall. 620, sub nom. 207, Half Pound Papers of Smoking Tobacco v. United States, 20 L. ed. 229.

So, Mr. Justice Field in De Geofroy v. Riggs, 133 U. S. 267, 33 L. ed. 645, 10 Sup. Ct. Rep. 297: 'The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the states. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the states, or a cession of any portion of the territory of the latter, without its consent.'

And it certainly cannot be admitted that the power of Congress to lay and collect taxes and duties can be curtailed by an arrangement made with a foreign nation by the President and two thirds of a quorum of the Senate. See 2 Tucker, Const. §§ 354, 355, 356.

182 U.S. at 370.

[294] Ackerman and Golove at 810-11. The plaintiffs observe that some commentators have attempted to argue that the interchangeable use of congressional-executive agreements in place of the Treaty Clause procedure does not oppose the intent of the Framers. However, they contend that the argument presented by Ackerman and Golove adequately refutes any such contentions. Ackerman and Golove, in fact, characterize such commentators as "myth-makers," stressing that, prior to the late 1930's, it was well-established that executive agreements could only be employed under limited sets of circumstances. In his 1998 follow-up article, Golove states that "the best and most widely accepted account [of the supposed interchangeability of congressional-executive agreements] rests upon false historical premises . . . [T]he conventional historical accounts

The plaintiffs argue that the Framers' observations regarding the Treaty Clause following the
adoption of the Clause further indicate that they viewed the provision as constituting an exclusive
grant of authority. They point to John Jay's discussion of the Treaty Clause in Federalist No. 64,
where Jay, after quoting the language of the Treaty Clause, stated:

> The power of making treaties is an important one, especially as it relates to war, peace, and
> commerce; and it should not be delegated but in such a mode, and with such precautions, as
> will afford the highest security that it will be exercised by men the best qualified for the
> purpose, and in the manner most conducive to the public good. The convention appears to
> have been attentive to both these points.

Federalist No. 64 at 390 (John Jay) (Clinton Rossiter ed. 1961). The plaintiffs note that Jay goes on
to reject the argument that "the legislature" should have been given the authority to make treaties.[295]
Jay also contended that Treaty Clause is well designed to ensure that corrupt treaties will not be
made, commenting that it is not "probable that the President and two thirds of the Senate will ever
be capable of such unworthy conduct."[296]

The plaintiffs also note that, in writing Federalist 64, Jay recognized that treaties differ from
statutes in that the latter can be unilaterally repealed while the former cannot. The plaintiffs argue
that Jay's recognition highlights a major reason why the procedures embodied in the Treaty Clause
must be honored. According to the plaintiffs, the fact that international agreements cannot be
unilaterally repealed shows why it would be incongruous to allow Congress to adopt, by a simple
majority vote, agreements that amount to treaties. The plaintiffs argue that by so doing, Congress
would be taking an action that a subsequent Congress could not undo – a situation that plaintiffs

---

developed in the 1940's were wrong in claiming that the congressional-executive agreement had
roots going back to the earliest days after the founding and had always been a consistent part of
the nation's agreement-making practices . . . [D]uring the first 150 years of our history, there was
no practice which supported interchangeability or even the existence of the congressional-
executive agreement form in its modern guise." Golove at 1799-1800.

[295] Id at 394.

[296] Id. at 395.

characterize as anomalous in our constitutional system.[297]

In Federalist No. 75, Alexander Hamilton states that the power to make treaties should be lodged in the President and the Senate,[298] and defends the two-thirds rule as securing "the advantage of numbers in the formation of treaties."[299] The plaintiffs contend that the Government's argument regarding the beliefs of early American statesmen is misleading. They note that Gallatin's statements, as cited by the Government, were in connection with the 1796 debate over a proposed resolution requesting that President Washington disclose to the House the instructions he had given to John Jay regarding the negotiation of a controversial commercial treaty that had been concluded with England.[300] Gallatin and other supporters of the House resolution did not, according to the plaintiffs, contend that the approval of Congress could substitute for two-thirds of the Senate, but that "the House could exercise legislative discretion in deciding whether to adopt laws necessary to put treaties into effect."[301] Gallatin recognized that the approval of two-thirds of the Senate was required for the formation of a treaty, but he argued that the House could refuse to pass laws effectuating a treaty.[302] Thus, Gallatin, "did not claim for the House a power of making treaties, but a check upon the Treaty-making power – a mere negative power."[303] The plaintiffs further note that no one present at the Jay

---

[297] This is not one of the plaintiffs' better arguments. Jay's suggestion that treaties cannot be unilaterally terminated may suggest that NAFTA, which can, by agreement, be so terminated, is not a treaty.

[298] Id. at 449-53,

[299] Id. at 453.

[300] The debate is summarized in 5 Annals of Cong. (1796). Additionally, Charles Henry Butler provides a description of the episode in his book, The Treaty-Making Power of the United States 421-31 (1902).

[301] Ackerman and Golove at 812.

[302] 5 Annals of Cong. at 469-73 (1796).

[303] Id. at 467. James Madison concurred with Gallatin, noting that their conception of the treaty-making power "left with the President and Senate the power of making Treaties, but

Treaty debate suggested that a treaty could be adopted without the concurrence of two-thirds of the

Senate, and point to Charles Butler's summarization of the conclusions that were reached as a result

of the debate, which states:

> It was definitely decided that the House of Representatives had no voice whatever in the
> negotiation or ratification of a treaty; [and] that the treaty-making power is vested exclusively
> in the Executive, subject only to the prescribed ratification by two-thirds of the Senate; that
> when the Executive makes a treaty and the Senate ratifies it in a constitutional manner, the
> · treaty becomes the supreme law of the land; on the other hand . . . , it was practically decided
> that although a treaty becomes the supreme law of the land as soon as it is ratified as to every
> provision which can be enforced without legislation, it remains ineffectual as to those matters
> which do require legislation, or the appropriation of money, and can only be enforced after
> both Houses of Congress enact appropriate legislation . . . "[304]

C. Butler, at 429-30. This view of the Treaty Clause, argues the plaintiffs, is constitutionally sound

and should be adhered to in this case.

The plaintiffs contend that the Government's reliance on the Senate Committee Report of

1844 is equally misplaced in that, as in the case of the Jay Treaty debate, the materials cited by the

Government address the House's ability to refuse to pass legislation pursuant to a ratified treaty. In

opposing the proposed commercial treaty with Prussia, the Report argued that the Senate should not

approve the treaty if the House, which would have to vote on implementing legislation, was opposed.

The Report stated that:

> The question has been debated how far Congress would be bound to give effect, in cases

---

required at the same time the Legislative sanction and cooperation, in those cases where the
Constitution had given express and specific powers to the Legislature." 5 Annals Cong. at 489,
493.

[304] The plaintiffs also argue that the records of the House's Jay Treaty debate not only fail
to support the Government's assertion that some Representatives conceived of the Congress's
Foreign Commerce Power as superior to the Treaty Power, but actually indicate that several
Representatives viewed any amount of House participation in the treaty-making process as
violative of the Constitution. Thus, several Representatives suggested that the House lacked the
authority to refuse to appropriate money or to refuse to enact legislation necessary to effectuate a
treaty. See 5 Annals of Cong. 436-37 (Rep. Murray); Id. at 438-40 (Rep. Smith); id. at 478-81
(Rep. Griswold).

requiring its cooperation, to regulations by treaty on subjects put within its express province by the Constitution. Whichever may be the better opinion, the doubt supplies reason enough against putting the question to trial in other circumstances than those in which the concurrence of Congress may be safely assumed. And the reason is the stronger for this forbearance from the fact that, in the contingency of conflict, it would be not the interests only, but the faith, too, of the nation which might be compromised, as this could have been committed by the adoption of the treaty regulations.

Compilation of Reports of the Senate Committee on Foreign Relations, 1789-1901, S. Doc. No. 231 56th Cong. 2d Sess., pt. 8, at 40 (1901). The plaintiffs argue that the Report simply reaffirms the point made in 1796, arguing that it would not be prudent, given the potential of Congress's refusal to pass the necessary implementing legislation, for the President and Senate to conclude the agreement.

The plaintiffs also contend that the practice during the era of the Framers indicates the true nature of the Treaty Clause as an exclusive grant of authority.[305] They argue that during the time of the Framers and the following one hundred years, non-treaty international agreement took one of two distinct forms: (1) agreements made by the President pursuant to his sole authority as Commander in Chief or his authority to settle foreign debts and claims; and (2) postal conventions negotiated by the executive branch, often with congressional approval.[306] Thus, for about one hundred and fifty years, international agreements, save those falling into the above-noted exceptions, were ratified pursuant to the Treaty Clause procedure.

The existence of the exceptions, argue the plaintiffs, are easily explained. The exceptions based on the President's individual authority were well-established constitutional necessities. Without the power to conclude some types of international agreements, the President's authority, it is argued,

---

[305] The plaintiffs note that Golove's article acknowledges the veracity of this assertion, as Golove comments that "the original intent and the first hundred and fifty years of practice were unequivocal" in establishing the exclusivity of the Treaty Clause with respect to certain types of agreements. Golove at 1940. Golove further points to "the absence of any practice during the first 150 years supporting an independent congressional agreement-making power." Id. at 1892 n. 318.

[306] See Ackerman and Golove at 820, 826 and 860.

would be greatly impaired. Similarly, the President's claim settlement power is viewed as "integrally connected with the normalizing of United States' relations with a foreign state,"[307] and arising pursuant to his power to recognize foreign governments.[308] The postal conventions exception results from the conventions' status as "constitutional anomalies." Such conventions, the plaintiffs note, are often not included in standard compilations of international agreements, apparently "on the ground that they are largely 'business arrangements between offices of transport rather than agreements between governments in the ordinary sense.'"[309] Given the limited nature of these exceptions and the clear reasons for their existence, argue the plaintiffs, historical practice for the first one hundred and fifty years of this nation's existence weighs conclusively in favor of an exclusive reading of the Treaty Clause.

The plaintiffs argue that the Government's references to early statutes that suspended trade relations and gave the President the authority to lift such sanctions are irrelevant in that such arrangements did not involve any sort of international agreement – they consisted of unilateral United States action and were therefore not subject to the Treaty Clause. The plaintiffs further contend that despite President Tyler's language in connection with the annexation of Texas, the annexation was accomplished without an "agreement" between sovereigns and that the incident cannot, therefore, be referred to as precedent for adopting international agreements without the use of Treaty Clause procedures.

The Government's argument concerning the pedigree of the congressional-executive agreement is, according to the plaintiffs, further weakened by the fact that even the late nineteenth-

---

[307] Dames & Moore v. Regan, 453 U.S. 654, 683 (1981).

[308] Ozanic v. United States, 188 F.2d 228, 231 (quoted in Dames & Moore, 453 U.S. at 683). Plaintiffs apparently do not recognize such Presidential power under the circumstances of this case.

[309] Ackerman and Golove at 826, and n.103 (quoting a 1931 statement of the State Department's treaty advisor).

century agreements referred to by the Government, such as the McKinley Tariff and Dingley Tariff, were not understood to authorize the President to unilaterally enter into binding international agreements. The McKinley Tariff of 1890, while authorizing the President to reduce tariffs unilaterally if he found that certain conditions were met, did not refer to or authorize the creation of "agreements" of any sort with foreign powers.[310]  When the President did attempt to complete agreements pursuant to the Act, the United States contended that the agreements were not binding as a result of the President's failure to adhere to the Treaty Clause procedures.[311]  Although the Dingley Tariff of 1897 purportedly granted the President the authority to conclude agreements with respect to a certain defined set of commodities, the United States again took the position, this time in spite of the authorizing legislation, that the resultant agreements were not binding.[312]

The plaintiffs conclude that the intent of the Framers in connection with the adoption of the Treaty Clause is made clear by the text of the Constitution, their language following the adoption of the Constitution, and by the practices that followed in the ensuing one hundred and fifty years. According to the plaintiffs, the Supreme Court's decisions in Thornton, 514 U.S. at 789-815, I.N.S. v. Chadha, 462 U.S. 919, 946-51 (1983), and Clinton v. City of New York, 118 S.Ct. 2091, 2103-04 (1998), all indicate that in situations such as this, deference should be given to the intent of the Framers.

The plaintiffs acknowledge that the twentieth century has seen the rise of the congressional-executive agreement in connection with international agreement-making. They appear to make two distinct arguments with respect to the applicability and the legitimacy of the practice: (1) recent practice, while evidencing increasing disregard for the strictures of the Treaty Clause, does not reflect the view that treaties and congressional-executive agreements are completely interchangeable or that

---

[310] See Ackerman and Golove at 821-24.

[311] See id.

[312] Id. at 824-26.

agreements of the nature and with the scope of NAFTA need not be regarded as treaties; and (2) to the extent that modern day practices do deny the exclusivity of the Treaty Clause and do deny the need to ratify agreements such as NAFTA pursuant to the Treaty Clause, such practices do not justify a refusal to give effect to the clear intent of the Framers and the clear meaning of the Clause.

The plaintiffs claim that the modern day use of the congressional-executive agreement effectively nullifies a structural protection intentionally included by the Framers. They note Tribe's argument concerning the "architectural safeguards" of the Constitution:

> The Constitution's architectural safeguards were specially designed to protect the states, citizens, and each branch of the federal government both from aggrandizement of power and from neglect of constitutional responsibility by those who temporarily hold public office – even when such aggrandizement or neglect seems wise as a matter of policy. Such constitutional protections are needed because seemingly benign and brief departures from constitutional protections tend to provide momentum for more enduring departures that may eventually result in the very harms that the constitutional architecture was designed to prevent. Although Congress had for five decades used the legislative veto, Jagdish Chadha was entitled to claim the Constitution's protections in challenging such a veto that threatened him with deportation. And the American people, whether regarded collectively or as the citizens of their respective states, are similarly entitled to the safeguards provided by the Senate supermajority requirement of the Treaty Clause.

Tribe at 1282.

According to the plaintiffs, this court should give effect to the intent of the Framers reflected in their "contemporaneous legislative exposition of the Constitution."[313] Again, they cite the Powell court's admonition against deference to practices simply on the basis of current or past use: "That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date."[314] Plaintiffs argue that the Court's Chadha and Clinton v. City of New York decisions illustrate that the principle elucidated in Powell is particularly applicable to cases

---

[313] Printz v. United States, 117 S.Ct. 2356, 2370 (1997).

[314] Powell, 395 U.S. 486, 545-47 (1969).

concerning the structural provisions of the Constitution.[315]

### 5. Federal Court Decisions Cited By the Government[316]

In addition to arguing that the text of the Constitution and historical precedent weigh in favor of a finding that NAFTA was concluded in a valid and legitimate manner, the Government also contends that relevant Supreme Court decisions support the constitutionality of NAFTA's approval. The Government maintains that an analysis of the Supreme Court's jurisprudence in connection with international agreements leads to three conclusions: (1) that there are constitutional methods outside Article II's Treaty Clause that may be employed as alternative means for the conclusion of international agreements; (2) that Congress may approve trade agreements through bicameral legislation; and (3) matters that may properly be the subject of the Treaty Clause may also be dealt with by an executive agreement.

#### a. Valid Non-Treaty International Agreements

In arguing that the Supreme Court has recognized the existence and validity of international agreements approved through non-Treaty Clause procedures, the Government begins with the Court's language in United States v. Curtiss-Wright. In Curtiss-Wright, Justice Sutherland stated that:

[T]he investment of the federal government with the powers of external sovereignty did not

---

[315] See Chadha, 462 U.S. at 944-45 (acknowledging that Congress was engrafting a "legislative veto" power onto legislation with increasing frequency, but noting that "[c]onvenience and efficacy are not the primary objectives – or the hallmarks – of democratic government" and concluding that the Court's "inquiry is sharpened rather than blunted by the fact that Congressional veto provisions are appearing with increased frequency . . ."); Clinton, 524 U.S. 417 (holding that the Line Item Veto Act violated the Presentment Clause, and that "if there is to be a new procedure in which the President will play a different role in determining the final text of what may 'become a law,' such change must come not by legislation but through the amendment procedures set forth in Article V of the Constitution").

[316] The Supreme Court has never been called upon to determine whether a particular international agreement was invalid because of a failure to adhere to Treaty Clause procedures. The only federal court case to have directly addressed the issue is Star-Kist Foods, Inc. v. United States, 275 F.2d 472 (C.C.P.A. 1959), which is briefly discussed by both parties, infra.

depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality . . . The power to acquire territory by discovery and occupation, the power to make such international agreements as do not constitute treaties in the constitutional sense, none of which is expressly affirmed by the Constitution, nevertheless exist inherently inseparable from the conception of nationality.

299 U.S. 304, 318 (1936) (citations omitted) (emphasis added). The suggestion that international agreements not constituting treaties in the constitutional sense may be entered into by the federal government is confirmed as to executive agreements, argues the Government, by the Court's decisions in United States v. Belmont and United States v. Pink.

In 1918, the President, purportedly pursuant to his Article II enumerated powers, signed an international compact with the Soviet Union known as the Litvinov Assignment. The purpose of the agreement was to bring about a final settlement of the claims and counterclaims between the Soviet government and the United States. Under the agreement, the Soviet Union agreed not to directly pursue claims against American nationals. Rather, the agreement released and assigned all such claims to the United States with the understanding that the United States would duly notify the Soviet government of all amounts realized from such release and assignment. In United States v. Belmont, 301 U.S. 324 (1937), the Court was called upon to determine the validity of the agreement. Belmont's estate sought to recover a sum of money that had been deposited with Belmont, a private banker, by a Russian corporation that was nationalized under the agreement. Noting that it "may not be doubted" that "the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President," the Court held that:

The assignment and the assignments in connection therewith did not, as in the case of treaties, as the term is used in the treaty making clause of the Constitution (Art. II, § 2), require the advice and consent of the Senate.

A treaty signifies 'a compact made between two or more independent nations with a view to the public welfare.' B. Altman & Co. v. United States, 224 U.S. 583, 600. But an international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations. See 5 Moore Int. Law Digest, 210-221.

301 U.S. at 330.

Five years following its <u>Belmont</u> decision, the Supreme Court, in <u>United States v. Pink</u>, considered the question of whether, even though it was not an Article II treaty, the Litvinov Assignment superseded state law. The Court held that "[i]nternational compacts and agreements as the Litvinov Assignment have a similar dignity," under the Supremacy Clause, U.S. Const. Art. VI, cl. 2., to that of a treaty.[317]

The Government argues that the Court has also addressed the question of whether the Congress and the President, acting jointly, may conclude international agreements through non-Treaty Clause procedures. In <u>Weinberger v. Rossi</u>, 456 U.S. 25 (1982), the Court reviewed an employment statute that made it illegal to discriminate against U.S. citizens on military bases overseas unless permitted by "treaty." At least twelve agreements negotiated with the government of the Phillippines provided for the preferential hiring of local nationals on United States military bases overseas. The agreements were all negotiated by the President in conjunction with legislation passed by Congress. The issue was whether the word "treaty" in the employment statute included the agreements concluded by the President pursuant to the authority conferred by Congress, or was limited to duly-ratified Article II treaties. The Court held that:

> The word "treaty" has more than one meaning. Under principles of international law, the word ordinarily refers to an international agreement concluded between sovereigns regardless of the manner in which the agreement is brought into force. Under the United States Constitution, of course, the word "treaty" has a far more restrictive meaning.

456 U.S 25, at 29-30 (citation omitted). However, in a related footnote, the Court stated:

> We have recognized . . . that the President may enter into certain binding agreements with foreign nations without complying with the formalities required by the Treaty Clause of the Constitution, even when the agreement compromises commercial claims between United States citizens and a foreign power. Even though such agreements are not treaties under the Treaty Clause of the Constitution, they may in appropriate circumstances have an effect similar to treaties in some areas of domestic law.

---

[317] <u>Belmont</u>, 301 U.S. at 230.

456 U.S. at 30 (citations omitted).

Hence, the Government concludes that the Supreme Court has expressly recognized the existence and validity of international agreements ranging from sole executive agreements to executive agreements passed pursuant to legislative authority.

### b. Bicameral Legislation in the Area of International Trade

The Government, citing Field v. Clark, 143 U.S. 649 (1892) and B. Altman & Co., next maintains that Supreme Court decisions have held that Congress can approve international trade agreements through bicameral legislation without violating the Treaty Clause. In Field v. Clark, the Court considered a challenge to section 3 of the McKinley Tariff Act of 1890 on the basis that it unconstitutionally delegated both legislative and treaty making power to the President. The Act, as noted supra, gave the President the authority to enter into comprehensive trade negotiations with foreign nations, allowed him to permit certain products into the country duty-free, and allowed him to suspend such status when foreign nations failed to adequately reciprocate such treatment. In deciding that the Act constituted a permissible grant of authority, the Court stated:

[T]he third section [of the Act] is not an entirely new feature in the legislation of Congress, but has the sanction of many precedents in legislation. While some of these precedents are stronger than others, in their application to the case before us, they all show that, in the judgment of the legislative branch of the government, it is often desirable, if not essential, for the protection of the interests of our people against the unfriendly or discriminating regulations established by foreign governments, in the interest of their people, to invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations.

143 U.S. at 691. Based on this reasoning, the Court also rejected the plaintiff's assertion that the Act unconstitutionally invested the President with treaty-making power.

In B. Altman & Co., the Supreme Court was presented with an appeal in which the appellants contended that a forty-five percent ad valorem duty on a bronze bust imported from France should not have been assessed under ¶ 193 of the Tariff Act of 1897, but rather a mere fifteen percent duty should have been assessed on the bust under a commercial reciprocal agreement with France regarding statuary. Prior to addressing this issue, the Court was confronted with the question of

whether it enjoyed jurisdiction to hear the appeal under § 5 of the Circuit Court of Appeals Act of March 3, 1891.[318] That section stated that "appeals or writs of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court . . . [i]n any case in which the constitutionality of any law of the United States, or the validity of or construction of any treaty made under its authority, is drawn in question." Although the Court did not address the constitutionality of the legislation that purportedly authorized the conclusion of the agreement, the Government argues that it (the Court) implicitly acknowledged that the legislation and agreement were valid in stating: "If not technically a treaty requiring ratification, nevertheless it was a[n] [international] compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of the President."[319]

---

[318] The Court first noted that, were the claim in the action merely a challenge to the Tariff Act of 1897, it would lack jurisdiction, because the constitutionality of the Tariff Act would not be the matter at issue. 224 U.S. at 599-600. However, the Court noted that the appellant's claims also brought into question a construction of the term "statuary" in the reciprocal agreement concluded between the United States and France under the authority of § 3 of the Tariff Act of 1897 and that if the reciprocal agreement was a treaty within the meaning of § 5 of the Circuit Court of Appeals Act, then the Court would have jurisdiction. Id. at 600.

[319] Id. at 601. The Court's complete discussion of the issue stated as follows:
    Generally, a treaty is defined as 'a compact made between two or more independent nations, with a view to the public welfare.' 2 Bouvier's Law Dict. 1136. True, that under the Constitution of the United States the treaty-making power is vested in the President, by and with the advice and consent of the Senate, and a treaty must be ratified by a two-thirds vote of that body (art. 2, § 2), and treaties are declared to be the supreme law of the land (art. 6); but we are to ascertain, if possible, the intention of Congress in giving direct appeal to this court in cases involving the construction of treaties. As is well known, that act was intended to cut down and limit the jurisdiction of this court, and many cases were made final in the circuit court of appeals which theretofore came to this court, but it was thought best to preserve the right to a review by direct appeal or writ of error from a circuit court in certain matters of importance, and, among others, those involving the construction of treaties. We think that the purpose of Congress was manifestly to permit rights and obligations of that character to be passed upon in the Federal court of final resort, and that matters of such vital importance, arising out of opposing constructions of international compacts, sometimes involving the peace of nations, should be subject to direct and prompt

Field v. Clark and B. Altman & Co., according to the Government, constitute Supreme Court precedent in favor of the conclusion that the President, pursuant to Congress's authority, may conclude international trade agreements without reference to the Treaty Clause. The Government also points to the decision of the U.S. Court of Customs and Patent Appeals in Star-Kist Foods, Inc. v. United States, Star-Kist Foods, Inc. v. United States, 275 F.2d 472 (C.C.P.A. 1959), where the court held that a trade agreement executed by the President pursuant to the Trade Act of 1934 was a valid exercise of Congress's delegated Foreign Commerce Clause powers together with the President's inherent powers and did not require separate ratification as a treaty, even if commercial treaties might also have covered the same subject matter.

### c. Overlapping Authority – Legitimate Uses of Alternative Procedures

Finally, as noted above, the Government argues that the Supreme Court has determined that resort to the Treaty Clause is not mandatory when Treaty Clause authority overlaps with authority apparently allowing approval through alternative procedures. Further, citing Dames & Moore v. Regan, 453 U.S. 654 (1981), the Government argues that even where particular matters have traditionally been dealt with via Treaty Clause procedures, subsequent use of alternative means of approval has been sustained by the Court. In Dames & Moore, the Court upheld President Carter's suspension of claims pending in U.S. court against Iran as required by the Algiers Accord and various

---

review by the highest court of the nation. While it may be true that this commercial agreement, made under authority of the tariff act of 1897, § 3, was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the representatives of two sovereign nations, and made in the name and on behalf of the contracting countries, and dealing with important commercial relations between the two countries, and was proclaimed by the President. If not technically a treaty requiring ratification, nevertheless it was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President. We think such a compact is a treaty under the circuit court of appeals act, and, where its construction is directly involved, as it is here, there is a right of review by direct appeal to this court.

*Id.* at 600-01.

executive orders. The Court found that, in light of Pink, "prior cases . . . have recognized that the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate."[320]  The Court also stated that:

> [T]he United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries. Though these settlements have sometimes been made by treaty, there has also been a longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate.

Id. at 679.  Thus, claims the Government, the Court recognized and condoned the concurrent applicability of the Treaty Clause and alternative means of approval.

In addition to citing the Supreme Court's holdings on this issue, the Government cites the D.C. Circuit's decision in Edwards v. Carter.  The issue in Edwards was whether the Property Clause, Art. IV, § 3, cl. 2, which commits to the Congress the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," prevented the President and the Senate from using the Treaty Clause power to transfer ownership of the Panama Canal.  In addressing the issue, the court found that:

> The grant of authority to Congress under the Property Clause states that "The Congress shall have Power . . ." not that only the Congress shall have power, or that the Congress shall have exclusive power.  In this respect the property clause is parallel to Article I, § 8, which also states that "The Congress shall have Power . . ."  Many of the powers thereafter enumerated in § 8 involve matters that were at the time the Constitution was adopted, and that are at the present time, commonly the subject of treaties.  The most prominent example of this is the regulation of commerce with foreign nations, Art. I, § 8, cl. 3, and appellants do not go so far as to contend that the treaty process is not a constitutionally allowable means for regulating foreign commerce.  It thus seems to us that, on its face, the Property Clause is intended not to restrict the scope of the Treaty Clause, but, rather, is intended to permit Congress to accomplish through legislation what may concurrently be accomplished through other means provided in the Constitution.

580 F.2d at 1057-58.  The Government contends that an analogous argument can and should be made with regard to the relationship between the foreign affairs and commerce powers of Congress and the President, as outlined above, and the Treaty Clause.

---

[320] 453 U.S at 682.

The Government argues that in order to find that Congress lacked the authority to pass the Implementation Act pursuant to its power to regulate commerce, this court would have to ignore Supreme Court decisions like Wickard v. Fillburn, 317 U.S. 11 (1942), construing the scope of the interstate commerce clause and cases such as United States v. 12,000-Ft. Reels of Super 8MM Film, 413 U.S. 123 (1973), characterizing the Congress's foreign commerce power as "broad," "plenary," and "complete."[321] Congress's power in regulating commerce is further bolstered, argues the Government, by the fact that, as noted above, federal legislation passed pursuant to Congress's enumerated powers is constitutional despite its potential impact on the States and by the fact that "in the unique context of foreign commerce . . . a State's power is further constrained because of the 'special need for federal uniformity.'"[322]

The plaintiffs have failed, according to the Government, to cite any legal authority indicating that Congress's Commerce Clause authority is insufficient to sustain its implementation of NAFTA. The Government argues that plaintiffs' reliance on the Thornton case is misplaced. In Thornton, the Supreme Court dealt with the question of whether the power granted to each House of Congress to judge the "Qualifications of its own Members," U.S. Const. art. I, § 5, cl. 1, included the power to add a term limit qualification to those expressly outlined in the Constitution and was called upon to review whether state constitutional amendments placing terms limits on Members of Congress

---

[321] The Government also notes the Supreme Court's comment that "there is evidence that the Founders intended the scope of the foreign commerce power to be greater than" Congress's power to regulate commerce "among the several states." Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448 (1979).

In addressing the legitimacy of a challenge to Congress's authority to enact legislation implementing the GATT Uruguay Round Agreements, agreements with a scope and importance similar to that of NAFTA, the Office of Legal Counsel stated that a such a challenge "would be a radical attack upon the modern understanding of federal power: it would be an attempt to carve out of the scope of the Commerce Clause matters that are part of or closely related to the Clause's core meaning, which is that Congress can control the conditions of all trade and commerce that affect more states than one." OLC Mem. # 1, at 6.

[322] Barclays Bank PLC v. Franchise Tax Board of Cal., 512 U.S. 298, 311 (1994) (quoting Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1, 18 (1986)).

transgressed an identifiable textual limit in the U.S. Constitution.[323] The Thornton Court held that states may not impose qualifications for offices of United States Representatives or United States Senators in addition to those set forth by the Constitution.[324] The Government argues that Thornton is distinguishable from this case in that Thornton involved identifiable and express provisions within the Constitutional text that were not countervailed by other provisions within the Constitution. In this case, the Government argues, Congress's Commerce Clause authority, combined with the Constitution's other grants of authority to both the President and Congress, are sufficient to legitimize the action taken.

The Supreme Court's decision in I.N.S. v. Chadha found Article I's provisions for bicameral passage of legislation and presentment to the President to be "[e]xplicit and unambiguous." 462 U.S. at 945. The Government contends that there is no "[e]xplicit and unambiguous" grant of exclusive authority in this case. Further, the Government notes that Chadha should not be construed to suggest that longstanding practice is irrelevant in interpreting constitutional provisions in light of the Court's statement in United States v. Midwest Oil Co., 236 U.S. 459, 473 (1915), that "in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself – even when the validity of the practice is the subject of investigation."

### 6. Plaintiffs' Argument Regarding Federal Court Decisions and Exclusivity

The plaintiffs argue that the Curtiss-Wright decision fails to bolster the Government's contentions not only because the only portions of the decision concerning international agreements are dicta, but because even those portions of Justice Sutherland's decision that do discuss the use of international agreements are meant to refer only to those international agreements not constituting treaties in the constitutional sense.

The issue in the Curtiss-Wright case was whether the President had the power, with

---

[323] 514 U.S. 779, at 787 (1995).

[324] Thornton, 514 U.S. 779.

congressional authorization, to impose an arms embargo on the nations of Bolivia and Paraguay. The case did not involve any international agreement. However, in dicta, Justice Sutherland referred to "the power to make such international agreements as do not constitute treaties in the constitutional sense."[325] The plaintiffs note that Justice Sutherland cited Crandall, Treaties, Their Making and Enforcement, 2d ed., p. 102 and note 1, in support of this proposition. The cited page states that the President has the authority to make "temporary arrangements and administrative agreements . . . with foreign governments, which are not submitted to the Senate for its approval." The cited footnote states that "[the conduct of foreign relations] involves intercourse, oral and written, conferences, administrative agreements and understandings, not included in the generic word 'treaty', as used in the Constitution." The plaintiffs submit, based on these passages, that Justice Sutherland's Curtiss-Wright language was intended to refer to only a narrow category of "international agreements [that] do not constitute treaties in the constitutional sense." They note that prior to ascending to the Bench, Justice Sutherland had written that "international agreements which are not treaties in the full constitutional sense, are perhaps confined to such as affect administrative matter, as distinguished from policies, and those which are of only individual concern, or limited scope and duration, as distinguished from those of general consequence and permanent character."[326] Thus, according to the plaintiffs, Justice Sutherland's dicta, even if given consideration, should be viewed to refer only to a limited set of agreements and not as a general justification for the replacement of the Constitutional "treaty" with other types of international agreements.

The plaintiffs note that in Weinberger, the Court made no effort to define what constitutes a treaty for the purposes of the Treaty Clause because the question was not at issue in the case – the issue was one of statutory construction. Further, although the Weinberger court did state that "the President may enter into certain binding agreements with foreign nations without complying with the

---

[325] 299 U.S. at 318.

[326] George Sutherland, Constitutional Power and World Affairs 121 (1919).

formalities required by the Treaty Clause," the Court went on to state that the President could do so only with respect to "agreements [that] are not treaties under the Treaty Clause of the Constitution."[327]

The Government's reliance on Dames & Moore, Belmont and Pink is also misplaced, according to the plaintiffs, arguing that those cases deal with and are clearly limited to the issue of claims settlement – one of the two recognized exceptions to the exclusivity of the Treaty Clause. The plaintiffs claim that the language in those cases provides support only for the contention that the President has authority, pursuant to his powers to recognize foreign governments and to normalize relations with foreign powers, to settle the claims of the United States and its citizens with respect to foreign nations and that none of the language used in the three cases provides support for the contention that the President may, under any other circumstances, bypass the Treaty Clause in favor of an alternative procedure.

In B. Altman, argue the plaintiffs, the only question presented was whether a dispute as to the construction of the agreement was appealable to the Supreme Court under a statute allowing such appeals where the "construction of any treaty" was at issue. The implications of the Court's language in B. Altman are, according to the plaintiffs, similar to those of the Curtiss-Wright case. The plaintiffs argue that, by noting that the agreement at issue in the case was "not a treaty possessing the dignity of one requiring ratification by the Senate . . .," the B. Altman court clearly implied the existence of treaties that do possess the dignity of agreements requiring Senate ratification. Thus, citing Ackerman and Golove, the plaintiffs contend that B. Altman "did not constitute . . . an effort to make substantive law and vindicate the constitutional interchangeability of treaties and congressional-executive agreements."[328] Notable, according to the plaintiffs, is the fact that the agreement considered in B. Altman was later determined by the United States to be unenforceable because it had

---

[327] 456 U.S. at 30 n.6.

[328] Ackerman and Golove at 831.

not been ratified as a treaty.[329]

The Supreme Court's Field v. Clark opinion is also inapplicable to this case, according to the plaintiffs. They again point out that the McKinley Tariff, considered in Field, delegated no agreement-making authority to the President. The plaintiffs further note that although the government did negotiate several agreements allegedly under the authority of the Act, none of those agreements were before the Court. Thus, all that was at issue was the authority of the President to reduce tariffs by proclamation as opposed to agreement.[330]

The Supreme Court's decision in the Head Money Cases, argue the plaintiffs, is completely irrelevant to the issues in this case. The Government appears to suggest that if Congress can override a treaty with later legislation, Congress should be able to engage in the treaty-making process. The plaintiffs argue that the abrogation of treaties is a completely different matter from the ratification of treaties. Thus, in Goldwater v. Carter, Justice Rehnquist's concurring opinion stated that "while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to that body's participation in the abrogation of a treaty."[331] The plaintiffs contend that to the extent the Head Money Cases have any relevance to this action, they support the view that the Treaty Clause should be read exclusively, since the Court distinguishes between treaties, "made by the President and the Senate," and statutes, "made by the President, the Senate and the

---

[329] Protocol Respecting Commerce, May 28, 1898, U.S.-Fr., T.S. No 98. This agreement stated that it was agreed upon "in accordance with the provisions of Section 3 of the United States Tariff Act of 1897." The agreement did not commit to any particular duration, and it was terminated by the United States in 1909 when a new tariff law took effect. 7 Bevans 857. The French Government objected to the termination because the agreement contained no termination provision, but the State Department replied that termination was implicit "in the absence of enabling legislation by Congress." V Green H. Hackworth, Digest of International Law 429 (1943).

[330] See Ackerman and Golove at 830-31.

[331] 444 U.S. 996, 1003 (1979) (Rehnquist, J., concurring in judgment).

House of Representatives."[332]

The plaintiffs also dispute the Government's characterization of lower court decisions, noting that the D.C. Circuit's Edwards v. Carter decision expressly recognizes that the Framers adopted the Treaty Clause's supermajority requirement as a check on certain kinds of government action.[333] The plaintiffs argue that the reasoning of the Edwards decision applies only to the relationship between the Property Clause and the Treaty Clause and that the court's passing reference to the Foreign Commerce Clause does not suggest that Congress is free to adopt international commercial agreements that amount to treaties via mere legislation.

The plaintiffs argue that the Government's contention that other constitutional powers are co-equal to the supermajority requirement is similar to the argument made in Thornton. In Thornton it was argued that the qualifications for federal office contained in the Qualifications Clause could be altered by Congress pursuant to the Elections Clause. The Supreme Court dismissed that argument:

> Petitioners would have us believe . . . that even as the Framers carefully circumscribed congressional power to set qualifications, they intended to allow Congress to achieve the same result by simply formulating the regulation as a ballot access restriction under the Elections Clause. We refuse to adopt an interpretation of the Elections Clause that would so cavalierly disregard what the Framers intended to be a fundamental constitutional safeguard.

514 U.S. at 832. Plaintiffs maintain that the "fundamental constitutional safeguard" argument applies with equal force in this case, contending that the federal government is not free to disregard the Treaty Clause requirements by invoking other powers, less directly related to international agreement-making, to accomplish the same result. Thus, according to the plaintiffs, the Government's broad conception of congressional and presidential powers as replacements for the authority granted by the Treaty Clause is misguided.

Plaintiffs argue that no case has endorsed the proposition that the Treaty Clause may be ignored wherever an international agreement deals with foreign commerce. As agreed by the parties,

---

[332] Head Money Cases, 112 U.S. at 599.

[333] 580 F.2d at 1060.

the only case directly dealing with the validity of an international agreement in light of its approval through means other than the Treaty Clause is <u>Star-Kist Foods, Inc. v. United States</u>. The plaintiffs argue that, in addition to lacking status as controlling authority, the <u>Star-Kist</u> holding fails to provide substantial support for the Government's position. The plaintiffs claim that although the <u>Star-Kist</u> court did reject the argument that the provisions of a reciprocal tariff agreement with Iceland reducing import duties were invalid because the agreement was not ratified as a treaty, the court's two-page discussion involves very little analysis in support of its conclusion. Further, plaintiffs note that the court cited only <u>B. Altman</u>, <u>Curtiss-Wright</u>, <u>Belmont</u> and <u>Pink</u> as support for its conclusion, concluding without further discussion, that the agreement at issue was valid. Given the court's scant analysis, the plaintiffs argue, it is difficult, if not impossible, to determine the intended scope of the court's ruling. The plaintiffs also argue that, given their discussion of the above-noted cases, the court's reliance on those cases for its determination must have been based on a gross misreading of the Supreme Court's holdings in each of them. As the court failed to provide any other basis for its conclusion, the plaintiffs argue, the court's holding is left without support and should, therefore, be ignored.

## C.    Fourth Conclusion of the Court

In early discussions with the parties, I framed the issues as stated above on page three. The parties generally agreed with this statement, including the two questions addressing the merits being:

(4)    Do NAFTA and the Implementation Act constitute a "treaty" as contemplated by Article II, Section 2 of the Constitution?

and

(5)    Even if NAFTA and the Implementation Act constitute a "treaty" as contemplated by Article II, Section 2 of the Constitution, was the making and implementation of NAFTA authorized under other provisions of the Constitution?

On reflection and further analysis, I am of the opinion that question (4) is a somewhat academic question, an answer to which will provide little aid toward reaching an ultimate decision

in this case.[334]  Ironically, in the only significant area of agreement in the case, the parties apparently agree that the answer is "yes."    The defendant apparently suggests that there was an interchangeability of method by which NAFTA could have been completed, including pursuant to the Treaty Clause.  The plaintiffs argue that the only appropriate method of completing NAFTA was pursuant to the Treaty Clause.  Both sides apparently agree that NAFTA could have been completed by the President following the advice and consent approach of the Treaty Clause, and, thus, both sides apparently agree that NAFTA is a "treaty" as contemplated by the Treaty Clause.[335]

If I accept the apparent answers of the parties to question (4), the total issues, as to the merits of the case, collapse into question (5).  Perhaps, however, again ironically, the answer to (4) may not be as clear as the parties have suggested.  While this court and the parties have primarily discussed the issues from the perspective of whether the Treaty Clause provides the exclusive means of completing such agreements as NAFTA, there has been some suggestion that the enumerated powers of Congress, under the Commerce Clause and other clauses, coupled with the broad powers of the President in dealing with foreign nations, provide the exclusive authority for the completion of commercial treaties.

In view of the apparent agreement of the parties, I will not dwell on the issue, but will continue with some analysis as to the question.  There is no clear guidance from the Constitution or controlling authority as to whether NAFTA, considered either separately or in tandem with the

---

[334]Even if the answer is "no," the question still remains as to whether the President and Congress had the power(s) to put NAFTA into effect.  If the answer is "yes," I must still determine if the President and Congress had concurrent power(s) to do so.

[335]To the extent that the Government disagrees with the plaintiffs' "test" for determining what is a "treaty," the disagreement is apparently insignificant as to the final result.  Agreeing that NAFTA is a "treaty" within the contemplation of the Treaty Clause is not tantamount to agreeing that the Treaty Clause provided the exclusive means for its making and approval.  Perhaps the issue is not so much whether an agreement is or is not a "treaty," but whether the power to make it exists from one or more sources.  There may be instances in which Congress would not have the Constitutional power(s) to pass legislation and the agreement could only be completed under the Treaty Clause in order to be effective.

Implementation Act, constitutes a "treaty" as contemplated by the Treaty Clause. The Agreement is obviously an agreement with foreign nations. It is also clear that under international law the Agreement would be considered to be a treaty and there is no clear distinction between what constitutes a treaty under international law as opposed to a treaty "in the constitutional sense."[336] It appears to be accepted that there are agreements "in the constitutional sense" which fall within the contemplation of the Treaty Clause. The Supreme Court has stated that, "[t]he treatymaking power is broad enough to cover all subjects that properly pertain to our foreign relations, . . ."[337] and that "[t]he treaty-making power of the United States is not limited by any express provision of the Constitution, and, though it does not extend 'so far as to authorize what the Constitution forbids,' it does extend to all proper subjects of negotiation between our government and other nations."[338] The

---

[336] I note that the Supreme Court, in Weinberger v. Rossi, stated that

The word "treaty" has more than one meaning. Under principles of international law, the word ordinarily refers to an international agreement concluded between sovereigns, regardless of the manner in which the agreement is brought into force. Under the United States Constitution, of course, the word "treaty" has a far more restrictive meaning.

456 U.S. 25, 29-30. The Court went on to cite the language of the Treaty Clause. However, although it recognized the distinction between the term as used in international law and as used in the Constitution, the Court's statement does nothing more than suggest that a "treaty," as the term is used with respect to the Constitution, is an international agreement that has been subjected to the Treaty Clause. It does not suggest that the substance of a "treaty in the constitutional sense" differs from that of an international "treaty." Even if the Court did suggest such a differentiation, it made no effort to clarify what the defining factors might be.

[337] Santovincenzo v. Egan, 284 U.S. 30, 40 (1931).

[338] Asakura v. City of Seattle, 265 U.S. 332, 341 (1924) (citing Geofroy v. Riggs, 133 U.S. 258, 266, 267; In re Ross, 140 U. S. 453, 463; and Missouri v. Holland, 252 U. S. 416). See also Holden v. Joy, 84 U.S. 211, 242-43 (1872)(stating that "Express power is given to the President, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur, and inasmuch as the power is given, in general terms, without any description of the objects intended to be embraced within its scope, it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty, if not inconsistent with the nature of our government and the relation between the States and the United States.")

Agreement is obviously an important agreement with neighboring nations. Its significance has been repeatedly heralded.[339]

Other than the possible exclusivity under Congress's enumerated powers, coupled with Presidential powers, I can think of only one substantial reason for concluding that the Agreement is not a Treaty Clause "treaty," the fact that it can be terminated on relatively short notice.[340] While it may be so terminated, the measures which it put in place have had and will likely continue to have long term consequences regardless of a later termination. These consequences could have been anticipated when the Agreement[341] was made. In The Geopolitical Constitution: Executive Expediency and Executive Agreements, 86 Calif.L.Rev. 671 (1998), Joel R. Paul, the author states:

> The distinction between treaties, agreements, and compacts appeared in the Articles

---

[339] As noted by Professor Quincy Wright:

. . . "importance" and "dignity" are hard words to define, but the United States annexed Texas and Hawaii, ended the first world war, joined the International Labor Organization, the Universal Postal Union and the Pan American Union, settled over ten billion dollars worth of post-World-War I debts, acquired Atlantic naval bases in British territory during World War II, acquired all financial claims of the Soviet Union in the United States, joined the United Nations pledging itself not to make separate peace in World War II and to accept the Atlantic Charter, submitted over a score of cases to international arbitration, and modified the tariff in numerous reciprocal trade agreements, by means other than the treaty-making process.

Wright, The United States and International Agreements, 38 Amer. J. Int'l Law 341, 343 (1944). The plaintiffs have made considerable efforts to distinguish the instances cited by Wright. Nonetheless, neither the Constitution nor the Supreme Court has provided any real guidance as to how significant the "importance" of a given agreement is in determining whether that agreement is or is not a "treaty."

[340] Professor Andrew T. Hyman of Lewis and Clark's Northwestern School of Law has argued that the 1987 U.S. Japan Nuclear Energy pact is invalid because it was not made and approved under the Treaty Clause. He further states that it is the "only such violation in United States history." Professor Hyman states that "International accords such as NAFTA . . . have also gone into effect without blatantly violating Article II, Section 2 of the Constitution, because such accords never represented long-term commitments. NAFTA . . . allow[s] the United States to withdraw upon six months 'notice.' " Denver Journal of International Policy, Vol. 23, No. 2, Spring 1995, pp. 315 and 320.

of Confederation, and in both early and subsequent drafts of the Constitution, suggesting that the Framers chose these words deliberately. This distinction would have been familiar to the Framers through the work of the mid-eighteenth century Swiss publicist Emerich de Vattel. Vattel's treatise, the Law of Nations or Principles of Natural Law, first published in French in 1755, was the most authoritative contemporary source of international law among the thirteen states. The Framers relied upon Vattel in constructing the Constitution's foreign relations powers.

Vattel outlined a temporal distinction between treaties and compacts or agreements. Vattel defined a treaty as "a pact made with a view [sic] to the public welfare by the superior power, either for perpetuity, or for a considerable time." By contrast, Vattel wrote,

The pacts with a view to transitory affairs are called agreements, conventions, and pactions. They are accomplished by one single act, and not by irritated oaths [repeated acts] [sic]. These pacts are perfected in their execution once for all: treaties receive a successive execution, the duration of which equals that of the treaty.

Thus, the Constitution's distinction between treaties, international agreements and compacts was deliberate, well-understood, and intended by the Framers in 1789. While treaties would bind the nation in perpetuity, agreements and compacts functioned like contemporaneous exchanges which imposed no future obligations on any party; agreements and treaties were not interchangeable.

86 Calf. L Rev. 671, 736-37 (footnotes omitted).

In The Federalist No. 64, John Jay says:

They who make laws may without doubt amend or repeal them, and it will not be disputed that they who make treaties may alter or cancel them; but still let us not forget that treaties are made not by only one of the contracting parties but by both, and consequently as the consent of both was essential to their formation at first, so must it ever afterwards be to alter or cancel them.

While the ability of a single party to terminate the Agreement was consented to by the parties at the time of the making of the Agreement, the ability of a party to unilaterally terminate on short notice at least suggests that there may not be a treaty in the Treaty Clause sense.

Again, not dwelling on the issue, it is reasonably arguable that the Foreign Commerce Clause and related enumerated powers in Article II, coupled with the President's foreign relations powers, provided the exclusive authority for completing NAFTA. In Treaties and Executive Agreements in the United States, Elbert M. Byrd, Jr. (1960), an extensive review of the subject, reference is made to the comments of one Francis Corbin at a ratifying convention. Byrd states:

Francis Corbin also agreed with Madison and Nicholas that the House would influence treaty making. But he added something more important: "In all commercial treaties, it will be necessary to obtain the consent of the representatives," because of the power given to Congress to regulate foreign trade. Here was posed a position which later threw the government into a dilemma: an interpretation of the enumerated powers of Congress as exclusive as against the treaty making agency [the President and two-thirds of Senators present].

Id. at p. 3.

While it is unquestionable that there are agreements which can be called commercial

"treaties," it is not so clear that all commercial "treaties" are "treaties" within the contemplation of

the Treaty Clause.[342] Byrd's work, supra, states:

On the same day, August 23[1987][at the Constitutional Convention], "Mr. Madison hinted for consideration whether a distinction might not be made between different sorts of treaties; allowing the President to make treaties . . . for limited terms, and requiring the whole Legislature in other treaties." It appears obvious from the above remark that there were in circulation ideas as to "different sorts of treaties." How those, "for limited terms" were to be distinguished from "other" treaties is, of course, conjectural but perhaps he would distinguish them on the basis of political and commercial. If this should be so, then the power given to Congress to regulate commerce with foreign nations would allow the approval of treaties by Congress ("the whole Legislature") when those treaties encompassed subjects provided for in the enumerated powers of Congress. "Treaties for limited terms,"' to be made by the President and Senate would, it seem, concern something not within the enumerated powers of Congress, and under this reconcilliation the treaty power would be a substantive power in its own right. This, admittedly, is a speculative interpretation; yet, it appears difficult to find another interpretation which would rationally explain Madison's remark on "different sorts of treaties," although it can always be said that it was a mere vague and impulsive utterance.

Id. at 19-20.

While NAFTA is likely a treaty, it may not be a "treaty," as contemplated by the Treaty

---

[342]Of course, all treaties of the United States must be "treaties in the Constitutional sense" under one or more powers. The real issue is what is the source of the powers?

Clause.[343] Nevertheless, I will assume that it is such. In any event, this suggestion adds weight to the argument that the Commerce Clause, coupled with the Necessary and Proper Clause and the President's foreign relations powers, provides sufficient authority for the completion of NAFTA, exclusive or not.

## D. Fifth and Final Conclusion of the Court

The most significant issue before the court is whether the Treaty Clause is an exclusive means of making an international agreement under the circumstances of this case.[344] It is clear that there is no explicit language in the Constitution which makes the Treaty Clause exclusive as to all international agreements.[345] On the other hand, the broad breadth of the Commerce Clause, particularly the Foreign Commerce Clause, has been repeatedly emphasized. The inability of the Congress under the Articles of Confederation to regulate commerce was one of the main weaknesses which led to the call of the Constitutional Convention. The Annapolis Convention of 1786 was called to discuss problems which had resulted from this weakness. This meeting, in turn, led to the Constitutional Convention. The Commerce Clause was clearly intended to address this concern. The "Power" to regulate commerce, foreign and interstate and with Indian Tribes, was specifically given to Congress. The Treaty Clause makes no specific reference to commerce of any type.

That the power to regulate commerce is plenary power is emphasized in Gibbons v. Ogden,

---

[343]For a summary of the uncertainties attendant to the Treaty Clause, see the Introduction to Treaties and Executive Agreements in the United States, Byrd (1960).

[344] At oral argument the parties agreed that the court has only two options: (1) declare the Agreement entirely valid; or, (2) declare the Agreement totally invalid.

[345] Under the Articles of Confederation, Congress had the "sole and exclusive right and power," with exceptions, to enter into treaties and alliances. Article IX. The Impeachment Clauses of the Constitution give sole powers to, respectively, the House and the Senate. These clauses indicate that the Founders and Framers knew how to grant sole powers. Further, I note that Article II, Section 2, states that the President "shall have power," not that he "shall have the power." The Treaty Clause, by its terms, is not exclusive and does not, by its terms, limit other enumerated powers of Congress.

22 U.S. 1 (1824). While <u>Gibbons v. Ogden</u> was primarily an interstate commerce case, the Court extrapolated from what the Court considered to be the recognized plenary nature of the power to regulate foreign commerce.

Chief Justice Marshall's opinion includes the following:

> [The Constitution] contains an enumeration of powers expressly granted by the people to their government. It has been said that these powers ought to be construed strictly. But why ought they to be so construed? Is there one sentence in the constitution which gives countenance to this rule? In the last of the enumerated powers, that which grants, expressly, the means of carrying all others into execution, Congress is authorized "to make all laws which shall be necessary and proper" for the purpose. <u>But this limitation on the means which may be used, is not extended to the powers which are conferred</u>; nor is there one sentence in the Constitution which has been pointed out by the gentlemen of the bar, or which we have been able to discern, that prescribes this rule. We do not, therefore, think ourselves justified in adopting it. What do gentlemen mean by a strict construction? If they contend only against that enlarged construction which would extend words beyond their natural and obvious import, we might question the application of the term, but should not controvert the principle. If they contend for that narrow construction which, in support of some theory not to be found in the constitution, would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument; for that narrow construction, which would cripple the government and render it unequal to the objects for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent; then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the constitution is to be expounded.

Gibbons, 22 U.S. at 187-88. (Emphasis added).

> The subject to be regulated is commerce; and our constitution being, as was aptly said at the bar, one of enumeration, and not of definition, to ascertain the extent of the power it becomes necessary to settle the meaning of the word.[346] The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. <u>It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.</u> The mind can scarcely conceive a system for regulating commerce between nations, which shall exclude all laws concerning navigation, which shall be silent on the

---

[346]I call attention to this being another case where the Supreme Court undertook to decide an indefinite issue.

Page -149-

admission of the vessels of the one nation into the ports of the other, and be confined to prescribing rules for the conduct of individuals, in the actual employment of buying and selling, or of barter.

Id. at 189-90. (Emphasis added).

. . . The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it. The convention must have used the word in that sense; because all have understood it in that sense, and the attempt to restrict it comes too late. . . .

Id. at 190.

To what commerce does this power extend? The constitution informs us, to commerce "with foreign nations, and among the several states, and with the Indian tribes."

It has, we believe, been universally admitted that these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend. It has been truly said, that commerce, as the word is used in the constitution, is a unit, every part of which is indicated by the term.

If this be the admitted meaning of the word, in its application to foreign nations, it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it.

But, in regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several states. It would be a very useless power if it could not pass those lines. The commerce of the United States with foreign nations, is that of the whole United States. (Emphasis added).

Id. at 193-94.

We are now arrived at the inquiry, What is this power?

It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at election, are, in this, as in many other instances, as that, for example of declaring war, the sole restraints on which they have relied, to secure

them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments.

Id. at 196-97 (emphasis added).

Thus, while the reason(s) for the existence and adoption of the Treaty Clause and its scope are debatable, the plenary scope of the Commerce Clause is clear.[347] There exists no reason to apply a limiting construction upon the Foreign Commerce Clause or to assume that the Clause was not meant to give Congress the power to approve those agreements that are "necessary and proper" in regulating foreign commerce.[348] It is impossible to definitively conclude that the Framers intended

---

[347]See California Bankers Ass'n v. Shultz, 416 U.S. 21 (1974) (Congress has plenary authority to regulate foreign commerce); Board of Trustees of University of Illinois v. U.S., 289 U.S. 48 (1933) (The power of Congress to regulate foreign commerce is exclusive and plenary, and its exercise may not be limited or impeded by state action). See also Katzenbach v. McClung, 379 U.S. 294 (1964) (The power of Congress in commerce field is broad and sweeping, and where it keeps within its sphere and violates no express constitutional limitation, Supreme Court will not interfere); Crutcher v. Commonwealth, 141 U.S. 47 (1891) (The power of Congress over interstate commerce is as absolute as it is over foreign commerce); U.S. v. Carolene Products Co., 304 U.S. 144, (1938) (The power to regulate commerce, like all others vested in Congress, is complete in itself, may be exercised to the utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution); Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334 (1937) (same); Briggs v. Sagers, 424 F.2d 130 (10th Cir. 1970), certiorari denied 400 U.S. 829 (Regulatory power of Congress, though limited to constitutionally defined matters, is plenary as to those matters).

[348] Professor Quincy Wright suggested that both Thomas Jefferson and James Madison viewed the Treaty Clause as nothing but a convenience, setting up an alternative to bicameral action when circumstances so required:

The position has recently been taken by Congressman Fulbright, as it was taken by Jefferson and by Madison at an earlier period, that the treaty-making power of the President and Senate was never intended to deprive Congress of the concurrent power to give effect to international agreements or to authorize international agreements on subjects within its delegated powers. In this particular case (the treaty-making power) a concurrence of two-thirds at least is made necessary, as a substitute or compensation for the other branch of the legislature, which on certain occasions could not be conveniently a party to the transaction." James Madison, "Helvidius" letter No. 1, Writings (Hunt Ed.), Vol. 6, p. 140; E.S. Corwin, The president's Control of Foreign Relations, p. 18; Sen. Merrick of Maryland, in Congressional Globe, Vol. 14 (1845), p. 322.

This opinion contends that while the requirements of secrecy, speed, and sectional

the regulation of foreign commerce to be subject to the rigors of the Treaty Clause procedure when commercial agreements with foreign nations are involved. Given the Court's language in Gibbons v. Ogden, the power of Congress to regulate foreign commerce with foreign nations is so extensive that it is reasonably arguable, as earlier discussed, that no "treaty" affecting commerce with foreign nations is valid unless adopted by Congress as a whole. In the absence of specific limiting language in or relating to the Treaty Clause, I am led to conclude that the Foreign Commerce power of Congress is at least concurrent with the Treaty Clause power when an agreement, as is the case here, is dominated by provisions specifically related to foreign commerce[349] and has other provisions which

---

policy made it "convenient' to give the President and Senate the power to make treaties, the Senate at that time being a small body evenly balancing the sections, it was expected that this power would only be employed when circumstances required, and would not affect the capacity of "the whole Congress" to use its constitutional powers, in order to justify the president in using his constitutional power to negotiate with foreign Governments.

The United States and International Agreements, 38 American Journal of International Law 341, 341-42 (1944). Professor Wright has further noted that:

It is unquestioned that explicit proposals to attach the House of Representatives to the treaty power were voted down. This historic fact, however, only proves that the Convention wished to make it possible for the President to make treaties without submission to the House. It does not prove that the Convention intended to prevent Congress from exercising its Constitutional powers to authorize or implement international agreements made by the President alone.

Id. at 350.

[349] The following dialogue took place at the oral argument before this court:

THE COURT: Is the bottom line your claim of injury under NAFTA is that by virtue of NAFTA businesses that were operating in the United States have moved to Mexico and/or Canada, and if those businesses had not moved their operations to Mexico and/or Canada they would have been still in the United States and employing people here who have lost jobs? Is that the –

MR. COLLINS [One of the Attorneys For Plaintiffs]: That's one. I think there are three main pieces. That's one. The second is that even for companies that have stayed in the U.S., the flood of imports from Mexico because of the tariff reductions and other things and because of the regulatory reductions, those have also cost jobs. And, thirdly, Made in the USA alleges that it's members wish to buy American products. And because these

are reasonably "necessary and proper" for "carrying all others into execution."[350] I am also persuaded

_____

companies either going to Mexico or being destroyed, they can no longer buy the American products. So those are the main aspects of it.

Transcript of Oral Argument of May 17, 1999, 88-89. I note that all these alleged injuries relate to foreign commerce and/or the "Power To lay and collect Taxes, Duties, Imposts and Excises" under the enumerated powers of Congress in Article I, Section 8. By way of analogy, I postulate the following. It is likely that, under a treaty made pursuant to the Treaty Clause, the President and two-thirds of the Senate could open the Mississippi River to navigation by the ships of Mexico and Canada. It is also likely that Congress, through legislation, could authorize an agreement to open the Mississippi River to navigation by the ships of Mexico and Canada by virtue of its power under the Foreign Commerce Clause, Gibbons v. Ogden making it clear that such navigation is considered commerce. I have not determined whether any such agreements are now or have ever been in effect.

[350] In United States v. Curtiss-Wright, 299 U.S. 304 (1936), Justice Sutherland makes the interesting statement that,

The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs . . . . It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers . . . to make treaties, . . . if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. . . .

Further,

As this court said in Mackenzie v. Hare (1915), "As a government, the United States . . . has the powers of nationality, especially those which concern its relations and intercourse with other countries. We should hesitate long before limiting or embarrassing these powers." (Emphasis in original).

Saying that the President has the power to make treaties by and with the advice and consent of the Senate is not saying that agreements with foreign nations cannot otherwise be made and implemented. The plaintiffs argue that nothing in the Constitution empowers Congress to enact as legislation an agreement with a foreign country. Citing Federalist No. 75 (Hamilton), they argue that the Framers believed that "contracts with foreign nations" could not be made through "the legislative authority . . . to enact laws." The Government does not contest the plaintiffs' assertion. However, it should be noted that the Supreme Court has upheld the power of Congress to delegate to the President the ability to negotiate and conclude agreements with foreign nations or to implicitly approve the President's actions with respect to such agreements. See Dames & Moore v. Regan, 453 U.S. 654, 668 (1981). Under such circumstances, the President is said to "exercise not only his powers but also those delegated by Congress," and has been allowed to conclude international agreements settling claims of United States citizens. Thus, although

by the language quoted hereinabove from <u>Edwards v. Carter</u> with reference to the concurrent power

under the Property Clause.[351] Further, I note that the President, in negotiating the Agreement in

connection with the fast track legislation, was acting pursuant to his constitutional responsibility for

---

Congress itself may not be empowered to conclude an international agreement, Congress may delegate its authority in a given field to the President, creating a combination of powers that allows the President to conclude an international agreement in an area otherwise reserved to Congress or where the President's authority might be questionable. Although the <u>Dames & Moore</u> Court recognized that "the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate" and that such power was particularly relevant to claims settlement, the Court stated that "[c]rucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement." 453 U.S. at 682-83, 680.

[351] Similarly, in <u>Holden v. Joy</u>, 84 U.S. 211, the Court, in construing the validity of a treaty entered into by the United States with the Cherokee nation, stated:

   ... [I]t is insisted that the President and Senate, in concluding such a treaty, could not lawfully covenant that a patent should issue to convey lands which belonged to the United States without the consent of Congress, which cannot be admitted. On the contrary, there are many authorities where it is held that a treaty may convey to a grantee a good title to such lands without an act of Congress conferring it, and that Congress has no constitutional power to settle or interfere with rights under treaties, except in cases purely political.

84 U.S at 247. The Court went on to find that the ultimate resolution of this question was unimportant for the purposes of the case at hand, while "the treaty in question [had] been fully carried into effect, and its provisions [had] been repeatedly recognized by Congress as valid." Id.

   Nonetheless, the Court's language may be instructive. Article IV, § 3, cl. 2 of the United States Constitution states that, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ." In finding that the President and Senate may, via the Treaty Clause, convey lands belonging to the United States, the Court held that the Treaty Clause may be used to do something that may also be done by Congress as a whole. In so doing, the Court effectively recognized that the Treaty Clause could be used in a non-exclusive manner with respect to the territory and property of the United States. Although the <u>Holden</u> Court's language may only negate the proposition that the Treaty Clause is wholly exclusive, it clearly illustrates the Court's recognition that a given result could be accomplished either through the Treaty Clause of Article II or the Territory Clause of Article IV. See also <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 679 (1981) (noting that, in settling claims of United States nationals against foreign countries, the United States has sometimes utilized the treaty process and has, at other times, settled "such claims by executive agreement without the advice and consent of the Senate.").

conducting the Nation's foreign affairs[352] and pursuant to a grant of authority from Congress.[353]

The foregoing, considered in light of at least some degree of presumption of constitutionality to which the Agreement is entitled,[354] leads me to ultimately conclude that NAFTA and the

---

[352] See Department of Navy v. Egan, 484 U.S. 518, 529 (1988) (recognizing "the generally accepted view that foreign policy was the province and responsibility of the Executive.") (quoting Haig v. Agee, 453 U.S. 280, 293-94 (1981)); Alfred Dunhhill of London, Inc. v. Republic of China, 425 U.S. 682, 705-06 n.18 (1976) ("the conduct of [foreign policy] is committed primarily to the Executive Branch"); United States v. Louisiana, 363 U.S. 1, 35 (1960) (President is "the constitutional representative of the United States in its dealings with foreign nations."). See also Robinson v. Harbert International, Inc., 743 F.Supp. 797 (N.D.Ala. 1989, aff'd without opinion, 912 F.2d 1423 (11th Cir. 1990) (holding that the President's authority in conducting foreign affairs includes the power to enter into certain binding agreements with foreign nations, such as the removal of United States jurisdiction over areas, without reference to the Treaty Clause procedures).

[353] Again, according to Youngstown, the President's power is at its pinnacle when he acts in concert with Congress. Youngstown, 343 U.S. 579, 635 (1952) (when the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress such that the President's action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation . . ."). See also Dames & Moore v. Regan, 453 U.S. 654, 668, 680 (1981) (upholding validity of an executive agreement settling claims between United States nationals and the Iranian government based, in large part, on the fact that Congress implicitly approved the President's action).

[354] "The wisdom and discretion of Congress, their identity with the people, and the influence which their constituents possess at election, are . . . the restraints on which the people must often rely solely, in all representative governments." Gibbons v. Ogden, 22 U.S. 1, 197 (1824).

The Supreme Court has repeatedly stated that acts of Congress are entitled to a presumption of constitutionality. Generally, the presumption has been expressly applied in situations where the Court was called on to determine whether congressional action was based rational judgment and permissible purposes or where a statute is subject to alternative interpretations, one of which is constitutional. Under such circumstances, the Court has found that it is accepted law that an act of Congress carries a presumption of constitutionality. See, e.g. Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); Pittman v. Home Owners' Loan Corp., 308 U.S. 21, 32-- 33, 60 S.Ct. 15, 84 L.Ed. 11 (1939). The Court has stated that, "Given the deference due 'the duly enacted and carefully considered decision of a coequal and representative branch of our Government,' we do not lightly second-guess such legislative judgments...." Bd. of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 251 (1990). Further, the Court has held that an Act of Congress will be invalidated only "for the most compelling constitutional reasons," Mistretta v. United States, 488 U.S. 361, 384 (1984). With

Implementation Act were made and approved in a constitutional manner.[355] One thing is clear. This

_____

respect to the interpretation of substantive statutory provisions, the Court has stated that the courts should favor that interpretation of a statute which serves to comply with the Constitution. See, e.g. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937); United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 82 (1932); Edmond v. United States, 520 U.S. 651 (1997).

The Court has extended this presumption to the examination of procedurally-related issues, but the weight given to the presumption is unclear. In introducing its analysis of whether the legislative veto provision of the Immigration and Nationality Act was constitutional, the Chadha Court stated: "We begin, of course, with the presumption that the challenged statute is valid." 462 U.S. at 944. The Court went on to state that:

When any branch [of the federal government] acts, it is presumptively exercising the power the Constitution has delegated to it. When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Article II. And when, as here, one House of Congress purports to act, it is presumptively acting within its assigned sphere.

462 U.S. at 951-52. The Court, however, simply treated this proposition as a starting point, eventually concluding that the Act was unconstitutional.

Similarly, in striking down the Line Item Veto Act in Clinton v. City of New York, the Court stated, "We do not lightly conclude that [Congress's] action was unauthorized by the Constitution." 118 S.Ct. 2091, 2107. As support for this statement, the Court, in a footnote, cited language from Justice Stevens' concurrence in Bowsher v. Synar:

When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons.

118 S.Ct. 2091, 2107 n.42 (quoting Bowsher, 478 U.S. at 736). Again, however, the Court did not further elaborate on how these considerations influenced their decision. Thus, although it is clear that NAFTA is entitled to some presumption of constitutionality, it is not clear how much weight that presumption is to be given.

[355] In reaching my conclusion, I do not accept a theory of total interchangeability. As the Supreme Court has stated, "[i]t is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could." Missouri v. Holland, 252 U.S. 416, 433 (1920). Further, the Justice Department has stated that it does not disagree with the premise that some agreements with foreign nations "may have to be ratified as treaties." Memorandum, Walter Dellinger, Asst. Atty Gen to Ambassador Michael Kantor, November 22, 1994. Similarly, while purportedly speaking on behalf of the Senate Judiciary Committee, Senator Dirksen, in 1956, rejected the "doctrine that treaties and executive agreements are wholly interchangeable." Senate Rep. No. 1716, 84th Congress, 2nd Session 9 (1956). Thus, there may exist circumstances where the procedures outlined in the Treaty Clause must be adhered to in order to adopt an international agreement. However, it is not entirely clear what those circumstances are. In any case, in light of Congress's

court does not have jurisdiction to review the wisdom of NAFTA or to determine whether it is in the best interest of the Nation.

Thus, I hold that the President had the authority to negotiate and conclude NAFTA pursuant to his executive authority and pursuant to the authority granted to him by Congress in accordance with the terms of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1126 (1988), codified at 19 U.S.C. § 2901, and section 151 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975), codified as amended at 19 U.S.C. § 2101 and as further approved by the Implementation Act. Within ten days the defendant will submit and serve a proposed judgment. Plaintiffs will have ten days thereafter to submit and serve objections as to form. The court will thereafter enter a final judgment.

This the 23rd day of July, 1999.


**ROBERT B. PROPST**

**SENIOR UNITED STATES DISTRICT JUDGE**

---

enumerated powers in the areas dealt with by NAFTA, I conclude that such circumstances are not present in this case. My opinion is limited to the area of foreign commerce and related enumerated powers coupled with Presidential power(s) and the powers under the Necessary and Proper Clause.